___

**SO ORDERED,**



*Judge Selene D. Maddox*

**United States Bankruptcy Judge**

The Order of the Court is set forth below. The case docket reflects the date entered.
___

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

IN RE: EXPRESS GRAIN TERMINALS, LLC         CASE NO. 21-11832-SDM

DEBTOR                                       CHAPTER 11

**MEMORANDUM OPINION AND ORDER FINDING THE INDIVIDUAL GRAIN CONTRACTS ARE SEVERABLE AND ARE NOT CONTRACTS FOR FINANCIAL ACCOMMODATIONS UNDER 11 U.S.C. § 365**

This matter came on for hearing on November 12, 2021 on the request of the Debtor, Express Grain Terminals, LLC ("Express Grain"). On November 12, 2021, Express Grain requested a brief status conference to address procedural issues surrounding the status of executory contracts to be accepted or rejected pursuant to the Court's prior Order *Establishing General Procedures* (Dkt. #177). During the status conference, the parties raised two issues surrounding the executory contracts: first, whether the Master Trade Agreement ("MTA") was the single executory contract to be assumed or rejected or whether each individual executory contract under

the MTA are those to be assumed or rejected; and second, whether such executory contract(s) is a "financial accommodation" under 11 U.S.C. § 365(c)(2)[1].

On November 15, 2021, the Court held a hearing on the *Motions to Assume Lease or Executory Contracts*, during which the Court instructed the parties to submit simultaneous briefs concerning one or both ancillary legal issues. The Court entered an *Order Setting Deadlines and Establishing Briefing Schedule for Ancillary Legal Issues* (Dkt. #1146) on the same day. The deadline to submit briefs concerning these two issues was November 22, 2021. In total, four briefs were submitted to the Court by the following parties: Farm Group I[2] (Dkt. #1177); the Farm Group (Dkt. #1179); Express Grain (Dkt. #1181); and UMB Bank (Dkt. #1182). The Court will address the parties' arguments in more detail below.

## I. JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief District Judge L.T. Senter and dated August 6, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), (M), and (O).

## II. FACTS AND PROCEDURAL HISTORY

Express Grain is a large grain terminal operating in several locations among the Mississippi Delta. The terminal functions in several ways, from physically storing crops (grain, soybeans, corn, sorghum, etc.) purchased by Express Grain from its contracted farmers[3], to operating as a

---

[1] Except where stated otherwise, all subsequent statutory references will be to Title 11 of the U.S. Code.

[2] Because of the number of farmers and their related entities involved in this bankruptcy case, the Court grouped and named certain farmers and farming entities together. For example, attorneys Walter Newman, Derek Henderson, and Eileen Shaffer represent the farmers and farming entities entitled the "Farm Group". Attorney Jim Spencer represents the farmers and farming entities entitled "Farm Group I".

[3] Express Grain contracts with farmers to purchase and store their grain through individual grain contracts titled "Grain Contract Confirmations," which are one- to two-page documents

"crushing facility" where certain delivered crops are processed to yield byproducts such as hulls, meal, and oil. Express Grain then sells the byproducts for a profit over and above the crop purchase price. Express Grain filed this Chapter 11 bankruptcy on September 29, 2021, a date that places the pendency of this bankruptcy in the middle of harvest season. As many farmers rely on the continued operation of Express Grain, the Court has prioritized the expeditious nature of the reorganization process while also keeping in mind many other competing interests present in this case.

On October 8, 2021, two farming entities—Bradley R. Hausner Farm and Jody Murphey Farms—filed an *Amended Emergency Motion Pursuant to 11 U.S.C. §§ 105, 365, and 557 for Entry of Order Setting Deadline and Procedures for Debtor to Accept or Reject Certain Pre-Petition Grain Contracts* (Dkt. #59). These two entities sought, among other things, for an expedited determination that the grain contracts were executory in nature and, if so, for the setting of an immediate deadline for Express Grain to assume them. A *Response* was filed by Express Grain on October 11, 2021 (Dkt. #94) in which Express Grain agreed that the setting of a deadline to assume or reject the grain contracts was reasonable. A hearing on the *Amended Emergency Motion* was held on October 12, 2021, and the Court entered an *Order Partially Granting Amended Emergency Motion* (Dkt. #102) on the same day.

The Court's Order determined the status of the contracts as "executory" under § 365 and set out deadlines for Express Grain to assume or reject the executory contracts. Express Grain had

---

containing an agreed-upon price, commodity description, quantity, destination, the contract date of execution, and "terms and conditions." As certain parties contend, the MTA seemingly contemplates the ongoing contractual relationship between Express Grain and the farmers through these individual contracts, referring to them as "various transactions (collectively "Contracts")." It is these individual contracted transactions, as well as the MTA, that are at issue in this Opinion and Order.

up to and including November 1, 2021 to either assume or reject the executory contracts and, should Express Grain have chosen to assume any of the executory contracts, Express Grain was to provide the parties to the executory contracts proof of adequate assurance of performance of both the monetary and non-monetary requirements of the executory contracts. The Court reset the remainder of the *Amended Emergency Motion* seeking alternative relief to October 15, 2021.

On October 15, 2021, the Court held a hearing on the remaining issues in the *Amended Emergency Motion* and entered an *Order Establishing General Procedures and Resolving Remaining Issues of Amended Emergency Motion* (Dkt. #177). The Order outlined the acceptance and rejection process and maintained the original scheduled deadlines, with two additions: (1) the movants or other parties to the executory contracts had up to and including November 8, 2021 to challenge Express Grain's acceptance of any contract, and (2) the Court would set a hearing regarding such challenges no later than November 15, 2021.

Express Grain began filing its motions to assume the executory contracts (the "Motions to Assume") on October 22, 2021, and by the deadline of November 1, 2021, Express Grain filed over 100 Motions to Assume the executory contracts of various farming entities. Several parties, including farming entities and crop production lenders, filed responses and objections to many of the Motions to Assume through and including November 8, 2021. Due to the voluminous nature of the responses and objections, the Court will not address every detail of those responses and objections; however, certain responses and objections contained arguments that (1) the executory contracts were a part of a "single contract," i.e., the MTA, and (2) that the executory contracts are actually contracts for "financial accommodations" under § 365(c)(2).

On November 12, 2021, Express Grain requested a brief status conference with several attorneys representing farming entities to discuss the procedural development of the assumption

and rejection process. During this status conference the same two issues were brought to the Court's attention by several parties. At that time, the Court deemed it necessary to allow the parties to brief these two issues and, at the November 15, 2021 hearing on the Motions to Assume, the Court instructed any party wishing to join in the discussion of one or both issues to submit simultaneous briefs to the Court. Following the hearing, the Court entered an *Order Setting Deadlines and Establishing Briefing Schedule for Ancillary Legal Issues* (Dkt. #1146). The deadline to submit briefs concerning these two issues was November 22, 2021. The arguments presented by each briefing party are as follows:

*Farm Group I*

Farm Group I presented several arguments with respect to the issue regarding the MTA. Specifically, Farm Group I asserted that Express Grain drafted the MTA to build a relationship with each farmer as "a single contract with different transactions, defined as 'Contracts,' for the sale of grain." Farm Group I argues that these "contracts" are not severable from the MTA, citing *In re Dowdy*, 2015 WL 393412 (Bankr. S. D. Miss. 2015) in support of this argument. The contracts, Farm Group I asserts, are not severable for three reasons: (1) the payment terms are set forth in the MTA rather than the individual grain contracts; (2) the contract terms for "basis contracts" and "hedge to arrive contracts" are defined in the MTA rather than the individual grain contracts; and (3) the existence of a "netting" provision related to Express Grain's right to net various contracts of the farmers. Finally, Farm Group I argues that, even in the absence of the MTA, "the parties have treated their relationship as a single contract with different transactions." Farm Group I did not address the second issue regarding 11 U.S.C. § 365(c)(2).

*The Farm Group*

The Farm Group addressed both issues somewhat simultaneously in its brief. With respect to the first issue, the Farm Group argues the only way the Court can determine which contracts to allow Express Grain to assume is by looking at the MTA. The MTA, in other words, is what determines the relationship between the parties and includes some key provisions, like pricing, not included in the individual grain contracts. Further, the Farm Group argues that the MTA is "a form" created solely by Express Grain that "favors the Debtor" but "clearly puts the burden of financial accommodation on the Farmers."

Next, the Farm Group argues that, by assuming the individual grain contracts under § 365, Express Grain is attempting to subvert the postpetition financial arrangements required under § 364 of the Bankruptcy Code. Specifically, the Farm Group argues that Paragraph 8[4] of the MTA is "clearly a financial accommodation" that renders the individual grain contracts "credit agreements" that may not be assumed in bankruptcy regardless of the desires of the parties. Thus, parties wishing to continue such an arrangement are subject to § 364 concerning obtaining credit, and such parties "will not be permitted to emasculate the postpetition financing requirements" of § 364 by utilizing contract assumption under § 365. The Farm Group concludes this argument by stating that § 365(c)(2) renders a loan agreement requiring further advances by a lender nonassumable and, similarly, disallows the assumption of contracts involving financial accommodations. In support of these arguments, the Farm Group cites to *In re Sportsman's Warehouse Inc.*, 457 B.R. 372 (Bankr. D. Del. 2011), *In re Sun Runner Marine*, 945 F.2d 1089

---

[4] "Customer acknowledges that Contracts involve financial risks which Customer will independently evaluate prior to entering into Contracts. Customer accepts the financial consequences of Contracts."

(9th Cir. 1991), *In re Postle Enterprises, Inc.*, 48 B.R. 721 (Bankr. D. Ariz. 1985) and *In re Cole Bros, Inc.*, 154 B.R. 689 (W.D. Mich. 1992).

The Farm Group concludes its brief with an argument advocating for the enforcement of a Uniform Commercial Code ("UCC") provision that allows the seller of a contract the right to discontinue delivery if the seller discovers the buyer is insolvent, or at least until the buyer can provide adequate assurance of performance. The Farm Group maintains that § 365(e), the Bankruptcy Code section that prevents modification or termination of a contract based on insolvency, does not preclude this result because the sellers, i.e., the farmers, are basing their demand for payment or adequate assurance on applicable nonbankruptcy law.

*Express Grain*

Express Grain addressed both issues in its brief, asserting that (1) the MTA cannot be the contract to be assumed or rejected based on the parties' prior course of business, and (2) the contracts are not for financial accommodations because of the narrow interpretation of that phrase and based on a prior Order of this Court. With respect to the first issue, Express Grain argues that it has identified a "relatively small" number of MTAs in connection with the individual grain contracts and that, upon a review of its motions to assume, it has only found executed MTAs connected to the individual contracts at docket numbers 251, 253, 410, 487, 607, and 925. In addition, the course of business between Express Grain and the farmers shows that there was "rarely" reliance on the MTAs in connection with prior agreements, transactions, or negotiations between the parties when entering into grain sale contracts. Express Grain contends that the parties "relied only upon the basis contracts and the purchase contracts to determine the respective rights, duties, and liabilities of the parties."

With respect to the second issue, Express Grain's argument is two-fold. First, Express Grain argued that this issue had previously been resolved by the Court's *Order Partially Granting Amended Emergency Motion* (Dkt. #103) in which the Court found that the contracts at issue were executory in nature. As no party appealed this Order, Express Grain argues the Court's finding is "final and it is the law of the case." Even if the Court had not made this finding, however, Express Grain further maintains that contracts for financial accommodations are limited to contracts for loan agreements, loan commitments, and letters of credit, referencing the legislative history[5] of 11 U.S.C. § 365(c)(2) as being "clear that contracts for the sale of goods or providing of services are not to be included in the 'financial accommodations' scope of contracts and agreements." Reference was also made to two cases analyzing this issue, both of which adopted the limited view that § 365(c)(2) should be narrowly construed to apply only to contracts to make loans and other traditional kinds of debt financing arrangements. *See In re Neuhoff Farms, Inc.*, 258 B.R. 343, 348 (Bankr. E.D.N.C. 2000); *see also In re Falcon V, LLC, et al.*, 620 B.R. 256, 266 (Bankr. M.D. La. 2020). As the MTA and individual grain contracts contain no provision evidencing any intent to extend a loan or other financial accommodations to either party under the contract, Express Grain argues that the contracts at issue cannot be for financial accommodations and should be able to be assumed or rejected.

---

[5] Examples of these kinds of contracts are "loan agreements, loan commitments, letters of credit and contracts to issue a security of the Debtor." 11 U.S.C.A. § 365(c)(2); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 348, reprinted in 1978 U.S.C.C.A.N. 5593, 6304. Express Grain also cites to a 1978 Congressional record, in which it is stated that financial accommodations are limited to contracts for "the extension of cash or a line of credit." 124 Cong. Rec. 32, 396 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6447 (statement of Rep. Edwards).

*UMB Bank*

Using similar arguments as Express Grain, UMB Bank asserts that the contracts are not contracts for financial accommodations. Specifically, UMB Bank argues that the interpretation of "financial accommodation" as it is used in § 365(c)(2) is a narrow one and has been limited by courts to mean the extension of money or credit to accommodate another. In support of this argument, UMB cites to *Citizens & S. Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton Co.)*, 969 F.2d 1013 (11th Cir. 1992). UMB argues that determining whether a contract is a financial accommodation requires an inquiry into whether the primary purpose of the agreement is to provide financing or whether any provided financing is incidental to the overall agreement. Thus, when considering the primary purpose of the grain contracts between Express Grain and the farmers, the contracts are not for financial accommodations: "The purpose of the grain contracts is to establish the relationship between the farmers and the Debtor for the sale of grain." UMB Bank did not address the first issue regarding the MTA.

### III. DISCUSSION

**A. The executory contracts to be assumed or rejected by Express Grain are the individual grain contracts under the MTA because the individual grain contracts are severable.**

When looking to the language of the MTA and individual grain contracts, the subject matter of the agreement, the parties' conduct, and the intentions of the parties as derived from the former, the contracts at issue are severable agreements which may be assumed or rejected by Express Grain as the debtor-in-possession under § 365 of the Bankruptcy Code. Section 365 provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a)[6]. Generally, executory contracts must be assumed or

---

[6] Executory contracts or unexpired leases may be assumed or rejected under this section by either the trustee or the debtor-in-possession. *See* 11 U.S.C. § 1107(a).

rejected in its entirety; however, if a single contract contains separate, severable agreements the debtor may reject one agreement and not another. *Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (citations omitted). A contract is severable when it "includes two or more promises which can be acted on separately such that the failure to perform one promise does not necessarily put the promisor in breach of the entire agreement." *Id.* (citing *In re Ferguson*, 183 B.R. 122 (Bankr. N. D. Tex. 1995)). Determination of the issue of severability depends on a variety of factors, including the intention of the parties, the subject matter of the agreement, and the conduct of the parties. *Id.*

While there is no one legal test that can be utilized in determining the severability of a contract, courts considering this issue have turned to state law governing the agreement to determine the issue of severability. *See Stewart Title*, 83 F.3d at 739; *In re Cafeteria Operators, L.P.*, 299 B.R. 384, 389 (Bankr. N.D. Tex. 2003); *In re Dowdy*, 2015 WL 393412 at 3. Here, there is no dispute that Mississippi state law governs both the MTA and the individual grain contracts: page 2, paragraph 4 of the MTA states that the agreement and "all transactions and all Contracts shall otherwise be governed by . . . the laws of the State of Mississippi," and the "Terms and Conditions of Agreement" found at the bottom of each individual grain contract states that each contract shall be governed by . . . the laws of the State of Mississippi."

Three cases in Mississippi jurisprudence are instructive to the Court on the issue of severability. The Supreme Court of Mississippi has previously stated that

> [W]hether a contract is entire or severable is one of intention, to be determined from the language which the parties have used and the subject matter of the agreement. A contract may both in its nature and in its terms be severable and yet rendered entire by the intention of the parties, or, by agreement, express or implied, the parties may render divisible a contract which as originally drawn in the first instance was entire.

*Mariana v. Hennington*, 299 Miss. 212, 230 (Miss. 1956). Similarly, the Mississippi Court of Appeals has held that "a severable contract includes two or more promises, each of which can be enforced separately, so that failure to perform one of the promises does not put the promisor in breach of the entire contract." *Jackson Motor Speedway, Inc. v. Ford*, 914 So. 2d 779, 784 (Miss. Ct. App. 2005). More recently, this issue was explored by Judge Samson in *In re Dowdy*, 2015 WL 393412, where the determination of severability was based primarily upon the intention of the parties as evidenced through the language of the agreement at hand.

In *Dowdy*, the debtor, Charles Dowdy ("Dowdy"), and Southwest Broadcasting, Inc. ("Southwest") entered into a stipulation and settlement agreement with the American Society of Composers, Authors and Publishers, et al. ("ASCAP") to resolve copyright infringement litigation pending against Dowdy and Southwest in the Southern District of Mississippi. *Id*. at 1. The agreement provided for the resolution of all claims ASCAP filed against Dowdy and Southwest for licensing fees and copyright infringement: Southwest and Dowdy agreed to pay $400,000.00 plus 4.10% interest over a period of five years. *Id*. Simultaneously, Southwest, North Shore Broadcasting Company, Inc., Brookhaven Broadcasting, Inc., and Southeastern Broadcasting, Inc. executed licensing agreements with ASCAP. *Id*. On September 22, 2011, Dowdy filed a voluntary petition for Chapter 11 relief in the Southern District of Mississippi, and on July 2, 2014, Dowdy filed a motion to assume the licensing agreements that were executed contemporaneously by Southwest and Brookhaven Broadcasting, Inc. with the previous settlement agreement. *Id*. at 2. In response to the motion to assume, ASCAP filed a response asserting that the settlement agreement and the licensing agreements were one and the same and constituted a single executory contract that must be assumed or rejected in its entirety under § 365 of the Bankruptcy Code. *Id*.

The court looked primarily to the language of the settlement agreement to determine whether it contained severable promises. *Id*. at 3. In doing so, Judge Samson made note of several factors indicating that the settlement agreement was distinct from the licensing agreements despite their contemporaneous nature. *Id*. at 4. First, the settlement agreement functioned in two different ways: it both settled ASCAP's claims against Dowdy and Southwest and prevented any future claims for copyright infringement and licensing fees by providing for the establishment of separate licensing agreements for all broadcasting stations involved. *Id*. Next, the licensing agreements were not part of the settlement agreement—rather, they were purposely executed separately. *Id*. In fact, each licensing agreement contained integration clauses stating that each agreement "constitute[ed] the entire understanding between the parties." *Id*., fn. 5. Finally, the default provisions varied between each agreement: default under the licensing agreement constituted breach of the settlement agreement, but default under the settlement agreement did not constitute breach of the licensing agreement. *Id*.

The Mississippi case law surrounding this issue demonstrates a reliance upon the language of the agreement itself in determining the issue of intent and, thus, severability. The use of unambiguous language to determine the intention of contracting parties is basic contract interpretation and, in this Court's opinion, the most telling when determining the matter of contract severability. While not necessary for the Court's analysis, the conduct of contracting parties can also shed light on their intentions and, here, the conduct of the farming entities and Express Grain is relevant. Other courts considering this issue have looked to the conduct of the parties in conjunction with the language and subject matter of the agreement to determine severability. *See Stewart Title Guar. Co. v. Old Nat. Title Ins. Co.*, 83 F.3d 735 (5th Cir. 1996); *In re Wolfin Oil,*

*LLC*, 318 B.R. 392 (Bankr. N.D. Tex. 2004); *In re FFP Operating Partners, LP*, 2004 WL 3007079 (Bankr. N.D. Tex. 2004).

1. *The language of both the MTA and the individual grain contracts demonstrate the severable nature of the individual grain contracts.*

The agreements at issue here are very similar to the agreements in *Dowdy*. Although the subject matter is distinctly different, the language contained in both agreements as well as the circumstances surrounding the execution of such agreements indicate that the parties intended each individual grain contract to be separate and independent. First, the language found in both the MTA and each individual grain contract indicate that the parties intended each grain contract to be individual, executory agreements. Throughout the entire MTA, stark distinction is made between the MTA and the individual grain contracts, referring to the MTA as the "Agreement" and the individual grain contracts as "Contracts." The terms are not used interchangeably. Page 1 of the MTA states that "the Customer . . . enter[s] into this Master Trading Agreement ("Agreement") because Company and Customer contemplate that they may enter into various transactions (collectively "Contracts")." In paragraph 1, the MTA provides that "Customer acknowledges that Customer is bound by Contract confirmations . . . regardless of whether or not Customer signs the confirmation or notice." Finally, the MTA contains a default provision that is similar to the default provision in *Dowdy*: paragraph 12 reads, "If Customer fails to perform any of the terms and conditions of any Contract with Company, then Company reserves the right to deem Customer in default of *that particular Contract* and in default of *any other Contract* between Company and Customer" (emphasis added). No reference is made in paragraph 12 to the "Agreement."

The language contained in the individual grain contracts further support that the parties intended to keep the MTA and the individual grain contracts separate. The top of the individual grain contracts, titled "Grain Contract Confirmation," states that "[t]he following confirms the

terms of the contract between the seller and the buyer." The bottom of the contract is a large body of text titled "Terms and Conditions of Agreement," in which reference is continually made to the function and scope of each individual contract by using the term "*this contract*" throughout its language.[7] The most glaring provision included in these terms and conditions is nearly identical to the integration provision identified by the court in *Dowdy*: the third-to-last sentence states, "This contract shall represent the final, complete and exclusive statement of agreement between the parties and may not be modified, supplemented or waived, except in writing signed by both parties." The unambiguous language in both the MTA and the individual grain contracts clearly establishes that the intention of the parties was for these agreements to be separate.

2. *The conduct of the parties during contract execution further supports the severable nature of the individual grain contracts.*

The court in *Dowdy* did not analyze the conduct of the contracting parties to determine severability, and so this Court could end its analysis at the unambiguous language in the individual grain contracts. But even if the language in the individual grain contracts was ambiguous, the Court's finding on this issue would be the same as the parties' conduct further supports the notion that the MTA and the individual grain contracts are severable. Three of the four briefing parties indicated that only a handful of the MTAs were executed and signed by the farmers. Express Grain's brief indicates that it is unable to locate fully executed MTAs in conjunction with a large majority of the motions to assume; in fact, Express Grain identified only six fully executed MTAs in connection to the individual grain contracts. Farm Group I makes a similar assertion in its brief:

---

[7] Examples of this language include terms governing acceptance, delivery, default, and cure: "Failure to return the signed confirmation immediately *constitutes acceptance of this contract and all terms thereof* . . . All deliveries made *under this contract* shall be of the grade and quality specified herein . . . Failure to comply fully with the provisions of this section shall constitute default such that the other party may liquidate *this Contract* and recover all losses therefore." (emphasis added).

"It appears that [Express Grain] did not obtain an executed MTA from all the farmers . . . We are actively investigating which farmers have signed an MTA." Finally, the brief of the Farm Group states on page 1 that ". . . most, if not all of the Farmers do not have an executed copy of Express Grain's MTA[.]" Evidence has also been presented that, even when the MTAs and individual grain contracts were executed between Express Grain and the farmers, each agreement was executed at separate times much like the agreements in *Dowdy*. For example, in the individual grain contract attached to Express Grain's *Motion to Assume Lease or Executory Contract with Black Dog Farms* (Dkt. #410), the date of execution is listed as November 5, 2020; however, the MTA between Black Dog Farms and Express Grain attached as "Exhibit A" to Farm Group I's brief was executed on January 10, 2020, roughly ten months earlier.[8]

Based on the unambiguous language in both the MTA and individual grain contracts, and further evidenced by the conduct of the parties surrounding the execution of both agreements, the Court finds that the individual grain contracts are severable from the MTA. As such, the individual grain contracts are those executory contracts to be assumed or rejected under § 365 by Express Grain rather than the MTA.

**B. The individual grain contracts are not contracts for "financial accommodations" under 11 U.S.C. § 365(c)(2) because they are not contracts for the extension of cash or a line of credit.**

The individual grain contracts between Express Grain and the farmers are contracts concerning goods rather than contracts for loans, for the extension of lines of credit or for debt financing. As such, the individual grain contracts are not contracts for "financial accommodations"

---

[8] The Court notes that the differing execution dates of the MTA and individual grain contract between Black Dog Farms and Express Grain is only one example of different execution dates for both agreements between the Debtor and a farming group. The fact still remains that, out of nearly 150 motions to assume filed by Express Grain, only six have been identified as having executed MTAs attached to them.

under 11 U.S.C. § 365(c)(2). Section 365(c)(2) states that "[t]he trustee may not assume or assign any executory contract or unexpired lease of the debtor . . . [if] such a contract is a contract to make a loan, or extend other debt financing or financial accommodations[.]" 11 U.S.C. § 365(c)(2).

While the Bankruptcy Code does not define the term "financial accommodations," other courts exploring this issue have looked to the main purpose and the "true legal nature" of the agreements before them, as well as the unambiguous nature of § 365(c)(2). *In re Neuhoff Farms, Inc.*, 258 B.R. 343 (Bankr. E.D.N.C. 2000); *In re Falcon V, LLC*, 620 B.R. 256 (Bankr. M. D. La. 2020). In *Neuhoff Farms*, the debtor filed its Chapter 11 petition on October 1, 1999. *Id.* at 345. Since January 9, 1995, the debtor operated under an executory contract with Hatfield Quality Meats, Inc. ("Hatfield") known as the "hog partnership agreement." *Id.* This agreement provided for the debtor to supply Hatfield with approximately 200,000 market hogs per year, purchased by Hatfield within a window range of prices per pound. *Id.* According to the agreement, when market prices for the hogs are lower than the "floor" of the window range, a portion of the amount that Hatfield paid to the debtor over and above the going market price was tracked in a deficit ledger account. *Id.* at 346. The debtor and Hatfield continued their agreement postpetition, with the debtor delivering and Hatfield purchasing hogs, causing an accumulation of the deficit amount of over 5 million dollars. *Id.* After the petition date, Hatfield filed a motion to force the debtor to reject the executory agreement, arguing, among other things, that the "window ledger" provision is the "heart" of the hog partnership agreement and thus constitutes an agreement to extend financial accommodations to the debtor. This agreement, Hatfield contended, cannot be assumed under § 365(c)(2). *Id.* at 347-48.

The court swiftly rejected this argument. Although the hog agreement provided for the window ledger, the court identified this provision as a price stabilization mechanism. *Id.* at 348.

When looking at the main purpose of the agreement, the court found that it was not a "contract to make a loan, or extend other debt financing or financial accommodations," under § 365(c)(2)—it was an agreement to supply hogs. *Id*. at 348. In fact, the court noted that if Hatfield's argument was accepted, "then nearly every supply of goods contract that did not require contemporaneous exchange could fall within the ambit of § 365(c)(2)." *Id*. The court also noted that the case law interpreting "financial accommodations" demonstrates that, both in spirit and letter, § 365(c)(2) should be strictly and narrowly construed to apply only to "contracts to make loans and other traditional kinds of debt financing arrangements." *Id*., *citing In re Thomas B. Hamilton Co.*, 969 F.2d 1013, 1018-19 (11th Cir. 1992). Additionally, a contract under which the extension of credit is only incidental to or part of a large arrangement involving the debtor cannot be classified as a financial accommodation. *Id*.

The contracts at issue here are not for hogs, but they are for the supply and purchase of grain, corn, soybeans, sorghum, and other movable, tangible goods between Express Grain and the farmers. There is no provision included in any grain contract at issue that provides for a price stabilization mechanism such as the one in the hog agreement in *Neuhoff*. When looking to the purpose and the "true legal nature" of these agreements, such purpose is for the purchase, sale, and supply of grain. Thus, the "true legal nature" of this agreement is to buy and sell grain, a practice that in no way (even incidentally) involves the extension of lines of credit, loans, or other debt financing.

Next, as Express Grain aptly noted in its brief, the Court previously entered an *Order Partially Granting Amended Emergency Motion* (Dkt. #103) concerning the type of the contracts at issue. Specifically, on page 2 of the second full paragraph, the Court orders that the "Movants' Contracts . . . are those pre-petition sales contracts similarly drawn . . . are executory in nature."

No party filed a response to the Court's Order for the Court to reconsider this decision, nor did any party timely file an appeal of the Court's Order under Bankruptcy Rule of Procedure 8002. As this *Order Partially Granting Amended Emergency Motion* is final, the contracts are executory in nature.

Based on the Court's previous Order and the relevant caselaw, the Court finds that the executory contracts are not contracts for financial accommodations under 11 U.S.C. § 365(c)(2) and may be assumed or rejected by Express Grain under 11 U.S.C. § 365(a).

**ACCORDINGLY**, it is hereby **ORDERED** that individual grain contracts, rather than the Master Trade Agreement, are severable in nature and thus are the contracts to be assumed or rejected by Express Grain Terminals. It is further **ORDRERD** that these individual grain contracts are executory in nature and do not constitute "financial accommodations" under 11 U.S.C. § 365(c)(2).

##END OF ORDER##