SO ORDERED,



_Selene D. Maddox_

**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

The Order of the Court is set forth below. The case docket reflects the date entered.

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **IN RE: EXPRESS GRAIN TERMINALS, LLC[1]** | **CASE NO.: 21-11832-SDM** |
| **DEBTOR** | **CHAPTER 11** |

### MEMORANDUM OPINION AND ORDER APPROVING AMENDED APPLICATION FOR FINAL EMPLOYMENT OF CR3 PARTNERS, LLC IN PART AND DENYING MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

This case came before the Court on several matters: (1) the *Application to Approve Interim and Final Employment of CR3 Partners, LLC to (I) Provide a Chief Restructuring Officer and Additional Personnel; and (II) Designate Dennis Gerrard as the Chief Restructuring Officer* (the "Application to Employ")(Dkt. #345) filed by Express Grain Terminals, LLC ("Express Grain" or the "Debtor"); (2) the *Amended Application to Approve Interim and Final Employment of CR3 Partners, LLC to (I) Provide a Chief Restructuring Officer and Additional Personnel; and (II) Designate Dennis Gerrard as the Chief Restructuring Officer filed by Express Grain* (the "Amended Application to Employ")(Dkt. #1154) also filed by Express Grain; and (3) the *Motion*

---

[1] The above styled case is being jointly administered with *In re Express Biodiesel, LLC*, Case No. 21-11834-SDM and *In re Express Processing, LLC*, Case No. 21-11835-SDM.

*for Appointment of a Chapter 11 Trustee* (the "Motion to Appoint a Chapter 11 Trustee")(Dkt. #779) filed by three attorneys representing multiple farmers and farming entities (the "Farm Group") [2].

Other interested parties filed joinders, responses, or objections to the Application to Employ, the Amended Application to Employ, and the Motion to Appoint a Chapter 11 Trustee. For the sake of simplicity, the Court will briefly note those parties and their filings. Concerning the Application to Employ, the parties filed the following pleadings:

(1)     Objection filed by the Farm Group (Dkt. #778);

(2)     Joinder in Farm Group's Objection filed by Southern AgCredit, ACA ("Southern Ag")(Dkt. #1078);

(3)     Response filed by three other attorneys who represent several farmers and farming entities ("Farm Group II" and "Farm Group III")(Dkt. #1082);

(4)     Joinder in Farm Group II and III's Response filed by 446 Farms, LLC ("446 Farms")(Dkt. #1087);

(5)     Joinder in Farm Group II and III's Response filed by, similarly, farmers and farming entities ("Farm Group I")(Dkt. #1088);

(6)     Joinder in the Farm Group's Objection filed by Farm Group II and III (Dkt. #1093);

(7)     Joinder in the Farm Group's Objection and to Southern Ag's Joinder filed by Bank of Commerce and First South Farm Credit, ACA (collectively, the "Production Lenders")(Dkt. #1137);

(8)     Joinder in the Joinder filed by the Production Lenders filed by Staple Cotton Discount Corporation ("Staple Cotton")(Dkt. #1193); and

---

[2] Based on the number of farmers and their related entities involved in this bankruptcy case, the Court grouped and named certain farmers and farming entities together. Specifically, attorneys J. Walter Newman, IV, Derek A. Henderson, and Eileen N. Shaffer represent the farmers and farming entities named the "Farm Group". Attorney Jim F. Spencer represents the farmers and farming entities entitled "Farm Group I". Attorneys D. Andrew Phillips, James Wilson, Jr., Rosamond Posey, and Amanda Burch represent "Farm Group II" and "Farm Group III". Several crop production lenders may also be similarly grouped together. The Court may periodically reference each of these groups based on their arguments in the pleadings or at the hearing.

(9)     Joinder in the Farm Group's Objection filed by the Mississippi Department of Agriculture and Commerce (the "MS Department of Ag")(Dkt. #1142).

The pleadings filed relating to the Amended Application to Employ are as follows:

(1)     Objection filed by the Farm Group (Dkt. #1167);

(2)     Joinder in the Farm Group's Objection filed by Farm Group I (Dkt. #1174);

(3)     Joinder in Farm Group's Objection filed by MS Department of Ag (Dkt. #1178);

(4)     Joinder in Farm Group's Objection filed by 446 Farms (Dkt. #1184);

(5)     Objection filed by the United States Trustee (the "UST")(Dkt. #1188);

(6)     Response filed by Farm Group II and III (Dkt. #1191);

(7)     Joinder in the Farm Group's and Farm Group II and III's Objections filed by the Production Lenders (Dkt. #1192);

(8)     Joinder in Farm Group II and III's Objection filed by 446 Farms (Dkt. #1199).

As to the Motion to Appoint a Chapter 11 Trustee, the parties filed the following pleadings:

(1)     Joinder filed by Farm Group I (Dkt. #780);

(2)     Joinder filed by Farm Group II and III (Dkt. #918);

(3)     Joinder filed by 446 Farms (Dkt. #990);

(4)     Response in Support filed by the Production Lenders (Dkt. #1136);

(5)     Objection filed by StoneX Commodity Solutions LLC f/k/a FC Stone Merchant Services, LLC ("StoneX")(Dkt. #1138);

(6)     Joinder and Response to Production Lenders filed by Staple Cotton (Dkt. #1140);

(7)     Objection filed by Macquarie Commodities (USA) Inc. ("Macquarie")(Dkt. #1141);

(8)     Joinder filed by MS Department of Ag (Dkt. #1143);

(9)     Answer and Response filed by Express Grain (Dkt. #1144); and

(10)    Objection and Response filed by UMB Bank, N.A. ("UMB")(Dkt. #1145).

To aid in judicial economy and avoid repetitive testimony and arguments, the Court considered the above matters simultaneously at one live, in-person hearing on November 30, 2021. At the conclusion of the hearing, the Court took the legal issues presented under advisement. Later, on December 14, 2021, the Court conducted a telephonic status hearing at which the Court issued its ruling approving the Amended Application to Employ in part and denying the Motion to Appoint a Chapter 11 Trustee. This Memorandum Opinion and Order incorporates the Court's bench ruling made on December 14, 2021 by reference and includes any findings of fact and conclusions of law. Based on the law and facts as detailed below, the Court finds that the Amended Application to Employ should be approved in part and that the Motion to Appoint a Chapter 11 Trustee should be denied. Further, the Court finds requiring Express Grain to sell the entirety of the prepetition raw grain under 11 U.S.C. § 557(i)[3] is premature at this stage in the § 557 procedures.

## I.    JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief District Judge L.T. Senter and dated August 6, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

---

[3] Unless noted otherwise, any statutory references will be to Chapter 11 of the United States Code.

## II.    FACTS AND PROCEDURAL HISTORY

The Debtor in this Chapter 11 bankruptcy case, Express Grain, is a large grain terminal employing approximately 160 people and operating in several locations across the Mississippi Delta. While Express Grain operates as a grain terminal and stores crops (grain, soybeans, corn, etc.), the Debtor primarily operates as a grain "crushing" facility.[4] The crushing process involves turning grain into byproducts like meal, oil, hulls, and pellets, which the Debtor then sells for, ideally, a profit over and above the grain purchase price.[5] As all the parties are aware, Express Grain filed its bankruptcy case in the middle of harvest season. During this crucial time, many farmers rely on Express Grain's continued operation. In fact, many of the farmers' livelihoods depend on it. This fact is not lost on the Court, and so, as this bankruptcy case has progressed over the past several months, the Court has done its best to facilitate a forum where the reorganization process can continue in the most expeditious means possible.

A case like this is never simple, and there are many competing interests: the farmers, the farmers' crop production lenders, the Debtor, and the Debtor's Creditors to name a few. At the crux of the case, and what will eventually be decided by this Court, is the parties' interests in and lien priority to the prepetition grain. But at this juncture, the Court was tasked with deciding whether to allow the final employment of CR3 Partners, LLC ("CR3") and its personnel to help Express Grain restructure and operate. Also, or in the alternative, the Court had to decide whether the appointment of a chapter 11 trustee was warranted.

---

[4] The Debtor operates at least three grain terminal facilities, but its grain manufacturing operation is located in Greenwood, Mississippi.

[5] The nature of the Debtor's business and other facts giving rise to this bankruptcy case have been spelled out in previous motions for use of cash collateral and the Court's orders on those motions. The Court need not expound upon many of those details for the purposes of this Memorandum Opinion and Order.

*CR3's Interim Employment*

As detailed in the parties' pleadings listed above, the Court previously approved the interim

employment of CR3 and its personnel, which included Dennis Gerrard ("Gerrard") as interim

Chief Restructuring Officer ("CRO"), in its Agreed Second Interim Cash Collateral Order.[6] See

*Agreed Second Interim Order (I) Authorizing Use of Cash Collateral, (II) Authorizing Continued*

*Use of Existing Bank Accounts and Cash Management System, and (III) Granting Adequate*

*Protection,* Dkt. #120. The Court continued to allow the interim employment in several subsequent

cash collateral orders. In those orders, the Court granted the following powers to Gerrard, the

interim CRO:

(1)     Directing the operations of the Business Debtors, including without limitation, being designated as an authorized signatory for the Business Debtors to execute all documents and agreements on behalf of the Business Debtors;

(2)     Reporting directly to the members, designated managers, or board of managers of the Business Debtors and taking any and all actions reasonably related thereto or in connection therewith;

(3)     Directing the preparation of all financial information;

(4)     Assisting with short-term cash management procedures and liquidity forecasting, including developing and maintaining cash flow forecasts and budgets delivered to UMB and the other Pre-Petition Grain Interest Holders pursuant to this Order;

(5)     Approving all material cash disbursements, in coordination with the Business Debtors' obligations under this Order, in order to maximize, protect, and preserve the assets of the Business Debtors;

(6)     Approving sales of assets in the ordinary course and authorizing motions and/or applications for the sale of assets outside of the ordinary course of business needing Bankruptcy Court approval in connection with the Chapter 11 Cases;

(7)     Overseeing any potential sale process of Business Debtors' businesses and assets

---

[6] The Court notes that while the interim cash collateral orders are entitled "agreed", multiple parties have continuing objections to Express Grain's use of cash collateral and CR3's employment.

including (i) assisting the Business Debtors and their advisors with the due diligence process and discussions with potential buyers in connection therewith, and (ii) assisting the Business Debtors and their advisors with obtaining Court approval for any potential sale and closing such sale to the successful buyer;

(8)     Managing the claims reconciliation process, including, without limitation, initiating and pursuing any necessary litigation involving claims filed against the Business Debtors, and approving or seeking approval, as applicable, of any settlements to be executed by the Business Debtors in connection therewith;

(9)     To the extent required, attending hearings, meetings, and other events related to the Chapter 11 Cases as the Business Debtors' representative;

(10)    Retaining or terminating employees, contractors and non-legal professionals employed by the Business Debtors;

(11)    Directing the preparation of information, including any reports and the schedules needed for the Chapter 11 Cases, and having access to all of the Business Debtors' controlled materials necessary for such preparation;

(12)    Participating in meetings with third parties and their respective representatives on all material matters related to the Business Debtors and the administration of the Chapter 11 Cases;

(13)    Communicating directly with UMB and the other Pre-Petition Grain Interest Holders, and their respective professionals, with or without Debtors' counsel being present;

(14)    Assisting with leadership of the Chapter 11 Cases; and

(15)    Taking any and all actions necessary to fulfill the responsibilities set forth above, including executing all necessary documentation on behalf of the Business Debtors to effectuate the same.

After approving CR3's interim employment, the Court instructed Express Grain to segregate any funds that would be used to pay CR3 until such time as the Court approved final employment and/or after properly filing a motion for payment of any fees and expenses.

*The Amended Application to Employ and CR3's Concessions*

Shortly before the hearing on CR3's final employment, Express Grain filed its Amended Application to Employ, which contained a modified engagement letter and sought to address some

of the objecting parties' concerns. The Amended Application to Employ and the amended engagement letter contain some key provisions that lay out the scope of CR3's employment which, subject to the concessions or other parts of this Memorandum Order and Opinion, are typical terms in a restructuring firm's employment agreement. A few of the provisions in the engagement agreement and Amended Application to Employ provide the scope of CR3's services like those listed above and the compensation rates for CR3's personnel. Regarding compensation, Gerrard, the CRO, charges a $775.00 hourly rate, with a weekly cap of $25,000.00. Todd Bearup, Director, charges a $575.00 hourly rate with a weekly cap of $16,000.00. Marc Paterson, Manager, charges a $425.00 hourly rate with a weekly cap of $13,000.00. The remainder of the "Partner, Director, and Manager" titles provide hourly rates but no cap on weekly compensation.

Based on the pleadings and testimony presented at the hearing on November 30, 2021, there are at least two key differences[7] between the Application to Employ and the Amended Application to Employ. First, in Section III of the Amended Application to Employ, and as acknowledged by Gerrard in his testimony, Express Grain's board of directors not only designated Gerrard as CRO (with all the powers as listed above) but also gave him "ultimate and final decision-making authority" in the bankruptcy case. The Amended Application to Employ acknowledges, however, that the board of directors will continue to "advise and consult" and, if

---

[7] The Court acknowledges that there are other differences between the Application to Employ and the Amended Application to Employ and in both engagement agreements attached to those applications. For example, paragraph 11 in the amended engagement agreement now reflects a "fiduciary relationship" between Express Grain and CR3. Regardless of the nature or extent of fiduciary relationship currently listed in the amended engagement letter, this Court is imposing a fiduciary obligation, which extends to the entirety of the bankruptcy estate, as a condition of CR3's final employment.

disagreements arise regarding major decisions, the board of directors may bring those issues to the Court's attention. The CRO does not serve, however, at the direction of the board of directors.

Next, the Amended Application to Employ now seeks CR3's final employment under § 327(a), as opposed to § §105(a) and 363(b).[8] As discussed below, these Bankruptcy Code sections differ regarding the employment of professionals, but as Express Grain conceded in its Application to Employ, even if the Court based CR3's final employment under § 363, it would submit fee applications and expense reimbursements under §§ 330 and 331 and follow Bankruptcy Rule 2014 and any other applicable Mississippi Bankruptcy Local Rule or UST guideline(s). Further, at least in the Amended Application to Employ, Express Grain submitted Gerrard's Declaration as an exhibit which outlined the relationships, if any, that CR3 and Gerrard have with the Debtor, its Creditors, or any "significant" interested parties.

At the hearing, Express Grain and Gerrard made several concessions in hopes to garner the Court's approval of CR3's final employment. The Court will adopt those concessions in this Memorandum Opinion and Order. Those concessions include the following changes to the amended engagement agreement:

(1)     Removal of the "success fee" paragraph under Paragraph 2, "Compensation";

(2)     Removal of the administrative charge of 4% of professional fee language under Paragraph 3, "Expense Reimbursement". Any expense reimbursement will only be approved upon proper application detailing itemization of actual expenses, notice provided to all interested parties, and opportunity for hearing;

---

[8] In its bench ruling given on December 14, 2021, the Court approved CR3's final employment under § 363(b), which was Express Grain's original request to this Court. The Court notes that while the Amended Application to Employ on page 6 states that Express Grain is seeking CR3's final employment under § 327, including some references to § 327 in the amended engagement agreement, pages 3, 9, and 10 of the Amended Application to Employ still state that Express Grain is seeking CR3's final employment under § 363(b). The Court does recognize that Gerrard testified at the November 30, 2021 hearing in response to a question posed by the Production Lenders that he now is seeking to be employed under § 327.

(3)   Removal of the "Indemnification and Related Matters" provision in Paragraph 5, which includes removal of Exhibit B to the amended engagement agreement in its entirety. Except as provided by applicable state and federal law, the amended engagement agreement will provide no indemnification provision;

(4)   In Exhibit A to the amended engagement agreement, removal of language in Paragraph 1, "CRO Services" which reads, "who will report to the Company's Board of Directors";

(5)   In Exhibit A to the amended engagement agreement, removal of Paragraphs 3(a) and (b) in their entirety.[9]

*Gerrard's Qualifications and CR3*

Gerrard provided extensive testimony at the hearing concerning his previous education and work experience and the general makeup of CR3. Specifically, Gerrard testified that he received a bachelor's degree in the late 1970s and has since worked in sales and marketing for multiple "fortune 500" companies, middle market companies, and finally as general management in several companies. As to his restructuring experience, and in addition to his role as a partner in CR3, Gerrard has previously served in positions which provided financial analysis and advice for profit improvement and workforce stability. Gerrard has also been previously employed as a CRO on 10 or more occasions, mainly in the manufacturing sector. As to CR3, Gerrard testified that it is a middle-market financial restructuring firm which employs around 15 professionals and has roughly 18 partners. While Gerrard has no previous experience in the grain manufacturing industry, several of CR3's personnel do have experience with grain storage facilities and operations, including Mark Patterson and Todd Barrett—both of whom have agreed to the weekly professional fee cap mentioned above.

---

[9] While not technically a concession, Express Grain has not produced any evidence of any indemnification provisions that exist in its bylaws or operating agreement.

*Other Relevant Testimony*

The Court heard testimony from Tammy Pearson ("Pearson"), Express Grain's comptroller. Pearson testified that since the arrival of CR3 and the CRO, the culture of Express Grain has improved, including structural improvements and better decision making at the management level. Pearson expressed concern that appointing a trustee or bringing in another restructuring group would be like "starting over", and much of the time already spent bringing CR3's personnel up to speed would have been wasted. Pearson also testified that if CR3 was replaced by a trustee or other management group, she feared for employee morale and turnover. Although in response to questions from the Farm Group's counsel, Pearson did concede that employee turnover could happen whether Express Grain was sold under CR3 or a trustee. Finally, as to Express Grain's continued operation, Pearson testified that the Debtor has a current competitive pricing advantage over other grain terminals based on Express Grain's terminal location(s).

The Farm Group called Lance Mohamed ("Mohamed"), a certified public accountant, as a witness. Apparently, Mohamed represents several farmers as clients and has some connection or relationship with other Creditors of Express Grain. The basis of his testimony (and to the extent the Court allowed his designation as an expert) concerned his review and conclusions of certain financial information i.e., the most current financial dashboard and 13-week financial projections provided by CR3 and Express Grain. To restate his testimony as simply as possible, Mohamed provided figures on what Express Grain's cost and revenue would be if the raw, prepetition grain currently in the Debtor's possession was sold on the open market versus what Express Grain's cost and revenue would be if the Debtor continued to manufacture the grain.

*Positions on CR3's Final Employment[10]*

The Court will summarize the arguments relating the employment of CR3, whether made in the parties' pleadings or during the hearing on November 30, 2021. The Farm Group argues that the cost to employ CR3 is cost prohibitive based on Express Grain's cash flow projections. Further, the Farm Group asserts that because the sale of the Debtor is the "ultimate result", and CR3's services do not provide for a liquidation, Express Grain has not adequately asserted the basis or need for CR3's final employment. As to the amended engagement agreement, the Farm Group complains that the while there is a proposed fee cap for several of CR3's personnel, there is no fee cap applied to all employees. Further, the Farm Group asserts that indemnification language puts the bankruptcy estate at risk of incurring a substantial administrative claim.

Farm Groups II and III similarly argue that the employment of CR3 is cost prohibitive to the bankruptcy estate considering the proposed hourly rates of CR3's employees. Farm Groups II and III also make several other arguments relating to CR3's disinterestedness. Specifically, Farm Groups II and III assert that somehow CR3 and the Debtor are in cahoots with UMB, arguably one of the Debtor's largest secured Creditors. Farm Groups II and III argue that the Debtor only brought in CR3 as a condition to have UMB's consent to use "their", i.e., UMB's, cash collateral. They further state that because of CR3's perceived loyalty issue, problems may arise when the

---

[10] The Court considered arguments from all pleadings, including the responses, objections, and joinders to both the Application to Employ and the Amended Application to Employ. Most of the Court's Memorandum and Opinion (at least outside of the discussion of §§ 105(a), 363(b), and 327(a)) will focus on arguments for and against the employment based on the terms as proposed in the Amended Application to Employ and CR3's concessions at the hearing on November 30, 2021. The Court will also discuss terms as proposed in the Application to Employ which are still relevant to CR3's final employment. On the other hand, the Court may not address all arguments made by the parties in this Memorandum Opinion and Order because they are no longer relevant based on the Court's bench ruling issued on December 14, 2021.

Court approves fees and expenses down the road in that the fees and expenses could have been incurred not for the benefit of the bankruptcy estate, but for the purpose of "readying UMB Bank's collateral as a turn-key prospect via a § 363 sale motion."

The UST filed its objection to the Amended Application to Employ, arguing that allowing the CRO to essentially take over the management of Express Grain, including ultimate decision making in its operational capacity, runs afoul of § 1104 of the Bankruptcy Code. Specifically, based on the terms of final employment as stated in the Amended Application to Employ, the CRO would only be accountable to the Court and would be a trustee in "all but name".

In addition to the various farmers and farming entities, the Production Lenders presented much of the substance in its pleadings and at the hearing. They agree with the UST in that employing a CRO with the type of powers requested in Express Grain's Amended Application to Employ subverts a chapter 11 trustee's role under § 1104(a). And while the Production Lenders admit that the Debtor's Amended Application seeks to remedy many of their initial objections, the Debtor's amendments do not go far enough. For example, the Production Lenders argue that while the amended engagement agreement reflects a fiduciary obligation, the fiduciary relationship is limited, i.e., it does not impose an obligation to the bankruptcy estate, nor does it provide the "protection" needed to parties in interest. The Production Lenders also argue that if the Court approves CR3's employment, it should be under § 327(a), which requires a "heightened standard" for employment of professionals.

*Positions on the Appointment of a Chapter 11 Trustee*

Because the Farm Group filed the Motion to Appoint a Chapter 11 Trustee, the Court will begin with their position(s). The Farm Group argues that current management cannot be trusted due to at least two checks (for postpetition deliveries) that were returned for insufficient funds.

They also make the same argument against former management, accusing the Debtor of failing to properly disclose its financial status up to the filing date of this bankruptcy case. The Farm Group further avers that, unlike a trustee, the CRO will likely not timely pursue potential claims against John Coleman, Express Grain's president. Finally, the Farm Group argues that the appointment of a trustee will be in the best interest of the Creditors in this case because: (1) the trustee would be an independent party in control and instill more confidence in the farmers to stabilize future deliveries of grain; (2) reduce administrative expenses; (3) assist with the determination of lien priority in the prepetition grain; and (4) coordinate an orderly liquidation of the Debtor's assets. Farm Group I argued at the hearing that the Debtor's violation of § 557(i) is sufficient grounds to appoint a trustee.

Next, the Production Lenders argue that numerous management deficiencies constitute cause for the appointment of a trustee. They agree with Farm Group I that the CRO's failure to implement § 557(i) and sell the raw, prepetition grain falls into the category of either cause or, at the minimum, mismanagement. Finally, the Production Lenders argue that based on financial information provided by the CRO, Express Grain cannot continue to justify the cost of CR3 just to "prop up" the Debtor to eventually sell as a going concern.

Express Grain and its secured Creditors UMB, StoneX, and Macquarie, not surprisingly, take different positions. On behalf of Express Grain, Gerrard testified that a trustee should not be appointed for several reasons. First, at this stage in the bankruptcy case, appointing a trustee would have a "chilling effect" for potential buyers because buyers would assume that "all is lost" and merely wait for the absolute lowest purchase price. Second, Gerrard testified that a trustee is not ideal from an operational standpoint considering that a trustee would not have any more operational knowledge than CR3 and would likely not do anything different than what CR3 is

already doing. Along those same lines, Gerrard testified that cost and time weigh against appointment of a trustee. Specifically, a trustee would need time to "get up to speed" with Express Grain's operation, and the Debtor cannot afford any reduction in productivity. Last, Gerrard testified appointment of a trustee would be cost prohibitive: a trustee would likely be a "nonoperational" person and need to bring in his or her own people to assist in operations, which is exactly the role that CR3 is undertaking at this stage. The trustee would also bill his or her time in addition to the rates of those operational professionals.[11]

The Debtor's Creditors make similar arguments against the appointment of a trustee to those made by Express Grain: no party has alleged fraud or gross mismanagement of the Debtor's affairs by current management, i.e., CR3. Further, as CR3 is an independent party already providing restructuring services to Express Grain, including the management and operational responsibilities, a trustee is not necessary—at least at this stage in the bankruptcy case. Finally, based on CR3's knowledge of Express Grain's operations to date, a trustee would not be in the best position to implement a process to market and sell the Debtor as a going concern and, thus, maximize the value of the bankruptcy estate for all Creditors.

*Positions on Implementation of § 557(i)*

The Production Lenders and other parties continue to argue that the Court should immediately implement the mandate of § 557(i) and force the sale of the raw, prepetition grain in Express Grain's possession. The Production Lenders' argument is simple: notwithstanding the ownership interest in the prepetition grain, § 557(i) is mandatory because Express Grain is a "grain

---

[11] As pointed out by Express Grain, under § 326, a trustee would be entitled to statutory compensation and/or commission over and above any fees and expenses incurred by bankruptcy estate professionals the trustee would likely seek to employ in this bankruptcy case.

storage facility" which holds over ten thousand bushels of a specific type of grain. As such, Express

Grain should be required to immediately sell the raw, prepetition grain in its storage facilities as

opposed to its current operating procedure of manufacturing the crops into byproducts through its

manufacturing operation and selling the byproducts. At the hearing on November 30, 2021,

counsel for the Production Lenders argued that by allowing the Debtor to continue to operate and

"crush" the prepetition grain, Express Grain and, presumably, this Court, are in violation of the

mandate. The Production lenders further argue the Court's failure to implement the sale

requirement ignores the legislative intent of § 557(i). The Production Lenders fail to cite any case

law on the issue either in oral arguments or in their pleadings.

Several of Express Grain's Creditors argue that due to the nature of the Debtor's operations

as a dual-purpose facility (it stores grain but mainly manufactures or processes the grain), § 557(i)

is not applicable. StoneX asserts that even if § 557(i) is applicable, Express Grain is complying

with the mandate in that the Debtor is selling the prepetition grain at a set price at January futures

prices plus $0.30 cents and is segregating those funds for the Court to determine ownership

interests and lien priorities a later date. Express Grain similarly argues that the prepetition grain is

being sold, albeit indirectly, after the manufacturing or "crushing" process. Further, Express Grain

asserts that the bankruptcy estate is benefiting more than if the Debtor were forced to sell the raw,

prepetition grain on the open market due to the Court's pricing mechanism at the current market

price with a bonus. Express Grain also argues that forcing the sale of the raw, prepetition grain

would not be free of additional costs to the estate.

## III.   DISCUSSSION

### A.    CR3 and its Personnel Meet the Requirements to be Employed as Professionals Under 11 U.S.C. §§ 105(a) and 363(b).

While there has been some debate between the parties concerning the most appropriate Bankruptcy Code provision for the Court to allow CR3's employment (if at all), the Court finds sufficient legal justification to approve CR3's final employment under §§ 105(a) and 363(b). The Court believes a more in-depth discussion is warranted to flesh out its bench ruling issued on December 14, 2021. Ordinarily, employment of professionals is governed by § 327, which provides that, with court approval, the trustee may employ professional persons that "do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties . . . ." 11 U.S.C. § 327(a). As the parties are aware, in a chapter 11 case, a debtor-in-possession is vested with the rights and powers of a trustee. 11 U.S.C. § 1107(a). As such, the terms "debtor-in-possession" and "trustee" are used interchangeably. *In re McDermott Int'l, Inc.*, 614 B.R. 244, 249 (Bankr. S.D. Tex. 2020 (internal citation omitted). To be employed under § 327, Bankruptcy Rule 2014 further requires the debtor to file an application with specific facts showing:

> the necessity for the employment, name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed R. Bankr. P. 2014. In summary, the debtor-in-possession must file an application containing the above requirements under Bankruptcy Rule 2014 and show the professional person is (1) disinterested and (2) does not hold or represent an interest adverse to the bankruptcy estate. *In re American Int'l Refinery, Inc.*, 676 F.3d 455, 461 (5th Cir. 2012).

Professional employment under §§ 105(a) and 363(b), however, is different. Section 105(a) allows courts to enter any order that is necessary or appropriate to carry out provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). Section 363(b) provides, in relevant part, that after notice and a hearing, the trustee (or debtor-in-possession) may "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). On its face, § 363(b) does not specifically address the employment of professionals, but rather the use of estate property. Nevertheless, bankruptcy courts have found that professional employment under § 363(b) is permissible. See *In re Nine West Holdings, Inc.*, 588 B.R. 678, 686-87 (Bankr. S.D.N.Y. 2018) (recognizing the "mountain of precedent" in which other courts have authorized debtors to retain professionals, including CROs, under § 363(b)). The basis for allowing professionals to be employed under § 363(b) is that a debtor-in-possession has broad discretion to use estate property when such use represents a reasonable business judgment on the part of the debtor. *In re K.G. IM, LLC*, 620 B.R. 469, 478 (Bankr. S.D.N.Y. 2020) (citing *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (finding that a debtor must show "some articulated business justification" for using property outside the ordinary course of business under § 363(b)).

As the Production Lenders correctly point out, many of the cases cited by Express Grain in its Application to Employ do not concern the employment of professionals that were not somehow involved with or employed by a debtor prepetition.[12] The Court recognizes that §§ 105(a)

---

[12] Express Grain cites the following cases in its Application to Employ: *In re American Workers Insurance Services, Inc.*, Case No. 19-44208 (Bankr. N.D. Tex. Nov. 13, 2019) (Dkt. #90); *In re Mid-Cities Home Medical Equipment Co., Inc.*, Case No. 19-41232-ELM-11 (Bankr. N.D. Tex. May 17, 2019) (Dkt. #89); *In re Senior Care Centers, LLC*, Case No. 18-33967 (Bankr. N.D. Tex. Feb. 27, 2019); *In re TPP Acquisition, Inc. d/b/a The Picture People*, Case No. 16-33437 (Bankr. N.D. Tex. Nov. 21, 2016) (Dkt. #377); *In re Energy &*

and 363(b) are commonly used when the disinterestedness requirement of § 327(a) may prohibit employment of professionals who were employed prepetition in an advisory capacity or as an officer of a debtor.[13] Nevertheless, the Production Lenders fail to consider the arguments and allegations made by the various farmers and farming entities that the hiring process involved some prepetition collusion with the Debtor's secured Creditors, the Debtor, and possibly CR3. The Court must weigh those allegations against Gerrard's testimony that the hiring or selection process (to his knowledge) was fair. To alleviate any possible issues with CR3's disinterestedness or continued allegations questioning Express Grain's motives for seeking to employ CR3 as its restructuring firm (and Gerrard as its CRO), the Court believes that retention of CR3 and the CRO under §§ 105(a) and 363(b) is appropriate in this bankruptcy case.[14]

The Court is certainly aware of a more recent opinion where a bankruptcy court decided differently in the context of employment of a financial advisor. In *In re McDermott International, Inc.*, 614 B.R. 244 (Bankr. S.D. Tex. 2020), cited above for its thorough discussion on employment

---

*Exploration Partners, Inc.*, Case No. 15-44931 (Bankr. N.D. Tex. Jan. 26, 2016) (Dkt. #263); *In re Pilgrim's Pride Corporation*, Case No. 08-45664 (Bankr. N.D. Tex. Feb. 9, 2009) (Dkt. #825); *In re Mirant Corp.*, Case No. 03-46590 (DML) (Banla. N.D. Tex. Sept. 29, 2003) (Dkt. #999); *In re PRC, LLC*, Case No. 08-10239 (MG) (Banla. S.D.N.Y. Feb. 27, 2008) (Dkt. #182); *ln re Bally Total Fitness of Greater NY, Inc.*, Case No. 07-12395 (BRL) (Banla. S.D.N.Y. Aug. 1, 2007) (Dkt. #283).

[13] The Production Lenders aptly discuss the creation and development of the UST's "J. Alix Protocol" when professionals are employed under § 363(b) in their arguments to CR3's final employment. This Court, however, does not need to delve further into the UST's protocol. As Express Grain acknowledged in its Application to Employ, the Debtor will follow any UST protocol where required. The Court is also imposing certain requirements for approval of professional fees and expenses in this Memorandum Opinion and Order that follow Bankruptcy Rule 2014.

[14] Despite the Court's finding that final employment for CR3 and the CRO is warranted under §§ 105(a) and 363(b), the Court would prefer in the future for movants to request employment under § 327(a), unless there is a significant issue with disinterestedness of a professional, which may prohibit employment of a professional under § 327(a).

provisions under the Bankruptcy Code, the court was faced with whether to approve an employment application for a financial advisory firm, an affiliate of the firm, and a chief transformation officer (the "CTO") under either §§ 363(b) or 327(a). 614 B.R. at 247. The United States Trustee filed an objection to the applications, arguing that the applications should be approved under §§ 105(a) and 363(b) because the CTO provided consulting services prepetition, and therefore, the two entities in which he was affiliated did not meet the disinterested requirement. *Id.* at 253. The court primarily focused on whether the CTO's lack of disinterestedness is *per se* imputed to the two entities, and the court found the following: (1) under §§ 101(14) and (41), no *per se* rule existed, (2) the J. Alix Protocol is unnecessary based on its practical implementation, and (3) the applications would be approved under § 327(a). *Id.* at 254-55. The court, however, maintained its discretion to address an inevitable "unusual" case. *Id.* at 255.

While this Court may agree with most of the findings in *McDermott*, the Court believes this case may very well fall into the "unusual" category. While Gerrard and CR3 did not provide any services to Express Grain prepetition and imputed disinterestedness is not at issue before this Court, as the Court mentioned above, the farmers continue to allege impropriety between Express Grain, its secured Creditors, and CR3 in the selection and hiring process. The Court must weigh these allegations made by the farmers and farming entities with Gerrard's testimony and information contained in Express Grain's Amended Application to Employ and accompanying documents. Out of precaution, the Court finds that employment under §§ 105(a) and 363(b) is more appropriate, especially considering Express Grain has agreed to follow all UST protocols and disclosure requirements of Bankruptcy Rule 2014. Further, if CR3 and its personnel wish to continue to be employed by the bankruptcy estate, they must adhere to the employment requirements that are imposed in this Memorandum Opinion and Order.

Concerning the fees and expenses incurred by professionals who have been hired under § 363(b), Express Grain is correct[15] in that courts have allowed those fees and expenses to be treated as an administrative expense incurred by a debtor in the normal course of business. While the fees and expenses may be treated as administrative expenses in the normal course, the Court is requiring Express Grain to file an application for approval of fees and expenses under §§ 330 and 331 before such fees and expenses may be awarded to any professional in this bankruptcy case.

After considering the testimony presented at the hearing, the Court believes Express Grain has shown a legitimate business justification for the final employment of CR3 and its personnel, including Gerrard as CRO. Not one party presented any evidence that suggests CR3, and its personnel, are unqualified to serve in their respective roles. Despite arguments suggesting that Express Grain cannot afford to sustain the proposed compensation rates for CR3 and its personnel, the Court finds that the proposed compensation for CR3's employees, which includes weekly caps for Gerrard and at least two other professionals, is fair and reasonable.

In addition, Gerrard testified that since his arrival on site in October of 2021, he has worked to improve Express Grain's manufacturing operation, which includes reducing overhead and expenses and providing stability to its employees. Pearson also testified that CR3 and its personnel have produced positive results relating to the management and structure since their arrival. Based on the arguments presented through the parties' pleadings and evidence presented at the hearing

---

[15] The Court agrees with the cases cited by Express Grain, which support its position on fees and expenses: *In re TPP Acquisition, Inc. d/b/a The Picture People,* Case No. 16-33437 (Bankr. N.D. Tex. Nov. 21, 2016) (Dkt. #377); *In re 4 West Holdings, Inc.,* Case No. 18-30777 (Bankr. N.D. Tex. 2018) (Dkt. #s 132 and 263); *In re UC!, Int'l, LLC,* Case No. 16-11354 (Bankr. D. Del. Jul. 12, 2016) (Dkt. #294); *In re Juniper GTL, LLC,* Case No. 16-31959 (Bankr. S.D. Tex. May 24, 2016) (Dkt. #176); *In re HII Technologies, Inc.,* Case No. 15-60070 (DRJ) (Bankr. S.D. Tex. Sept. 22, 2015) (Dkt. #32); *In re First River Energy, LLC,* Case No. 18-50085 (Bankr. W.D. Tex. Feb. 13, 2018) (Dkt. #200).

on November 30, 2021, the Court does not see a viable alternative other than Express Grain's continued operation at this time. CR3 and its personnel give the Debtor the best chance to restructure its affairs and reorganize under the Bankruptcy Code. Even if an asset sale is Express Grain's fate, CR3 will help maintain and/or maximize the value of the bankruptcy estate for the benefit of all Creditors.

Further, subject to the final employment conditions laid out in this Memorandum Opinion and Order, and as provided in the Amended Application to Employ and CR3's amended engagement letter, the scope of the CRO's duties and powers is appropriate and not prohibited by the Bankruptcy Code. The Court cannot find any authority which might suggest that allowing the CRO ultimate operational and managerial authority conflicts with § 1104.[16] The CRO, and the Debtor for that matter, are ultimately accountable to this Court. If Express Grain's board of directors or any other interested party has concerns about the Debtor's business operation based on decisions made by the CRO, the Court has and will continue to make itself available to address those concerns.

**B.      Appointment of a Chapter 11 Trustee is not Warranted at this Stage in the Bankruptcy Case.**

Section 1104(a) of the Bankruptcy Code provides that the court shall order the appointment of a trustee in two scenarios: (1) for cause, which includes fraud, dishonesty, incompetence, or

---

[16] The Court points the parties to *In re Pioneer Health Servs., Inc.*, Case No. 16-01119-NPO (Bankr. S.D. Miss. 2016) (Dkt. #552), where the court approved final employment of a CRO with, arguably, a similar role to that of Gerrard. While not a direct parallel, in that case, the UST objected to the employment of the CRO alleging that the CRO's duties conflict with those of a chapter 11 trustee. Judge Olack approved the CRO's employment over the UST's objection. The UST in this case made the same or substantially similar arguments in its oral argument before the Court on November 30, 2021, and the Court finds them unpersuasive. The scope of authority and managerial control afforded to Gerrard as CRO does not conflict with § 1104.

gross mismanagement of the debtor's affairs by current management, either before or after the commencement of the case, or (2) if the appointment is in the interest of the creditors, equity security holders, and other interest of the estate. 11 U.S.C. § 1104(a)(1)-(2). Generally, appointment of a chapter 11 trustee is an extraordinary remedy, and there is a strong presumption in favor of allowing the debtor to remain in control and possession. *In re New Orleans Paddlewheels, Inc.*, 350 B.R. 667, 691-92 (Bankr. E.D. La. 2006); *In re Tanglewood Farms, Inc. of Elizabeth City*, 2011 WL 606820 at *2 (Bankr. E.D.N.C. Feb. 10, 2011) (stating that bankruptcy courts are reluctant to displace management and control of a debtor's business unless extraordinary circumstances are present). The movant bears the burden of proof and must show gross mismanagement of the debtor or fraud by clear and convincing evidence. *In re Cajun Elec. Power Co-op., Inc.*, 69 F.3d 746, 750 (5th Cir. 1995). Courts have discretionary authority to determine whether conduct rises to the level of cause. *In re Tanglewood*, 2011 WL 606820 at *2.

As to the second scenario, determination of whether appointment of a chapter 11 trustee is in the best interests of creditors entails exercise of discretionary powers and equitable considerations. *In re New Orleans Paddlewheels, Inc*., 350 B.R. at 692. It must, therefore, be determined on a case-by-case basis and will rely heavily on the facts. *Petit v. New England Mortg. Servs., Inc. (In re Petit)*, 182 B.R. 64 (Bankr. D. Me. 1995). In making the determination, the court may consider the debtor's trustworthiness balanced against the costs of the appointment. *See Matter of Cajun Elec. Power Co-op., Inc.*, 74 F.3d 599 (5th Cir. 1996); *In re Tanglewood Farms, Inc. of Elizabeth City*, 2011 WL 606820 at *2 (finding that a trustee appointment would only burden the bankruptcy estate with additional cost and disadvantage Creditors).

After reviewing the arguments and testimony, the Court believes that the appointment of a trustee is not warranted or necessary in this bankruptcy case at this time. To begin, proponents for

the appointment of a chapter 11 trustee have not sufficiently proven fraud or gross mismanagement of Express Grain's affairs under *CR3's management*. As mentioned above, the Farm Group does argue that Express Grain issued two checks postpetition that bounced. But there is no evidence that those checks were issued under the direction and management of CR3 and the CRO. To the contrary, evidence presented to this Court indicate that those two checks were issued before CR3 and Gerrard arrived on site.

UMB aptly cites to *In re The 1031 Tax Group LLC*, 374 B.R. 78 (Bankr. S.D.N.Y. 2007) in its objection. In that case, the United States Trustee moved for the appointment of a trustee based on actions of the debtor's principal which occurred prepetition. *Id.* at 79. After the filing of the bankruptcy case, the debtor hired a CRO, who took over operational and managerial control. *Id.* The Court held that cause did not exist to appoint a trustee despite allegations of fraud and other misconduct on the part of prior management. *Id.* at 87. The Court reasoned that if current management is free from the "taint" of prior management, gross mismanagement on the part of prior management does not necessarily provide grounds for appointment of a trustee. *Id.*

The Court agrees with the Debtor and other objecting parties, that most, if not all, of the allegations of fraud, dishonesty, or gross mismanagement against Express Grain concern the actions of prior management. The Farm Group and other parties have not produced any evidence that CR3 or any of its personnel have a connection to allegations against John Coleman (the Debtor's President) or any actions taken by him which may have led to the filing of this bankruptcy case. As such, at least as to cause under § 1104(a)(1), the Farm Group and others have not met their high burden for the appointment of a trustee in this bankruptcy case.

Along the same lines, no party has shown to the Court how appointing a chapter 11 trustee at this stage in the bankruptcy case is in the best interest of the bankruptcy estate or its Creditors.

Despite arguments to the contrary, the Court is at a loss as to how a chapter 11 trustee would reduce administrative expenses to the bankruptcy estate. A trustee would need to "catch up" on all Express Grain's operations and financials, which is, to say the least, a complex manufacturing operation. As Gerrard testified at the hearing, a trustee would likely bring in his or her own operating professionals, including accountants and attorneys. Those professionals would likely duplicate much of the work already performed by CR3 and its personnel. Put simply, a chapter 11 trustee would only disrupt Express Grain's manufacturing operation and cause more unnecessary expense to the detriment of all Creditors. After considering Express Grain's trustworthiness under the management and control of CR3, the Court has not been presented with any evidence that suggests that a trustee would lower the cost and provide any additional benefit to the bankruptcy estate other than what services CR3 is currently providing.

The Court is also satisfied with the evidence presented regarding the work performed and services provided by CR3 and the CRO to Express Grain. The CRO is providing a daily dashboard containing financial information and cash flow projections to keep all parties abreast of Express Grain's operation. While some parties advocate that Express Grain should not be operating at all, the Court disagrees. As mentioned above, no party has put forward any evidence of an alternative to best optimize the assets of this bankruptcy estate if Express Grain were to cease operation. The Farm Group's own witness, Mohamad, provided his financial analysis and conclusions to this Court, which indicated that some weeks Express Grain would be more profitable selling the raw grain, while other weeks it would not. Further, based on CR3's final employment terms as approved by this Court, the CRO's expanded role in the Debtor's operation helps ensure that the manufacturing process continues uninterrupted and, if an eventual sale is in the forecast, helps maximize the Debtor's value.

In summary, Express Grain's actions under CR3's management simply do not meet the requirements under § 1104(a)(1) necessitating the appointment of a chapter 11 trustee. Further, no evidence or even rationale has been presented to the Court on a better path forward that would benefit the bankruptcy estate more than Express Grain's continued operation under CR3's management, at least based on the evidence as presented at the hearing on November 30, 2021. As addressed below in more detail, the failure to immediately implement § 557(i) is also not grounds to appoint a trustee, as the timing for implementation of this Bankruptcy Code section is within the Court's discretion under the § 557 procedures.

## C.    Applicability of 11 U.S.C. § 557(i)

Several parties, mainly the Production Lenders, have raised § 557(i) in their objections to the continued use of cash collateral, CR3's employment, and in support of appointing a chapter 11 trustee. The Court believes that the applicability of § 557(i) must be addressed in this Memorandum Opinion and Order due to the interrelatedness of Express Grain's continued operation under the management of the CRO and without the appointment of a chapter 11 trustee. Section 557(i) provides as follows:

> In all cases where the quantity of a specific type of grain held by a debtor operating a grain storage facility exceeds ten thousand bushels, such grain shall be sold by the trustee and the assets thereof distributed in accordance with the provisions of this section.

11 U.S.C. § 557(i). At first glance, this Bankruptcy Code provision seems straightforward: if a debtor operates as grain storage facility holding more than 10,000 bushels of grain, the bushels of grain must be sold and the proceeds distributed according to the § 557 procedures established by the Court. Several issues arise in this case that complicate the implementation of § 557(i) at this juncture—regardless of the mandatory nature of the provision. The first issue is whether Express

Grain qualifies as a grain storage facility under the Bankruptcy Code and § 557 generally.[17] Even if Express qualifies as a grain storage facility, the second issue relates to how the Court should implement § 557(i) in a bankruptcy case like this: where Express Grain operates as a dual-purpose Debtor, i.e., its survival and reorganization depends not on selling the raw grain, but on its ability to manufacture or "crush" the grain into byproducts. Last, § 557(i)'s language is unclear as to *when* the Court should require a debtor to sell its bushels of grain. Therefore, a more thorough discussion about the implementation of § 557(i) is appropriate.

1.    *Express Grain is a grain storage facility as defined under the Bankruptcy Code.*

Despite the Debtor's manufacturing operation, the Court believes that Express Grain qualifies as a grain storage facility, and, therefore, is subject to the statutory requirements of § 557 and, more specifically, § 557(i). Section 557 only applies to a debtor that "owns or operates a grain storage facility". 11 U.S.C. § 557(a). The Bankruptcy Code defines a grain storage facility as "a site or physical structure regularly used to store grain for producers, or to store grain acquired from producers for resale." 11 U.S.C. § 557(b)(2). The first part of § 557(b)(2) implies that for § 557 to apply to a debtor, a debtor receives grain from producers and holds it in storage with the title of grain remaining in the producer.[18] *In re Mickelson*, 205 B.R. 190, 195 (Bankr. D. N.D.

---

[17] The Production Lenders argued at the hearing that the applicability of § 557, and by extension § 557(i), has already been determined by the entry of the Court's *Order Granting Motion Establishing Procedures Under 11 U.S.C. § 557 for Determination of Rights, Ownership Interests, Liens, Security Interests and All Other Interests in and to Grain and Proceeds of Grain* (Dkt. #1070). The Court agrees, but because at least one of the arguments raised at the hearing concerned the applicability of § 557(i) to Express Grain, the Court believes the argument should be addressed in this Memorandum Opinion and Order.

[18] The Court ordered in its previous cash collateral orders that title to any *postpetition* grain delivered to Express Grain would remain with the farmers or producers of the grain. As stated above, the Court has not decided the ownership rights to the prepetition grain, and the parties are currently briefing the issue.

1996). In other words, a debtor simply stores the grain with the intent of returning it to the producer (farmer) in the same condition. *Id.* The second part of § 557(b)(2)'s definition suggests that a debtor stores grain acquired from the farmers and resells that same grain to other customers. *Id.*

If the Court only looked to the first part of § 557(b)(2), it likely would find that Express Grain does not qualify as a grain storage facility. As the Court found after reviewing these Bankruptcy Code provisions before entering its order on § 557 procedures, the second part of § 557(b)(2) is more instructive and applicable to Express Grain. Like any grain storage facility, Express Grain receives grain from the farmers and then issues warehouse receipts or scale tickets for the grain received. While most (if not all) of the soybeans are processed and turned into byproducts, Express Grain does resale corn. In fact, the Court has previously ordered the segregation of certain corn resale proceeds. Based on the facts presented to the Court in the parties' pleadings and through witness testimony up to the date of the November 30, 2021 hearing, the Court concludes that Express Grain regularly stores corn collected from farmers and resales that corn in its same condition to third parties. As such, Express Grain meets the definition of a "grain storage facility" under § 557(b)(2), and § 557(i) is applicable to the Debtor in this bankruptcy case.

2.     *While the actions to be taken under § 557(i) are mandatory, the Court determines when § 557(i) should be implemented within the confines of the § 557 procedures.*

The Court recognizes and does not dispute that § 557(i) is a mandatory provision. The language contained in this subsection concerning *what action* must be taken when a debtor-in-possession holds more than ten thousand bushels is not ambiguous: a trustee (or debtor-in-possession) sells those bushels and distributes the assets of those bushels in accordance with the provisions of § 557. But what is ambiguous when looking to the language of this subsection is *when* this action must be taken. In fact, § 557(i) is silent with respect to the timing of the sale of

grain and the distribution of the proceeds. The only guidance contained in § 557(i) is in the last eight words of the subsection, which read: ". . . in accordance with the provisions of this section." Therefore, to understand when § 557(i) must be implemented, the Court turns to traditional methods of statutory interpretation.

Proper interpretation of the Bankruptcy Code begins with the language of the statute itself. *Ransom v. FIA Card Servs.*, 562 U.S. 61, 69 (2011). Even when turning to the language of the statute itself, the statutory language should not be read in isolation, and the cardinal rule is that a statute should be read as a whole because the "meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). As mentioned above, the action that § 557(i) contemplates on its face is clear; however, the timing of such action is not. In following traditional methods of statutory interpretation and following § 557(i)'s reference to "the provisions of [§ 557]", the Court turns to the additional subsections of § 557 to understand when and how § 557(i) must be implemented.

As briefly mentioned above, § 557 begins with subsections (a) and (b), two subsections concerning the scope of § 557. Subsection (a) provides that § 557 only applies in a bankruptcy case concerning a debtor that owns or operates a grain storage facility and only with respect to the grain and the proceeds of that grain. 11 U.S.C. § 557(a). Subsection (b) goes on to define the phrases "grain," "grain storage facility," and "producer." 11 U.S.C. § 557(b). Subsection (c)(1) gives directives to courts concerning the expedition of the procedures for the determination of interests in and the disposition of grain and the proceeds of such grain. Section 557(c)(1) provides:

> [E]xpedite the procedures for the determination of interests in and the disposition of grain and the proceeds of grain, by shortening to the greatest extent feasible such time periods as are otherwise applicable for such procedures and by establishing, by order, a timetable having a duration of not to exceed 120 days for the completion of the applicable procedure specified in subsection (d) of this section.

11 U.S.C. § 557(c)(1). Thus, under § 557(c)(1), a court may by its own motion (and must by request of an entity claiming an interest in the grain) shorten time periods applicable for the procedures of determining interests in and the disposition of grain and its proceeds, so long as the procedures defined in § 557(d) are completed within a 120-day window. Although the word "disposition" is not defined for the purposes of § 557, disposition includes permitting owners of grain to recover their grain, granting relief from the automatic stay, abandonment of the grain by the estate, sale of the grain, and assumption or rejection of executory contracts of the estate relating to grain or the proceeds of grain. 5 *Collier on Bankruptcy* ¶ 557.04 (16th ed. 2021) (citing 11 U.S.C. § 557(i)). Subsection (d) outlines roughly 17 procedures that may be expedited under subsection (c), including a request for determination of whether such grain or the proceeds of grain is (1) property of the estate, (2) must be turned over to the estate, or (3) may be used sold, or leased; and the disposition of such grain or the proceeds of grain, before or after determination of interests in such grain or the proceeds of grain, by way of sale, abandonment, distribution, or such other methods as is equitable in the case. 11 U.S.C. §§ 557(d)(F)(i)-(iii), 557(2)(A)-(D).

Finally, § 557 contains a subsection outlining factors for a court to consider when determining the extent to which such time periods shall be shortened under § 557(c)(1). Under § 557(c)(2), the court shall determine the extent to which such time periods shall be shortened, based upon:

> (A) any need of an entity claiming an interest in such grain or the proceeds of grain for a prompt determination of such interest; (B) any need of such entity for a prompt disposition of such grain; (C) the market for such grain; (D) the conditions under which such grain is stored; (E) the costs of continued storage or disposition of such grain; (F) the orderly administration of the estate; (G) the appropriate opportunity for an entity to assert an interest in such grain; and (H) such other considerations as are relevant to the need to expedite such procedures in the case.

11 U.S.C. § 557(c)(2)(A)-(H). Therefore, while certain procedures must be expedited upon the motion of a party in interest under § 557(c)(1), courts have discretion to determine the need for and extent to which procedures should be expedited—a determination that is made by considering the above-referenced factors. 5 *Collier on Bankruptcy* ¶ 557.04[1] (16th ed. 2021).

In this case, the Production Lenders (and certain farmers and farming entities) claiming an interest in the grain or its proceeds being held and utilized by Express Grain made the request for the use of § 557. Therefore, under § 557(c)(1), the Court must expedite the procedures for the determination of such interests in and the disposition of grain by shortening (to the greatest extent feasible) the time periods applicable for these procedures. The Court determines the extent to which the procedures are expedited under § 557(c)(2) and sets out a timetable not exceeding 120 days for the completion of the applicable procedure as specified in § 557(d).

Section 557(i) calls for the mandatory disposition of grain and grain proceeds through a sale and distribution by a trustee. Not only does this section fall directly into the gambit of a "disposition" as that phrase is used by § 557(c)(1), but the action it contemplates mirrors the procedures that may be expedited under subsection (d): the disposition of such grain or the proceeds of grain by way of sale and distribution. 11 U.S.C. § 557(d). Thus, while this disposition is mandatory, the Court retains discretion in determining the extent to which the disposition may be expedited by using the factors contained in § 557(c)(2).

Further supporting this interpretation is the language of § 557(i) itself. As previously stated, this section provides for the disposition of the grain and grain proceeds to be done "in accordance with the provisions of [§ 557]." This means that these procedures are, again, still subject to the 120-day timetable contained in § 557(c)(1) as well as this Court's determination of the extent to which such time periods will be shortened using the factors contained in § 557(c)(2). When looking

to the additional subsections of § 557, it is clear to the Court that, while § 557(i) is a mandatory

procedure, the extent to which such a procedure is *expedited* is left to the Court's discretion under

§ 557(c)(1) and (c)(2). In other words, the Court determines the extent to which any time period

for a § 557 procedure is shortened under § 557(c)(2), so long as the time period for completion of

procedures under § 557(d) does not exceed 120 days under § 557(c)(1).

Here, several factors contained in § 557(c)(2) are present which the Court believes weigh

against expediting the disposition procedure contained in § 557(i), including the needs of the

interested parties, the market for such grain, the costs of transporting the grain, and the irreparable

harm that may be caused to all parties involved in the case, the employees of Express Grain, and

the economy of the Mississippi Delta. To begin, the Court finds that there is no immediate need

for any entity claiming an interest in grain for the prompt disposition or sale of such grain. While

the Court recognizes the positions of many interested parties in this bankruptcy case, the Court is

not, at this time in its implementation of the § 557 procedures, disbursing any proceeds garnered

from the disposition or sale of grain held by Express Grain. In other words, even if the Court

determined that a disposition or sale of the grain should take place as of the date of the hearing on

November 30, 2021, or the Court's bench ruling given on December 14, 2021, no interested parties

would receive their portion, if any, of the proceeds until further determinations are made under

§ 557 regarding the interests in such proceeds.

In addition, the current market for such grain and the costs associated with the disposition

of the grain weighs against expediting the disposition procedure of § 557(i). On October 29, 2021,

the Court entered the *Amended Agreed Second Interim Order (I) Authorizing Use of Cash*

*Collateral, (II) Authorizing Continued Use of Existing Bank Accounts and Cash Management*

*System, and (III) Granting Adequate Protection* (Dkt. #603), in which the Court established an

"Interim Established Price" to be associated with the prepetition grain used in the soybean crushing and refinement process. This price, set at a per bushel price based on the daily settle price of the January soybean futures plus $0.30, is paid by Express Grain upon the segregation of prepetition grain and grain proceeds. Based on the price fluctuations of the open market with respect to the sale of grain, the Court believes that it may be more profitable for all parties involved to allow Express Grain to continue processing the grain for the time being rather than mandating an outright and immediate sale under § 557(i). Further supporting this profitability concern are the costs associated with an outright sale of the raw, prepetition grain, including costs associated with the transportation of the grain.

The Court is also concerned with the consequences of expediting the disposition procedures of § 557(i) as those consequences relate to the employees of Express Grain and the economy of the Mississippi Delta. Expediting the disposition procedure of § 557(i) would result in the sale of all raw, prepetition grain held by Express Grain on the open market, yielding proceeds that would likely not adequately compensate those with interests in the prepetition grain and/or prepetition grain proceeds. Forcing Express Grain to sell all prepetition grain would likely force it into an immediate winding-up of its business operations and result in the termination of almost all Express Grain's employees. As Express Grain is one of the largest grain storage facilities in the state of Mississippi and has generated millions of dollars per year through the purchase, storage, and refinement of grain, the immediate shuttering of operations will send shockwaves through the Mississippi Delta and may have an adverse effect on the overall economy of Mississippi. Therefore, based on testimony given by the CRO, and the Court's previously enumerated concerns and the factors of § 557(c)(2), the Court will not expedite the disposition of grain and grain proceeds under § 557(i) at this time.

Section 557(i) is most certainly a mandatory procedure when an entity in interest makes a request for the utilization of § 557; however, the disposition procedure of § 557(i) shall go into effect at any time deemed appropriate by the Court by way of § 557(c)(2), so long as such a procedure is completed before the expiration of the 120-day timeframe contemplated by § 557(c)(1). To state it simply: a mandatory statutory provision does not equate to the immediate need for implementation of that provision.

3.      *The legislative history accompanying § 557 further supports that § 557(i) should not be implemented until the Court determines the ownership interests in the prepetition grain.*

Although the legislative history connected to § 557 is scant, the legislative history accompanying the Omnibus Bankruptcy Improvement Acts of 1983 sheds light on the purpose of § 557 and the expedition of the determination of interests in grain assets. This legislative history further supports Congress's intentions to provide a mechanism for the distribution of grain assets being held by a grain storage facility, but places focus on the ownership of grain assets by the producers and depositors of such grain. Because Congress placed weight on the ownership of grain and grain proceeds when contemplating distributions under § 557, until such ownership interests are determined by this Court, § 557(i)'s mandatory provisions are not ripe for implementation.

The purpose of § 557 is to prevent the "forced sharing" by a producer/depositor of grain in a grain storage facility with secured lenders by addressing bailment situations where producers deposit grain with a grain storage facility for storage and/or resale with title of the grain remaining in the producers of the grain. *In re Mickelson*, 192 B.R. 516, 521 (Bankr. N. D. 1996). Arising out of the farming crisis of the 1980s, §§ 546(d), 557, and 507(a)(5) were "amelioratory changes" of the 1984 Bankruptcy Code; however, even to this day, there is "practically no legislative history specifically attributed to those 1984 Code sections 546(d), 557 and 507(a)." *In re Esbon Grain*

*Co., Inc.*, 55 B.R. 308, 313 (Bankr. D. Kan. 1985). The court in *Esbon*, however, points out that

the legislative history accompanying §§ 236, 235, and 237 of the Omnibus Bankruptcy

Improvements Act of 1983 provides a useful guide for the interpretation of § 557. *Id.*

The matter brought before the court in *Esbon* arose out of the chapter 7 trustee's objection

to the secured claim of The First National Bank of Smith Center (the "Bank"), the subject of which

being that the "grain proceeds in storage at debtor's facility in quantity [were] insufficient to fully

satisfy the claim of Bank and the claims of grain depositors." *Id.* at 309. In 1983, the debtor had

executed security agreements and financing statements giving a security interest to Bank in "all

grain, or contract rights now owned or hereafter acquired." *Id.* at 310. On February 28, 1985, the

debtor filed for chapter 7 bankruptcy relief. The debtor was in the business of buying, selling, and

storing grain and grain related supplies at a facility in Esbon, Kansas:

> Both prior and subsequent to the execution of the security agreement *debtor, in the ordinary course of business, received grain delivered by grain producers and issued scale tickets and warehouse receipts therefor*. Many of the warehouse receipts specified "open storage." That designation was commonly understood as *permitting debtor to commingle grain of that particular producer along with grain owned by debtor and/or other grain depositors*. In instances where producers desired to sell their grain outright, debtor paid the producer upon delivery and thereby acquired ownership of the deposited grain. Transactions of the latter type usually were financed with funds provided by Bank under the security agreements. As of the petition filing date the quantity of grain on hand in storage was substantially less than the total represented by outstanding receipts, scale tickets and lien pledges to Bank.

*Id.* (emphasis added). The court went on to recognize the issues created upon the filing for relief

under the Bankruptcy Code in these situations, including the denial of a grain depositor's right to

a physical redelivery of like grain in kind "because the entire amount in storage is 'property of the

estate,'" and how, after the filing of a petition in bankruptcy, it "falls to the Bankruptcy Court to

determine the respective grain ownership and lien rights by application of appropriate state law."

*Id*. (citing *In re Missouri*, 647 F.2d 768, 774 (8th Cir. 1981) (holding that while the definition of

"property" under § 541 of the Bankruptcy Code is broad, the bankruptcy court must make the final

determination of property interests after presentation of evidence of ownership rights through

holders of documents of title under the state law)). In acknowledging that some of the decisions

made under the 1978 Code "produced unfair results," the court noted that the changes made to

Bankruptcy Code §§ 235, 236, and 237 of the Omnibus Bankruptcy Improvements Act of 1983—

and the changes made to their "essential counterparts," §§ 546(d), 557, and 507(a)(5), in 1984—

were done with the producers of grain and grain proceeds in mind. *Id*. at 310-15. In citing to an

excerpt from a Report of the Committee on the Judiciary United States Senate of the Omnibus

Bankruptcy Improvements Act of 1983, the court noted several problems identified by the Senate

that correlate with the 1984 sections of 557, specifically:

> [] the requirements of present law which mandate that *owners of crop assets held by the debtor solely on the basis of his status as bailee* must share grain assets held by the trustee in bankruptcy on a pro rata basis with any creditor holding a security interest in assets of a similar type which are owned by the debtor, such that bailors of such storage contract crop assets have the value of their property diminished for the benefit of such creditors when there is a shortage of produce on hand; and [] the reluctance of some courts to accept warehouse receipts and scale tickets, the principle [sic] documents used in warehouse business to establish record of ownership of crop assets stored in warehouse facilities on bailment contracts, as *evidence of ownership in bankruptcy abandonment proceedings*[.]

*Id*. at 313 (citing S. Rep. No. 98-65, 98th Cong., 1st Sess., p. 25) (emphasis added). The court

continued that the methods for solving these problems also correlate with the 1984 sections of 557,

specifically:

> [] The bill would require the court to distribute the grain assets or the proceeds of such assets *first to producers* who have merely stored their grain in such a facility upon a contract of bailment; and

> [] The bill contains measures requiring the bankruptcy court to accept valid warehouse receipts and scale *tickets as proof of ownership of crop assets possessed by the debtor upon* contracts of bailment where they were issued for that purpose[.]

*Id*. (citing S. Rep. No. 98-65, 98th Cong., 1st Sess., p. 26) (emphasis added). The "bill" referred to in this report was later passed as the 1984 Amendments to the Bankruptcy Code. *Id*.

Finding that this legislative history was material in interpreting the 1984 Amendments to the Bankruptcy Code, the *Esbon* court concluded that the purpose of § 557 "seems to be that of allowing producer/depositors to prove up ownership and receive distribution in advance of other classes of creditors." *Id*. at 315. The expedited nature of procedures under § 557 mandates bankruptcy courts to "order distribution of the stored grain (or grain proceeds) to the producer/depositor *before* distribution to debtor's secured creditors," a mandate that places the concept of ownership at its core. *Id*. The court maintained that this interpretation is supported by Federal Rule of Bankruptcy Procedure 3001(g), which provides for the use of a "warehouse receipt, scale ticket, or similar document of the type routinely issued as evidence of title by a grain storage facility" as *prima facie* evidence of the validity and amount of a claim of ownership of a quantity of grain. *Id*. (citing Fed. R. Bankr. Proc. 3001(g)).

This Court acknowledges that § 557 provides for the expedited determination of interests in grain assets, and its subsections provide for the expedited distribution of grain assets that are being held by a debtor-in-possession. The Court also acknowledges that many entities in this case may have some type of interest in the grain and grain proceeds being held and used by Express Grain. But Congress's apparent contemplation of and concern with proof of ownership in expediting the determination of interests under § 557 leads this Court to find that ownership should be established before proceeding with the disposition and/or distribution of grain or grain proceeds under § 557(i).

The Court again wants to make clear that the requisite action contemplated under § 557(i) is mandatory. The Court is simply finding that, while implementation of § 557(i) may be inevitable in this case, its implementation (without first making grain ownership determinations) is premature. In addition, based on the factors of § 557(c)(2) as analyzed above, the Court is exercising its discretion surrounding the extent of the expedition of the § 557(i) disposition procedure. Therefore, the Court will not, at this time, implement § 557(i).[19]

## IV.   CONCLUSION

Considering all facts and arguments presented to the Court on November 30, 2021, and for the reasons stated above, the Court finds that the final employment of CR3 is necessary for the Debtor to continue in its operation and reorganization under §§ 105(a) and 363(b). The Court further finds that appointment of a chapter 11 trustee at this juncture would only disrupt the bankruptcy case, burden the bankruptcy estate with additional and unnecessary administrative expenses, hinder Express Grain's reorganization, and not preserve the value of the bankruptcy

---

[19] The Court notes that Express Grain may likely be in compliance with § 557(i) after considering the purpose and intent of § 557 and its relevant subsections. The Court agrees with the Debtor and other parties that Express Grain is paying for the use and, arguably, purchasing (if the Debtor hasn't already purchased the grain at the time of delivery) the raw, prepetition grain by segregating the proceeds received after the sale of the byproducts. The Court would find it difficult to force implementation of § 557(i) at this point in the bankruptcy case when it clearly frustrates the purpose of Chapter 11 of the Bankruptcy Code—to aid a debtor in reorganization to the benefit of all parties. Further, the Court ordered price at which Express Grain is segregating the proceeds from the sale of the byproducts is likely more than what would be received if the raw, prepetition grain were sold on the open market. Finally, based on the legislative history discussed in this Memorandum Opinion and Order, the purpose of § 557(i)'s implementation is to compensate producers of the grain, seemingly before any other creditors. Even if this Court were to force the sale of the raw, prepetition grain at this juncture, no monies would be distributed to any party before the ownership interest in and lien priority to the prepetition grain is determined. In any event, the Court declines to decide whether the Debtor is technically in compliance with § 557(i). This makes sense because the Court is not implementing § 557(i) at this stage in the § 557 procedures.

estate. Last, the Court finds that implementation of § 557(i) is premature at this stage in the § 557 procedures. It is, therefore, **ORDERED** that the *Amended Application to Approve Interim and Final Employment of CR3 Partners, LLC to (I) Provide a Chief Restructuring Officer and Additional Personnel; and (II) Designate Dennis Gerrard as the Chief Restructuring Officer filed by Express Grain* (Dkt. #1154), subject to any limitations and conditions described in this Memorandum Opinion and Order, is **APPROVED IN PART**. It is further **ORDERED** that the *Motion for Appointment of a Chapter 11 Trustee* (Dkt. #779) is **DENIED**.

##END OF ORDER##