SO ORDERED,



*Selene D Maddox*

**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

**IN RE: EXPRESS GRAIN TERMINALS, LLC[1]**

**DEBTOR**

**CASE NO.: 21-11832-SDM**

**CHAPTER 11**

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR RELIEF FROM AUTOMATIC STAY AND DENYING AMENDED JOINT MOTION TO CONVERT TO CHAPTER 7 OR IN THE ALTERNATIVE APPOINT A TRUSTEE

This cause came before the Court for hearing on two matters: (1) the *Motion for Relief from Automatic Stay* (the "Motion for Relief") (Dkt. #1526) filed by the Mississippi Department of Agriculture and Commerce (the "State of Mississippi") and various objections, responses, supplemental responses, and joinders filed to the Motion for Relief (Dkt. #s 1599, 1607, 1608, 1609, 1610, 1611, 1613, 1615, 1616, 1618, 1619, 1625, and 1717); and (2) the *Amended Joint Motion to Convert Case to Chapter 7 Liquidation and For Order Directing Appointment of Trustee*

---

[1] The above styled case is being jointly administered with *In re Express Biodiesel, LLC*, Case No. 21-11834-SDM and *In re Express Processing, LLC*, Case No. 21-11835-SDM. For ease of reference, the Court will refer to these Debtors collectively as the "Business Debtors".

*Pursuant to 11 U.S.C. §§ 701 and 702, or Alternatively, for Appointment of Chapter 11 Trustee*

(the "Amended Motion to Convert") (Dkt. #1768) filed by the Farm Group and Farm Groups I, II,

and III (collectively, the "Farm Groups") and various objections, responses, and joinders filed to

the Amended Motion to Convert (Dkt. #s 1770, 1772, 1826, 1827, 1830, and 1832).[2] The Court

considered the arguments and evidence at a telephonic hearing conducted over two days from

February 7-8, 2022. At the conclusion of the hearing, the Court took both matters under

advisement. On February 9, 2022, the Court held a status hearing and issued its bench ruling

granting, in part, the relief requested from the State of Mississippi and denying the Motion to

Convert. This Memorandum Opinion and Order incorporates that bench ruling by reference,

including any factual findings and legal conclusions.

## I. JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C.

§ 157(a) and the Standing Order of Reference signed by Chief District Judge L.T. Senter and dated

August 6, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (matters concerning

the administration of the estate) and (G) (motions to terminate, annul, or modify the automatic

stay).

## II. FACTS AND PROCEDURAL HISTORY

*The Motion for Relief*

The basis of the State of Mississippi's Motion for Relief is that John Coleman ("Coleman"),

acting as President, CEO, and a member of the board of directors for the Business Debtors, altered

---

[2] The Farm Groups originally filed their Motion to Convert (Dkt. #1725), which also elicited two Joinders (Dkt. #s 1727 and 1757) and two Objections (Dkt. #s 1826 and 1832). The Court only considered the Amended Motion to Convert for procedural purposes, but the Court has considered all arguments for and against either conversion of this bankruptcy case or the appointment of a trustee.

(or caused to be altered) financial audit reports issued by their accounting firm, Horne, LLP ("Horne") and submitted those altered financial audit reports to the State of Mississippi to secure renewal of grain warehouse and dealer licenses to continue the Business Debtors' operations. Due to the alleged fraudulent conduct, the State of Mississippi is seeking to revoke or cancel the Business Debtors' licenses to operate under Miss. Code Ann. § 75-44-1, et seq.[3] In that vein, the State of Mississippi conducted an administrative proceeding on Thursday, February 3, 2022.

At the hearing on February 7, 2022 before this Court, the Commissioner of Agriculture, Andy Gibson (the "Commissioner"), appeared and testified as to his findings after serving as presiding officer at the administrative proceedings.[4] Based on the testimony and evidence presented at the administrative hearings, the Commissioner concluded and testified that the Business Debtors' licenses were only obtained through the materially altered financial audit reports. The Commissioner also testified that the financial audit reports were "fake" and "false" and amounted to "forgery". He further testified that but for the submission of those altered audit reports, the State of Mississippi would not have issued the licenses for the Business Debtors to

---

[3] Most, if not all, of the Farm Groups support the revocation of the Business Debtors' licenses, and their positions as stated in their pleadings are like those of the State of Mississippi. There were, however, several additional arguments by the Farm Groups that due to the timing of the alleged fraudulent conduct—before the licenses were issued—the State of Mississippi should terminate the Business Debtors' licenses "retroactively", thereby invalidating or voiding certain transactions by the Business Debtors with farmers and farming entities. Further, at least two production lenders, Bank of Commerce and First South Farm Credit, ACA (collectively, the "Production Lenders") support the State of Mississippi's position and argue in their pleadings that the State of Mississippi may not need this Court's permission to exercise its governmental police and regulatory powers under 11 U.S.C. § 362(b)(4).

[4] Dennis Gerrard ("Gerrard"), the Business Debtors' Chief Restructuring Officer (the "CRO"), appeared and testified on behalf of the Business Debtors along with Craig M. Geno ("Geno"), attorney for the Business Debtors. Gene Robertson ("Robertson"), an employee of the State of Mississippi, appeared, as well as Joe Green ("Green"), an accountant and representative of Horne. Robertson and Green also appeared and testified before this Court. While the Court considered that testimony, the Court relied heavily on the Commissioner's testimony, which includes his factual findings and legal conclusions from the administrative hearing.

operate. In summary, the Commissioner found that the Business Debtors' submission of the altered

financial or audit reports are in violation of Mississippi laws and regulations overseeing the

licensure process for grain warehousemen and dealers. Based on those findings, the State of

Mississippi requests to allow the Commissioner to issue an order revoking the licenses issued to

the Business Debtors.[5]

Others, including UMB Bank, N.A. ("UMB"), disagree with the State of Mississippi's

position that Coleman's alleged fraudulent conduct mandates the relief requested for at least two

reasons. First, UMB argues that the action the State of Mississippi intends to take, i.e., revoking

the Business Debtor's licenses, does not fall within any exception to the automatic stay.

Specifically, revoking the licenses does not protect public safety and health and fails to advance a

public policy goal. As to the second argument, even if revocation of the Business Debtors' licenses

does fall within an exception to the automatic stay, the Court should exercise its discretion under

11 U.S.C. § 105(a)[6] to prohibit the State of Mississippi's contemplated license revocation because

revocation would shutter the Business Debtors' operations.[7]

*The Amended Motion to Convert*

Many of the arguments made by the parties in their pleadings for or against either

conversion of this bankruptcy case or the appointment of a trustee have previously been addressed

by this Court. Nevertheless, because of the relief sought by the State of Mississippi, and other state

---

[5] The Business Debtors did not present any evidence to the Court rebutting or disputing the Commissioner's testimony.

[6] Unless noted otherwise, all statutory references will be to Title 11 of the United States Code.

[7] In a supplemental filing, UMB countered the Farm Groups' assertion that the Business Debtors' licenses should be retroactively revoked. The Court need not address this issue any further because the State of Mississippi did not request such relief, and this Court did not provide that relief in its bench ruling given on February 9, 2022.

law compliance arguments made in the Farm Groups' pleadings, the Court will briefly summarize these arguments. To begin, the Farm Groups assert that if the Business Debtors' licenses were procured by fraud, the Business Debtors' operations should cease immediately for failing to comply with state law requirements and requirements under the Bankruptcy Code. If the Business Debtors cease operation, the Farm Groups argue that the Business Debtors cannot propose or consummate a meaningful plan of reorganization or liquidation. Along the same lines, Gerrard's services as CRO would no longer be necessary, and a chapter 7 or chapter 11 trustee would be better positioned to wind down the Business Debtor's operations and conduct a sale of its assets. The Farm Groups also argue that neither the Business Debtors nor the CRO have taken action to preserve claims for the benefit of the bankruptcy estate, which include pursuit of a complaint against Coleman to deny a discharge in his individual chapter 11 bankruptcy case or the discharge of debt Coleman owes to the Business Debtors. As of the end of January 2022, the Farm Groups complain that there are no potential buyers interested in the Business Debtors' manufacturing or crushing operation, which is the sole justification for using the prepetition grain and maintaining the value of the estate and its assets for a potential sale.

The parties in opposition to the Farm Groups' Amended Motion to Convert predicate their arguments on the practicalities of the bankruptcy case. Specifically, StoneX Commodity Solutions LLC f/k/a FCStone Merchant Services, LLC ("StoneX"), argues that conversion of the bankruptcy case or the appointment of a trustee at this juncture runs the risk of shutting down the Business Debtors' operations and damaging the possibility of a going concern sale. Further, a going concern sale would create more value for all Creditors, and a financially sound buyer would be in the best interest of the Mississippi Delta as a whole. StoneX also argues that Gerrard and CR3 Partners were not involved in any wrongdoing alleged by the State of Mississippi and are familiar with the

Business Debtors' operations, so any disruption at this point in the bankruptcy case would cause the bankruptcy estate to incur unnecessary expense.

Last, StoneX argues that there is no need to disrupt the orderly wind down of operations being implemented by Gerrard, which includes the process of selling the remaining grain and/or byproducts. Citing to this Court's previous ruling, StoneX posits that the Farm Groups and Production Lenders have presented no new evidence, rationale, or better path forward which would better benefit the bankruptcy estate than the Business Debtors' continued operation with Gerrard and CR3 at the helm.[8]

The Business Debtors also address some arguments made in the Amended Motion to Convert. For example, the Business Debtors argue that the same parties objecting to Gerrard's lack of prosecution of dischargeability claims failed to file proofs of claim or seek their own dischargeability claims in Coleman's individual chapter 11 bankruptcy case. Addressing the allegations by the State of Mississippi that some parties are using to justify conversion or appointment of a trustee, the Business Debtors argue that while a "tragedy" has been perpetuated on the farmers, production lenders, and Creditors in this bankruptcy case, the Business Debtors can, and did, remove those responsible from the management. Further, the CRO and the Business Debtors have worked "diligently" to preserve the ongoing value of the bankruptcy estate to preserve jobs and provide viable assets to potential buyers.

*Gerrard's Testimony*

---

[8] Macquarie Commodities (USA) Inc. ("Macquarie") articulated similar arguments against conversion or the appointment of a trustee. While Macquarie acknowledges that there could be consequences for the Business Debtors because of Coleman's alleged conduct, the Farm Groups and Production Lenders have simply failed to produce sufficient evidence that continuation of the Business Debtors' operation and/or wind down is futile.

To address many of the arguments made by the Farm Groups and the Production Lenders, the Business Debtors' CRO, Gerrard, testified about his ongoing implementation of "Scenario 2" of the winddown plan,[9] the result of this Court's appointment of a trustee under chapter 11 or 7, environmental concerns associated with Express Grain's crushing operations, and the alleged prepetition fraudulent activity connected to Coleman.

Gerrard represented to the Court that, as of February 7, 2022, he and CR3 Partners, the Business Debtors' current management, were in the process of winding up all operation of the business according to "Scenario 2" of the winddown plan. Gerrard indicated that there was some interest in the purchase of the business and/or substantially all its assets: approximately 41 individuals or organizations had expressed interest in purchasing and 10 individuals or organizations had made site visits (with 4 making repeat visits). Gerrard explained that, with respect to the Sidon, Minter City, and Greenwood locations, interest was "scattered". While potential buyers expressed strong interest in the Sidon location, which employs roughly 9 employees of Express Grain, potential buyers expressed less interest in the Minter City and Greenwood locations. Gerrard testified, however, that he remains optimistic, as many of the prospective purchasers wanted both Sidon and Minter City as a "package deal," and that, while roughly two to three individuals or organizations were interested in Greenwood, Gerrard and CR3 Partners would continue to gauge interest leading up to the scheduled auction and sale of the Business Debtors' assets. Gerrard testified that he and CR3 would continue to secure purchasers, both for the overall business enterprises and for completed byproducts. Gerrard further testified

---

[9] The winddown plan was submitted to the Court by the Business Debtors on January 25, 2022. See 21-11832-SDM, Dkt. #1759.

that he intended to conduct the auction of Business Debtors' assets and assemble bids on all assets to find the highest bidder(s).

As a part of the winddown plan, Gerrard also testified that he would continue to collect account receivables for byproducts of grain manufacturing that were sold previously and still being sold as of February 7, 2022. Finally, Gerrard explained that other moving parts were ongoing as a part of the winddown operations: he and his team would prepare retention packages for those employees that will remain onboard if or when the business assets are sold; that he and his team will begin to organize all account receivables of the business; and that he will continue to be involved in the § 557 procedures until those procedures have concluded, which will involve the distribution of the grain or proceeds of the grain as contemplated by § 557. In addition, in response to being asked whether he would be able to formulate a plan for liquidation in this case, Gerrard stated, "Yes. I have no doubt."

Gerrard also addressed the Business Debtors' current cash flow and operating projections as of February 7, 2022. He explained that, while the Business Debtors' current cash flow is unfavorable on paper, the Court ordered segregation of proceeds caused the unfavorable representation. When adding these segregated funds back into the most recent cash flow projection, Gerrard testified that there was an increase by almost $500,000.00—which pushed the cash flow into the "favorable" range. In addition, Gerrard testified that the working capital assets have increased since the petition date: on the petition date the capital assets were approximately $57 million; however, as of October 28, 2021, the capital assets were approximately $63 million.

Concerning the potential appointment of a chapter 7 or chapter 11 trustee, Gerrard testified that, because he and his colleagues at CR3 Partners began working closely with the Business Debtors in October 2021, Gerrard and his team are the best to assist with all winddown operations

and the hopeful sale of all assets. Gerrard further testified that he and CR3 Partners "know the company, know its people, and have done this process many times before," and that they are in the best position to assist in the completion of manufacturing, the securing of the facilities, and the securing of assets in the most orderly manner. With respect to the § 557 procedures and discovery, Gerrard stated that CR3 Partners is better suited for these procedures as his team is familiar with the data and location of all data within the company, and that they have built relationships with those people and employees inside the Business Debtors that will be able to assist in the "harvesting" of the extensive discovery connected to the § 557 process.

Gerrard also addressed the costs associated with the appointment of a trustee and questioned the amount of the fees that any chapter 11 trustee would accrue. Specifically, following the completion of manufacturing operations, Gerrard surmised that the disbursements in this case should be approximately $55 million, including the cash currently located in the segregated accounts—an amount that directly correlates to the amount of fees a chapter 11 trustee would be owed. These fees, he went on to state, would also increase depending on the number of professionals a trustee would need to hire to continue forward in the wind down of operations and the § 557 procedures.

On cross examination, Gerrard received questions with respect to two aspects of the Business Debtors' management: (1) the production of hexane gas that is connected to the crushing of grain at the Business Debtors' facilities and (2) the financial audit that was received by Gerrard on October 26, 2021. Gerrard explained that a letter was received on February 4, 2022, from the Mississippi Department of Environmental Quality ("MDEQ") with respect to hexane gas emissions, stating that the Business Debtors were "noncompliant" with state regulations regarding gas emissions from the facilities. He indicated that the MDEQ had been to the Business Debtors'

facilities twice in connection with the noncompliance letter, but that he had not heard back from MDEQ and was not aware of any further action that he needed to take in connection with the apparent noncompliance. Gerrard also explained that, if the businesses are purchased in the asset sale, there would need to be a major equipment overhaul and other equipment updates for the Business Debtors to remain in compliance with the MDEQ's hexane regulations. Gerrard, however, also testified that the Business Debtors were attempting to "recapture" the hexane gas to reuse it in its crushing operations and that, once such crushing operations conclude on February 14 or 15 of 2022, the hexane would no longer be used.

Gerrard testified that he received a financial statement from Horne on October 26, 2021, and that he reviewed it on that same date. He indicated that, although he did review the financial statement, he never went on to contact other entities such as the State of Mississippi, UMB, StoneX, or Macquarie. Gerrard explained that the financial audit that he received covered the period ending June 30, 2020, and that, between June 30, 2020, and November 13, 2021, "significant" changes in the operations and finances had taken place at the Business Debtors. He also indicated that the financial statements had nothing to do with the situation of the business at the time of his appointment on October 13, 2021, and that the audit was a "snapshot in time that was well over a year old" by the time he was able to review the document. Gerrard testified that he reviewed the Motion for Relief with Geno, the Business Debtors' attorney, but after this initial review, Gerrard never reviewed any Mississippi statutory requirements regarding warehouse licenses and never took steps to apply for a new warehouse license. No further evidence was presented regarding Gerrard's actions or inactions postpetition relating to any financial statement or financial audit.

In summary, as to both the Amended Motion to Convert and the Motion to Lift, Gerrard testified that the consensus was either to convert this bankruptcy case to chapter 7 or shut the bankruptcy case down completely upon revocation of the licenses without alternatives. StoneX asked Gerrard whether the parties moving for conversion provided him with any alternative plan to produce greater value in the company—particularly with respect to funding the reserve accounts—and Gerrard answered simply: "No." Similarly, when asked whether it was his position that, if the Court lifts the automatic stay the Business Debtors should shut its doors, Gerrard responded, "That seems to be the prevailing view . . . no other alternatives have been suggested."

## III. DISCUSSION

### A.    The State of Mississippi's Contemplated Revocation of the Business Debtors' Licenses is Excepted from the Automatic Stay under 11 U.S.C. § 362(b)(4).

The Mississippi Department of Agriculture and Commerce filed its Motion for Relief seeking to (1) commence or continue regulatory and judicial proceedings to enforce its "police and regulatory powers" under provisions of Miss. Code Ann. §§ 75-44-1 et seq., to suspend, cancel, or revoke the grain warehouse licenses, including conducting administrative proceedings to determine whether those licenses should be suspended, canceled, or revoked; (2) exercise such other police and regulatory power as may be permissible under applicable state law; and (3) exercise other relief that this Court would deem proper under the facts of the bankruptcy case.

As stated by the Fifth Circuit addressing similar issues presented to this Court, the parties' positions on the Motion for Relief pit two policies underlying the Bankruptcy Code against one another: the Bankruptcy Code is designed to shield debtors from creditors and other parties by enforcement of an automatic stay, but it also aims to protect the public from a debtor's conduct that impacts public health, safety, and welfare by its enumerated exception to the automatic stay.

*In re Halo Wireless*, 684 F.3d 581, 588 (5th Cir. 2012). While these policies are not always at odds, the Court today must decide how to balance those policies.

To begin, the Court will first address whether the State of Mississippi's request to issue an order revoking Express Grain's licenses and then enforce the revocation of the licenses falls within an exception to the automatic stay in § 362(b)(4). When a bankruptcy petition is filed, § 362(a) stays all judicial and administrative proceedings and collection efforts against a debtor and the debtor's estate. 11 U.S.C. § 362(a). But that protection is not absolute. Section 362(b) provides certain exceptions to the automatic stay, with the relevant subsection before this Court being § 362(b)(4), which provides an exception to the stay for the

> commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power . . .

11 U.S.C. § 362(b)(4).

For the exception to apply, the entity raising the exception must be a governmental unit under § 101(27) and must be seeking to enforce its police or regulatory power. *In re Halo Wireless*, 684 F.3d at 588. The Court finds that the Mississippi Department of Agriculture and Commerce is a governmental unit under the Bankruptcy Code.[10] The dispute, however, lies with whether the State of Mississippi is seeking to exercise its police and regulatory power. The Fifth Circuit applies two tests to determine that question: the pecuniary interest test and the public policy test. *In re*

---

[10] Section 101(27) defines a "governmental unit" as "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." 11 U.S.C. § 101(27). The parties do not dispute that the Mississippi Department of Agriculture and Commerce is an agency for the State of Mississippi.

*Halo Wireless*, 684 F.3d at 588. Courts consider the totality of the circumstances when applying

both tests. *Id*. The pecuniary test asks whether the government primarily seeks to protect a

pecuniary governmental interest in the debtor's property, as opposed to protecting the public safety

and health. *Id*. The public policy test asks whether the government is effectuating public policy

rather than adjudicating private rights. *Id*. Simply put, if this Court finds that the State of

Mississippi's license revocation and subsequent enforcement are aimed at protecting a pecuniary

governmental interest *or* adjudicating private rights, as opposed to protecting public safety and

health *or* effectuating public policy, the exception does not apply. *Id*. (emphasis added). To fall

within the exception, the public policy interests of the governmental unit need not be limited to

health and physical safety, and the remedy sought by the governmental unit can be monetary in

character if the governmental unit is "acting to vindicate something more than a pecuniary

interest". *Equal Emp. Opportunity Comm'n v. Tim Shepherd M.D., PA*, 2018 WL 4932484, at *2

(N.D. Tex. Oct. 11, 2018) (citing *In re Wyly*, 526 B.R. 194, 198 (Bankr. N.D. Tex. 2015)).

  The Court has considered case law on the subject both within and outside of the Fifth

Circuit, but the Court primarily considered the analyses in cases post 1998 amendments to the

Bankruptcy Code because, before the amendments, § 362(b)(4) excepted actions covered arguably

by only § 362(a)(1). *In re Chapman*, 264 B.R. 565, 570 (B.A.P. 9th Cir. 2001). In other words,

prior to the 1998 amendments, there were questions as to whether the automatic stay exceptions

contained in previous Bankruptcy Code subsections (b)(4) and (b)(5) applied to other subsections

of § 362(a)—primarily acts to obtain possession of property of the estate or exercise control over

property of the estate in § 362(a)(3). *Id.* The Court finds that because the Bankruptcy Code now

excepts the exercise of governmental powers and regulations under § 362(b)(4) and slightly

broadens the applicability to § 362(a)(1), (2), (3), or (6), many arguments used by those pre-1998

courts, and therefore the arguments advanced by the opposing parties as to the Motion for Relief, are not applicable.

The Court also considered the legislative history behind the exception of § 362(b)(4), and as stated in the companion House Report: "where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay." H.R. Rep. No. 95–595, at 343, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6299. Congress intended the exception to prevent the Bankruptcy Code and the bankruptcy courts from becoming a "haven for wrongdoers". *In re Wyly*, 526 B.R. 194, 198 (citing *In re Halo Wireless*, 684 F.3d at 587). As to whether the State of Mississippi's actions pass either test and complies with the purpose behind the automatic stay exception in § 362(b)(4), the Court need not look much further than the Commissioner's own testimony, i.e., the findings from the administrative proceedings, and Mississippi's statutes governing warehouse licenses.

As stated above, the basis of the Commissioner's factual findings and legal conclusions determined at the administrative proceedings, and as testified to by the Commissioner before this Court on February 7, 2022, is that Coleman submitted, by sworn statement, altered financial audit reports (originally issued to the Business Debtors by Horne) to the State of Mississippi to secure renewal of the licenses. The Court has considered that evidence presented, testimony from Gene Robertson, an employee of the State of Mississippi, and testimony from a representative of Horne, Joe Green, that significant and material alterations were made to the original audit report issued to the Business Debtors by Horne. It is clear to the Court that the purpose of those alterations was to mislead the State of Mississippi as to the true condition of the Business Debtors' finances. The evidence also shows that Coleman affixed his signature to these altered audit reports that were

submitted for the renewal of the licenses, and either made the alterations himself, or caused them

to be made. There has been no evidence submitted by Business Debtors for the Court to conclude

otherwise.

Knowing these facts, the Court must assess their legal impact on the Business Debtors and

their licenses. The Mississippi Code requires that applications for licenses and/or renewals must

be accompanied by certified financial statements along with any other regulation requirements.

Miss Code Ann. § 75-44-11. Based on the findings by the Commissioner at the administrative

hearings, and the Court's own review of those findings and the underlying evidence, the Business

Debtors failed to comply with the state statutes governing warehouse licenses.

At the hearing on February 7, 2022, the Commissioner testified that the Business Debtors'

licenses were only obtained through the materially altered financial audit reports. The

Commissioner also testified that the financial audit reports were "fake" and "false" and amounted

to "forgery". He further testified that but for the submission of those altered audit reports, the State

of Mississippi would not have issued the licenses for Express Grain to operate. The Court finds

that these allegations, and now findings by the State of Mississippi, go to the type of activity that

the drafters of the automatic stay exception intended to allow governmental authorities to

address—despite the filing of a bankruptcy petition.

As to the pecuniary interest and public policy tests, the State of Mississippi and other

moving parties need only show that one is satisfied. The Commissioner stated that the purpose of

enforcing the proposed order revoking the licenses is meant to serve as a deterrent to other grain

warehouses and dealers from defrauding the State of Mississippi. In addition, the purpose for the

revocations is to signal to the public that Express Grain is not legitimately operating and should

not have valid licenses visible to the public. The Court is certainly aware of the arguments made

by some parties that the State of Mississippi is not acting to protect public safety and health. The Court would agree based on the insufficiency of the evidence presented as to how revocation of the grain warehouse license would, in fact, protect health and safety. Nevertheless, the State of Mississippi only needs to satisfy one test, and the Court believes that it has. Even though Coleman is no longer in ultimate control of the Business Debtors' operations and his alleged conduct is really at issue, he is still a member of the board of directors. The licenses were issued to the Business Debtors and they are, regrettably, operating solely on licenses that were obtained by intentional misrepresentation at the least and fraud at the most. Further, as articulated in more recent case law, even if the State of Mississippi's actions are pecuniary in nature, they only need to show or vindicate an additional basis for its actions to pass the requisite standard. See *In re Wyly*, 526 B.R. at 198 (citing *NLRB v. 15th Ave. Iron Works, Inc.*, 964 F.2d 1336, 1337 (2d Cir. 1992)). Based on the Commissioner's testimony, the additional basis for the license revocation is the public policy of deterrence.

The Court has considered the totality of the circumstances as required in its analysis both as it relates to the two tests and to this bankruptcy case. The Court is, once again, at a loss as to how certain parties advocate for the immediate shutdown by way of the State of Mississippi revoking the Business Debtors' licenses when they (or in the event of a trustee appointment) may be unable to sell any of the byproduct created as a result of using cash collateral and which would further fund the segregated accounts. After considering all the arguments, the Court does not make this decision lightly.[11] Nevertheless, the Court finds that the State of Mississippi has met is burden

---

[11] In fact, some of the Farm Groups cite to 28 U.S.C. § 959 and attempt to carve out a loophole for chapter 7 liquidation trustees to presumably pave the way for the Court to convert this bankruptcy case. This interpretation is incorrect. 28 U.S.C. § 959 requires that *a* trustee or debtor-in-possession must operate property in its possession according to the requirements of the valid laws of the state in which the property is located. Left unchallenged, the State of Mississippi,

and satisfied the public policy test and, therefore, its request to issue an order revoking the licenses

resulting in a license revocation is excepted from the automatic stay.

**B.      The Movants Failed to Establish Cause Under 11 U.S.C. § 1112(b)(1).**

The Farm Groups and other moving parties (collectively, the "Movants") are seeking to

convert this bankruptcy case to a case under chapter 7, for cause, under § 1112(b)(1). Section

1112(b)(1) provides that:

> [O]n request of a party in interest . . . the court shall convert a case under chapter 7
> or dismiss a case under this chapter, whichever is in the best interests of creditors
> and the estate, for cause unless the court determines that the appointment under
> section 1104(a) of a trustee or an examiner is in the best interests of creditors and
> the estate.

11 U.S.C § 1112(b)(1). Although previously a discretionary provision of the Bankruptcy Code,

the BAPCPA's 2005 amendments changed § 1112(b)(1) to "mandate[] conversion or dismissal if

the movant establishes exclusive cause, and no unusual circumstances establish that conversion or

dismissal is not in the best interest of creditors." *In re Miell*, 419 B.R. 357, 366 (Bankr. N.D. Iowa

2009) (citing *In re New Towne Development, LLC*, 404 B.R. 140, 146 (Bankr. M.D. La. 2009)).

While § 1112(b)(1) mandates dismissal or conversion upon a finding of cause, whether cause exists

under this section and, if so, whether conversion is appropriate are questions that are left to the

sound discretion of the bankruptcy court. *Id.*

Cause is not expressly defined by the Bankruptcy Code. Section 1112(b)(4), however, lists

16 enumerated grounds establishing cause, including the "substantial or continuing loss to or

diminution of the estate and the absence of a reasonable likelihood of rehabilitation," and "gross

---

in carrying out its statutory duties, may very well require the Business Debtors to take certain
actions or cease from acting in ways that will cause monetary loss to the bankruptcy estate, which
will ultimately be a detriment to all Creditors, including the Farm Groups and other Creditors. *See*
3 COLLIER ON BANKRUPTCY ¶ 362.05 (16th ed. 2022).

mismanagement of the estate". 11 U.S.C. § 1112(b)(4)(A)-(B). But this list is not exhaustive, and courts may identify other factors establishing cause warranting dismissal or conversion from chapter 11, including the debtor's bad faith conduct. *Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*, 779 F.2d 1068, 1072 (5th Cir. 1998). The movant bears the burden to establish cause by a preponderance of the evidence. *In re Korn*, 523 B.R. 453, 465 (Bankr. E.D. Pa. 2014); 7 Collier on Bankruptcy ¶ 1112.04[4] (16th ed. 2022). If the party moving for dismissal or conversion under § 1112(b)(1) establishes cause by a preponderance of the evidence, the burden then shifts to the opposing party to show why dismissal or conversion would not be in the best interests of the estate and the creditors. *Id.* Similarly, if cause has been established by the moving party, the Court has the option to appoint a chapter 11 trustee or examiner in lieu of conversion or dismissal if such appointment is in the best interests of the creditors and the estate. 7 Collier on Bankruptcy ¶ 1112.04[7] (16th ed. 2022). Once cause has been established by the moving party, the court *must* grant some form of relief, i.e., conversion, dismissal, or the appointment of a chapter 11 trustee or examiner, unless the "unusual circumstances" exception contained in § 1112(b)(2) applies. *Id.*

Under § 1112(b)(2), the "unusual circumstances" exception only applies if: (1) the debtor or a party in interest objects and establishes that there is a reasonable likelihood that a plan will be confirmed within the time periods set forth in §§ 1121(e) and 1129(e), or if these provisions are inapplicable, within a reasonable period of time; (2) the grounds for granting such relief include an act or omission of the debtor for which there exists a reasonable justification for such act or omission; and (3) such act or omission will be cured within a reasonable period of time. *In re Delta AG Group, LLC*, 596 B.R. 186, 197 (Bankr. W.D. La. 2019).  Like cause, "unusual circumstances" is not defined by the Bankruptcy Code, but other courts have found that "unusual circumstances"

involve "conditions that are not common in most chapter 11 cases". *In re Orbit Petroleum, Inc.*, 395 B.R. 145, 148 (Bankr. D.N.M. 2008); *In re Korn*, 523 B.R. at 468 ("[C]ourts focus on the likely consequences of remaining in chapter 11 or converting the case to chapter 7 and consider what the likely differences would be in the end result under each chapter . . . if the likely outcome for creditors will be vastly superior under chapter 11, courts may find unusual circumstances under § 1112(b)(2).").

The Movants have presented three arguments in hopes of establishing cause to convert this chapter 11 bankruptcy case to a bankruptcy case under chapter 7: (1) there has been substantial or continuing loss to or diminution to the bankruptcy estate; (2) there has been a gross mismanagement of the bankruptcy estate; and (3) the alleged prepetition fraudulent activity committed by Coleman has been perpetrated, postpetition, by the current management and the CRO, Gerrard.

To begin, there has been no evidence presented that demonstrates a substantial or continuing loss to or diminution to the estate postpetition. Section 1112(b)(4)(A) provides that cause exists to convert a case if the movant establishes that (1) there has been "substantial or continuing loss to or diminution of the estate" postpetition, and (2) that there is an "absence of a reasonable likelihood of rehabilitation". 11 U.S.C. § 1112(b)(4)(A). This is a two-part inquiry, and the party moving for conversion bears the burden of proof by a preponderance of the evidence. *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014). The Court must deny the motion to convert or dismiss if the movant fails to satisfy either prong of § 1112(b)(4)(A). *Id.*

The test of whether there exists a "substantial or continuing loss to or diminution of the estate" has been met where it has been shown that the debtor suffered or has continued to experience a negative cash flow or declining asset values following the entry of the order for relief.

*Id*. The second prong—whether there is an absence of a reasonable likelihood of rehabilitation—looks to whether the debtor lacks a reasonable likelihood of reestablishing itself "on a firm, sound basis". *In re Gregory & Parker, Inc.*, 2013 WL 2285671 (quoting *In re Westgate Properties, Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010)). Here, the Court recognizes that the Movants have established the second prong as this case does not present a reasonable likelihood of the Business Debtors reestablishing itself on a firm, sound basis; rather, the Debtor is currently implementing a wind down of all business operations. But as stated above, the Movants must satisfy both prongs of the § 1112(b)(4)(A) test and, here, there has been no evidence presented that there has been a substantial or continuing loss to or diminution of the estate.

The court in *In re Gregory & Parker, Inc.* similarly found that cause was not established under § 1112(b)(4)(A) because of a lack of evidence demonstrating that the debtors suffered from a substantial or continuing negative cash flow. *Id*. at 5. The case involved three debtors: Gregory & Parker, Inc. ("Gregory & Parker"), a North Carolina corporation; Gregory & Parker-Seaboard, LLC ("Seaboard"); and Mr. and Mrs. William and Diana Parker (the "Parkers")[12] *Id*. at 1. The debtors filed for chapter 11 relief on February 22, 2012 and filed a summary of schedules for each debtor. *Id*. Gregory & Parker's summary of schedules reflected that it owned assets with an estimated value of $2,793,614 and liabilities estimated at $18,744,754.35. *Id*. Seaboard's summary of schedules showed that it owned assets with an estimated value of $19,014,491.89 and liabilities estimated at $20,933,465.28. *Id*. The Parkers, in their individual chapter 11 bankruptcy case, filed schedules that reflected assets with an estimated value of "$8,686,82.70" and liabilities estimated

---

[12] Gregory & Parker, Inc. and Seaboard had their cases procedurally consolidated and jointly administered with the Gregory & Parker, Inc. case designated as the lead bankruptcy case. The Parkers filed their individual chapter 11 bankruptcy on April 25, 2012. *Id*.

at "$1,791,489,38". *Id*. All three entities owned a significant amount of real property, some of which was encumbered by liens. *Id*. at 1-2.

Gregory & Parker, Seaboard, and the Parkers filed their plans of reorganization in November of 2012. *Id*. at 3. Regions and Georgia Capital filed motions to dismiss the cases under § 1112(b) or, in the alternative, to convert them to chapter 7. *Id*. at 4. In attempting to establish cause to dismiss the case under § 1112(b), Regions Bank ("Regions") and Georgia Capital, LLC ("Georgia Capital"), two of the largest creditors in the cases, argued that there was a "substantial or continuing loss to or diminution to the estate and the absence of a reasonable likelihood of rehabilitation" under § 1112(b)(4)(A). The court analyzed the two prongs of § 1112(b)(4)(A) and found that there "was not much, if any, evidence on the debtors' post-petition cash flow or, more specifically, on Seaboard's cash flow as the primary income producing entity". *Id*. at 5. The court looked to the debtors' monthly operating reports for guidance and, even still, found that it was unclear whether the company suffered from a substantial or continuing negative cash flow since filing bankruptcy. *Id*. In fact, the reports showed that Seaboard's postpetition operating account accumulated a significant amount of cash from the petition date and, therefore, was experiencing a positive postpetition cash flow even while making adequate protection payments and paying administrative expenses. *Id*.

In addition, the company's postpetition net operating income was unclear because, despite a showing of seven positive net monthly operating incomes and five negative net monthly operating incomes, such statements were not true indicators of financial stability because they contained noncash accounting entries such as depreciation. *Id*. The court further found that there was no evidence or allegation made that the debtors' assets suffered a substantial or continuing decline in value: "[w]ithout more, the movants [did not] establish that any of the estates' assets

[had] diminished in value since filing the bankruptcy." *Id*. Because the movants did not satisfy the burden of presenting sufficient evidence to establish the first prong of the test under § 1112(b)(4)(A), the court found that cause was not established to dismiss or convert the case.

Here, the Court similarly finds that there has not been sufficient evidence presented to establish that there has been a substantial or continuing loss or diminution to the estate, whether that be a substantial or continuing negative cash flow since the filing of the petition or a substantial or continuing decline in value of the assets of the estate. No evidence was presented by any party regarding the actual value of the assets of the estate—namely, the grain—before the grain was crushed and the grain proceeds segregated into the proper segregated accounts. The Court has also looked to the monthly operating reports filed in this bankruptcy case for the months of September, October, November, and December of 2021 to ascertain whether there has been a substantial or continuing negative cash flow. While the September 2021 operating report shows both a negative cash flow and operating balance the October, November, and December 2021 operating reports demonstrate both a *positive* cash flow and operating balance.

The Business Debtors monthly operating reports are slightly "skewed" because of the presently existing segregated accounts for adequate protection purposes. In other words, the monthly operating reports may not be completely accurate as a result of the Business Debtors taking money from its cash flow and operations and placing it into segregated accounts pursuant to this Court's prior orders. The fact that these monthly operating reports are "skewed" does not, however, amount to a substantial or continuing loss to or diminution of the estate; rather, the continued segregation of funds from the Debtor's cash flow and operating balances simply causes these balances to be unclear. This is not *per se* evidence of a substantial or continuing loss to or diminution of the estate because the burden to establish cause on this ground rests with the

Movants. Here, the Movants failed to present any further evidence supporting that the Debtor experienced a continuing negative cash flow or decline in asset values[13] and, without more, the Movants have failed to establish cause under § 1112(b)(4)(A).

The Movants next argue that cause has been established under § 1112(b)(4)(B): that there has been a gross mismanagement of the bankruptcy estate. Section 1112(b)(4)(B) focuses on the management of the bankruptcy estate rather than the debtor and, therefore, the inquiry cannot include mismanagement by the debtor prior to the filing of the bankruptcy petition. 7 COLLIER ON BANKRUPTCY ¶ 1112.04[b] (16th ed. 2022) (citing *In re Sunnyland Farms, Inc.*, 517 B.R. 263, 267 (Bankr. D.N.M. 2014). Courts have generally found gross mismanagement of the bankruptcy estate where debtors, or current management, fail to seek court approval before taking certain actions outside the ordinary course of business, file monthly operating reports without closely monitoring them, and where the business lacks effective management. *Compare In re Creech*, 538 B.R. 245, 251 (Bankr. E.D.N.C. 2015) (finding that variance in value of debtor's inventory and accounts receivable did not constitute gross management of the bankruptcy estate), *with In re Gateway Access Solutions, Inc.* 374 B.R. 556, 564-65 (Bankr. M.D. Pa. 2007) (finding gross mismanagement where debtor's sole director worked full time as an anesthesiologist while attempting to rehabilitate the debtor, failed to closely monitor operating reports, and made and accepted loans on an oral basis on behalf of the debtor), *and In re ARS Analytical, LLC*, 433 B.R. 848 (Bankr. D.N.M. 2010) (finding gross mismanagement where, among other things, the chief

---

[13] The Business Debtors presented evidence that their operational cash flow is favorable depending upon the removal of funds placed in the segregated accounts. For example, Gerrard testified that, concerning the cash flow projections contained in the winddown plan, operations were favorable to the budget in the most recent budgeted period except for the removal of almost $500,000.00, which was placed in the segregated account(s). On a similar note, Gerrard testified that, as of the petition date, the working capital assets were in the $57 million dollar range but, as of October 28, 2021, the working capital increased to the $63 million dollar range.

operating officer and chief executive officers were hardly present at the debtor's business offices, had no grasp of the daily activities and operations of the debtor's bankruptcy estate, and lacked understanding of the assets the debtor owned, leased, or used).

Here, there is no evidence that the Business Debtors and current management have engaged in a gross mismanagement of the bankruptcy estate. While the Court acknowledges that the Business Debtors' management may have been disorganized prior to Gerrard's appointment as CRO, since the time of Gerrard's appointment in October of 2021, management of the Business Debtors' affairs, including the manufacturing operations and the current wind down of operations, have been handled in an organized, knowledgeable, and productive fashion. There has been no evidence presented to suggest that the Business Debtors lack effective management, have taken actions outside of the ordinary course of business without Court approval, or have failed to closely monitor all operating budgets, reports, and other financing documents filed with the Court.

To the contrary, evidence presented to this Court suggests that CR3 Partners, both through the actions of Gerrard and other professionals such as Heather Williams and Todd Bearup, have instilled some sense of certainty and security in the Business Debtors' employees. The evidence shows that the current management has worked diligently to effectuate a plan for the Business Debtors going forward—one that will likely increase the value of the assets and attempt to benefit all parties in the end. All actions taken by the Business Debtors' current management have been within its sound business judgment and, although it has been made apparent that certain parties disagree with the CRO's business judgment, disagreement surrounding the management of the Business Debtors' bankruptcy estate does not rise to the level of "gross mismanagement" that is required to establish cause under § 1112(b)(4)(B). The Movants simply have not established cause under this subsection of § 1112(b)(4).

Finally, the Movants argue that cause exists to convert this bankruptcy case to a bankruptcy case under chapter 7 because Coleman's alleged prepetition fraudulent activity has been perpetrated and effectuated postpetition by Gerrard. Specifically, the Movants argue that, by failing to report financial discrepancies contained in the financial audit received by the CRO in October of 2021, the CRO engaged in fraudulent activity that warrants conversion of this bankruptcy case.

As mentioned above, the list contained in § 1112(b)(4) is not exhaustive, and a court may consider other factors and equitable considerations establishing cause to reach an appropriate result in the individual case. *In re Miell*, 419 B.R. at 366. While it is true that the CRO did not make a report of the financial discrepancies contained in the financial audit he received, Gerrard's testimony indicates that the audit in question was conducted over one year before the filing of the bankruptcy petition in September of 2021 and that "substantial changes" had been made to the Business Debtors' operations between the time the audit was issued and Gerrard's receipt of that audit. These facts, coupled with the range of time contemplated by the financial audit, had no direct application to Gerrard's management decisions made as the CRO in this bankruptcy case. Further, while both Coleman, and his father, Michael Coleman, have remained on the Business Debtors' board of directors during the pendency of this bankruptcy case, Gerrard presented testimony that neither were directly involved in the management of the Business Debtors. Gerrard testified that he has rejected suggestions presented to him by the Business Debtors' board of directors. Beyond evidence that Gerrard failed to report discrepancies contained in a financial audit taken over a year before he was appointed as the CRO in this case, no further evidence has been produced by the Movants that Gerrard took steps to perpetrate fraud, conceal fraudulent activity, or engage in ongoing fraudulent activity while in his position as the Business Debtors' CRO.

As a general point to conclude the cause discussion, converting this case to a case in chapter 7 would do nothing but cause more confusion, burden the bankruptcy estate with more cost, and unduly delay the current § 557 process that is in place. The objecting parties—the Business Debtors, StoneX, Macquarie, and UMB—have established that there is a reasonable likelihood that a plan will be confirmed within a reasonable time. Both at the hearing on February 7, 2022 and at prior hearings, evidence has been presented that Express Grain is currently engaging in a wind down of operations and that a plan for chapter 11 liquidation under § 1123(b)(4) will be forthcoming. In fact, when asked by the Business Debtors' counsel whether a plan for liquidation can be formulated in this bankruptcy case, Gerrard responded in the affirmative, stating that he has "no doubt" that a chapter 11 liquidation plan is on the horizon. Thus, the Court is satisfied that a plan for chapter 11 liquidation will likely be confirmed within a reasonable period of time as contemplated by § 1112(b)(2)(A).

Despite the Movants' arguments in support of converting this bankruptcy case to a case under chapter 7, the Court finds that the Movants have failed to prove by a preponderance of the evidence that cause exists to convert this bankruptcy case on any of the grounds, both enumerated and unenumerated, under § 1112(b)(4).[14]

### C.     The Movants Failed to Meet the Requirements Under § 1104(a) for the Appointment of a Chapter 11 Trustee.

While the Movants requested, as alternative relief, the appointment of a trustee, they failed to do so explicitly under § 1104(a). The Court, however, will briefly address the appointment of a trustee under § 1104(a) separate and in addition to its inquiry under § 1112(b)(1). As stated in its

---

[14] Because the Movants have failed to establish cause under § 1112(b)(1), the Court need not determine whether the appointment of a chapter 11 trustee under § 1104(a) by way of § 1112(b)(1) is in the best interests of the Creditors and the bankruptcy estate.

bench ruling given on February 9, 2022, and for many of the same reasons that the Court found no cause to convert the bankruptcy case, the Court finds that there is no cause to appoint a chapter 11 trustee under § 1104(a). Further, the appointment of a chapter 11 trustee would not be in the best interest of the Creditors.

Section 1104(a) provides the circumstances in which the Court shall appoint a trustee, namely for cause or similar cause, which includes fraud, dishonesty, incompetence, or gross mismanagement of the debtor by current management either pre or postpetition. 11 U.S.C. § 1104(a)(1). In addition, § 1104(a) also mandates that the Court appoint a trustee if the appointment is in the "interest of the creditors". 11 U.S.C. 1104(a)(2). As other courts have recognized, there is an overlap between § 1104(a)(1) and the factors for determining cause to convert or dismiss under § 1112(b)(1) and (b)(4). *In re TP, Inc.*, 455 B.R. 455, 458 (Bankr. E.D.N.C. 2011).

As mentioned above, the Court has not been presented with any credible evidence that the Business Debtors' current management, Gerrard as CRO and the firm in which he is a partner, CR3 Partners, has participated in or perpetuated any fraud. Further, the Business Debtors' current management has not been engaged in gross mismanagement of the Business Debtors' affairs at any point in this bankruptcy case. At this stage in the bankruptcy case, the Court also finds it difficult to believe that the appointment of a chapter 11 trustee would be in the best interests of the Creditors and the bankruptcy estate for at least two reasons.

First, the moving parties fail to consider the costs associated with the appointment of a chapter 11 trustee, namely that the compensation of a chapter 11 trustee under §§ 326 and 330 of

the Bankruptcy Code would likely cost over $1 million dollars.[15] The Court simply cannot fathom a chapter 11 trustee stepping in *now*, at the tail end of the § 557 procedures, which would increase costs and expenses to the bankruptcy estate. Additional costs, albeit non-monetary, are the costs associated with transitioning from the current management to a trustee who will have to spend a significant amount of time becoming acquainted with the bankruptcy case and the Business Debtors' affairs and personnel. As previously mentioned, the Business Debtors and CR3 Partners and their employees have spent a considerable amount of time creating and implementing a winddown plan, all of which would have been for naught if a chapter 11 trustee is appointed and forced to either "catch up" on any winddown operations having already been implemented or implement his or her own winddown operations.

Second, with the current deadline for the completion of the § 557 procedures, including what could be an incredibly lengthy and tiresome trial on certain identified legal issues, the Court cannot reconcile the inevitable delay, confusion, and cost that would occur if a chapter 11 trustee is appointed in this bankruptcy case. The appointment of a chapter 11 trustee at this point in the bankruptcy case would essentially amount to a total shutdown of *all* operations of Express Grain, which is a result that would hurt all parties, including the Farm Groups, Production Lenders, and other Creditors. The Court is at a loss as to why certain parties continue to push for such an extreme result knowing the detriment such a result would cause. Simply put, the interests of the Creditors and the bankruptcy estate would not be served by the appointment of a chapter 11 trustee.

---

[15] Section 326(a) provides: "In a case under chapter 7 or 11 . . . the Court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed . . . 3 percent of such moneys in excess of $1,000,000.00 upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims." 11 U.S.C. § 326(a).

**D.      Even if the Movants Established Cause, Unusual Circumstances Exist Warranting Retention of this Bankruptcy Case Under Chapter 11.**

Even if the Movants satisfied their burden and established cause by a preponderance of the evidence under § 1112(b)(1), unusual circumstances are present signaling to the Court that converting this bankruptcy case to chapter 7 is not in the best interests of the creditors and the bankruptcy estate.

The analysis of a conversion motion under § 1112(b) is a burden-shifting one and, if the moving party meets their burden in establishing cause, the burden shifts to the objecting parties to show "unusual circumstances" under § 1112(b)(2) and that (1) there is a reasonable likelihood that a plan will be confirmed within time periods set forth in section 1121(e) and 1129(e), or if these provisions are inapplicable, within a reasonable period of time; (2) the grounds for granting such relief include an act or omission of the debtor for which there exists a reasonable justification for such act or omission; and (3) such act or omission will be cured within a reasonable period of time. *In re Delta AG Group, LLC*, 596 B.R. at 197. When broken down, the exception to conversion or dismissal under § 1112(b)(2) consists of six components: (1) "unusual circumstances" exist; (2) conversion or dismissal is "not in the best interests of creditors and the estate"; (3) there is a reasonable likelihood of confirmation of a plan within any time period mandated by the Bankruptcy Code or otherwise within a reasonable period of time; (4) the grounds for conversion for "cause" do not include those set forth in § 1112(b)(4)(A); (5) there is a reasonable justification for the act or omission of the debtor giving rise to the finding of "cause" under § 1112(b)(1); and (6) the act or omission giving rise to "cause" may be cured within a reasonable period of time. *In re Korn*, 523 B.R. at 465, 468.

It is clear to the Court that unusual circumstances exist in this bankruptcy case—in fact, unusual circumstances have permeated this bankruptcy case since its inception. As most parties

are aware, this bankruptcy case is not a typical chapter 11 reorganization. This bankruptcy case involves hundreds of parties competing for a stake in the grain, grain assets, and the Business Debtors' assets, a process that has not only involved the interaction and coordination of a substantial number of parties throughout but has also implicated many difficult legal issues in a very short period due to the implementation of the § 557 expedited procedures. In addition, from this Court's own review of the relevant legal authority, § 557 is not a Bankruptcy Code section that has been explored or utilized by other courts in other jurisdictions to the extent required in this bankruptcy case. The Court has expedited the procedures for the distribution of grain and grain assets under § 557 and must complete the § 557 process—a process that will involve the completion of extensive discovery, the resolution of legal issues that distribution turns upon, and the actual distribution of grain and assets to the appropriate parties. To say that this bankruptcy case does not involve unusual circumstances would be a shocking minimization of the events that have unfolded since the filing of the Business Debtors' petitions on September 29, 2021.

## IV. CONCLUSION

Based on the analysis above, the Court finds there is no need to lift the automatic stay in this bankruptcy case because the State of Mississippi's administrative proceedings, and the issuance of an order by the Commissioner revoking the Business Debtors' licenses is excepted from the automatic stay under 11 U.S.C. § 362(b)(4). The automatic stay, therefore, does not apply. The Court further finds that the Movants have failed to satisfy their evidentiary burden to establish cause to convert this bankruptcy case to a case in chapter 7 or appoint a chapter 11 trustee.

**ACCORDINGLY,** it is hereby **ORDERED** that the *Motion for Relief from Automatic Stay* (Dkt. #1526) is **GRANTED IN PART** to the extent that the Court will not prohibit the issuance of an order by the State of Mississippi under the Bankruptcy Code revoking the licenses and **DENIED**

**IN PART** to the extent that relief from the automatic stay is not necessary. It is further **ORDERED**

that the *Amended Joint Motion to Convert Case to Chapter 7 Liquidation and For Order Directing*

*Appointment of Trustee Pursuant to 11 U.S.C. §§ 701 and 702, or Alternatively, for Appointment*

*of Chapter 11 Trustee* (Dkt. #1768) is **DENIED**.

##END OF ORDER##