___

**SO ORDERED,**



*[signature: Selene D. Maddox]*

**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

The Order of the Court is set forth below. The case docket reflects the date entered.
___

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

IN RE: EXPRESS GRAIN TERMINALS, LLC[1]　　　　CASE NO. 21-11832-SDM

　　　　DEBTOR　　　　　　　　　　　　　　　　　　CHAPTER 11

## MEMORANDUM OPINION AND ORDER GRANTING UMB BANK, N.A.'S MOTION TO ENFORCE PROTECTIVE ORDER AND FOR AN ORDER TO SHOW CAUSE

This cause came before the Court on *UMB Bank, N.A.'s Motion to Enforce Protective Order and for an Order to Show Cause* (the "Motion to Enforce") (Dkt. #2579) filed by UMB Bank, N.A., ("UMB") and the *Response* filed by John W. Barrett ("Barrett")[2] (Dkt. #2591). The Court conducted a telephonic hearing on the above pleadings on March 24, 2022. A day later, on March 25, 2022, the Court issued its bench ruling granting UMB's Motion to Enforce. This Memorandum Opinion and Order adopts, by reference, the Court's bench ruling, including any findings of fact and conclusions of law.

---

[1] The above styled case is being jointly administered with *In re Express Biodiesel, LLC*, Case No. 21-11834-SDM and *In re Express Processing, LLC*, Case No. 21-11835-SDM.

[2] Barrett and his law firm, Barrett Law Group, P.A., currently represent multiple farmers (the "Plaintiffs") in a civil case against UMB pending in the United States District Court for the Southern District of Mississippi (the "Civil Case").

## I. JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief District Judge L.T. Senter and dated August 6, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

## II. FACTS AND PROCEDURAL HISTORY

A brief overview of the facts and procedural history relating to the Motion to Enforce is helpful. The Court entered its *Amended Section 557 Procedures – Phase 2 Scheduling Order* (the "Scheduling Order") (Dkt. #1800) on January 31, 2022, establishing the parameters for an expedited discovery process and final determination hearing under 11 U.S.C. § 557.[3] Due to the sensitive and confidential nature of the documents produced by various parties participating in the § 557 procedures, the Court entered a *Protective Order* (Dkt. #1801). As UMB cited in its Motion to Enforce, the Protective Order contained several key provisions, including: (1) any party receiving documents must treat those documents as confidential; (2) documents produced and the sensitive information contained in those documents should not be "given, shown, made available to, disclosed or communicated in any way, except for individuals who need access for the purposes of the § 557 procedures"; (3) documents produced shall be limited to "attorneys for, employees of, or agents of the Participating Parties";[4] (4) documents must be used and disclosed "solely for the

---

[3] Unless noted otherwise, all statutory references will be to Title 11 of the United States Code.

[4] Based on prior orders of this Court, "Participating Parties" includes all parties participating in the final determination hearing, which would determine the parties' interest in the grain and grain assets being held by the Debtor. At no point has this Court considered Barrett or his law firm "Participating Parties" relating to § 557 procedures. The Court is not aware of any agreement between Barrett and his law firm to represent any farmer in this bankruptcy case and, more specifically, the § 557 procedures.

purposes of the discovery and final determination hearing under the § 557 discovery procedures; and (5) the Protective Order was binding on all counsel of record, their law firms, and all Participating Parties, among others. See *Protective Order* (Dkt. #1801).[5]

After the entry of the Protective Order, and sometime during the expedited discovery procedures established in the Court's Scheduling Order, Barrett and his law firm filed a *Farmers' Motion for Partial Reconsideration and/or Clarification of Discovery Orders* (the "Motion to Reconsider") (Dkt. #1967). In their Motion, Barrett and his law firm requested that this Court eliminate the requirement that his clients, i.e., the Plaintiffs, complete a discovery questionnaire, or in the alternative, extend the time in which the Plaintiffs could answer the questionnaire.[6] Barrett appeared telephonically at the hearing on the Motion to Reconsider and presented arguments before this Court. The Court denied the Motion to Reconsider and the relief requested therein (except to the extent the Court provided clarification as to the purpose of its discovery order(s) and discovery procedures). See *Order Granting in Part Farmers' Motion for Partial Reconsideration and/or Clarification of Discovery Orders* (Dkt. #1990).

Now to the basis of the Motion to Enforce before this Court. UMB argues that Barrett violated the Protective Order when he participated in a radio interview on March 17, 2022. The Court agrees with UMB that the timing of this interview was suspect, to say the least, as the Participating Parties in the § 557 procedures were set to begin mediation the same day to resolve all legal issues regarding the interest in grain and grain assets currently pending before this Court.

---

[5] The Court notes that the Debtor provided an avenue for the Participating Parties to expediently share and view discovery documents, known as the "Interest Data Room". In the Scheduling Order, of which Barrett and his law firm should be aware, the Court prohibited the sharing of the access information.

[6] The Court was perplexed as to why Barrett chose to file the Motion to Reconsider in this Court except that he was concerned the Plaintiffs disclosure of information could impact the Civil Case pending in another forum.

In the radio interview provided to the Court, Barrett generally referenced documents that he and his law firm had seen. Based on those documents, Barrett went on to assert conclusions about UMB's intentions and conduct. UMB argues that because there has been no production of documents in the Civil Case against UMB, Barrett must have been referencing documents obtained from the Interest Data Room.

Although Barrett had previously appeared before this Court to argue the Motion to Reconsider, Barrett entered a *Notice of Special Appearance* (Dkt. #2590) for the limited purpose of responding to UMB's Motion to Enforce. In his Response, Barrett argues that he did not violate the Protective Order for several reasons. First, Barrett argues that he did not reference any specific document or quote any document in the radio interview. Second, Barrett claims that documents produced by UMB are public record and public knowledge. Along the same lines, Barrett posits that the allegations against UMB in the Civil Case are known to the public. Next, Barrett argues that the Protective Order prohibits parties from disseminating protected information, which he did not do, and UMB is simply attempting to discourage media coverage of the dispute. Last, Barrett admits that he is "aware of the Protective Order and its language, intended to comply with it, tried to comply with it, and in good faith believes that he has complied with it . . . [u]nder no circumstances would the undersigned have willfully or intentionally violated any order of this Honorable Court." *Response* (Dkt. #2591).

At the hearing on March 24, 2022, the parties rearticulated many of their arguments asserted in their pleadings.[7] Barrett mainly argued that he did not refer to any specific documents

---

[7] Barrett also argued at the hearing that UMB fails to assert that he, Barrett, released any commercially sensitive information, financial information that needed protection, or information that harmed or prejudiced UMB. That argument is not relevant because the Court previously determined the unredacted information to be disclosed in the expedited discovery process is sensitive and confidential, hence the reason for the entry of the Protective Order. In any event,

in the radio interview; rather, he referred to the "totality of the evidence that had been building up". Tr. Oral Arg. at 12 (Dkt. #2689). But Barrett also made statements to the Court that are relevant to the Court's decision. In responding to a question by the Court, Barrett admitted that the documents he referred to in his radio interview and at the hearing were "*mostly* available to the general public . . . ." Tr. Oral Arg. at 12 (Dkt. #2689). Much to the Court's surprise after a follow up question, Barrett stated that "my firm has attorneys who are looking at the documents and trying to understand the documents." Tr. Oral Arg. at 12 (Dkt. #2689). Further, Barrett acknowledged that, while he had not seen the documents produced in the Interest Data Room, he had seen "summaries of what they said". Tr. Oral Arg. at 12 (Dkt. #2689). When asked directly by the Court whether the documents his law firm were reviewing were the documents from the Interest Data Room, Barrett answered "Yes, ma'am. Yes, ma'am." Tr. Oral Arg. at 13 (Dkt. #2689).

The Court then asked Barrett why attorneys in his law firm were reviewing the documents if they were not a part of the § 557 procedures. Barrett answered, "[w]ell, we're monitoring it, Your Honor. We represent those clients, and we've entered an appearance on behalf of some of them. Yes, ma'am." Tr. Oral Arg. at 13 (Dkt. #2689). The Court then asked whether Barrett represents the Plaintiffs specifically in the § 557 procedures to which Barrett responded, "[w]ell, I don't know whether I represent them in the 557. They have bankruptcy counsel that's primarily handling all of that." Tr. Oral Arg. at 13 (Dkt. #2689). After the Court expressed its concerns with attorneys in Barrett's law firm monitoring the documents produced in the Interest Data Room in direct violation of the Protective Order, Barrett stated, "I – if – we certainly hadn't intended to do anything that's improper or wrong . . . ." Tr. Oral Arg. at 14 (Dkt. #2689).

---

according to Barrett, adopting UMB's position to enforce the Court's Protective Order is not "sound public policy" due to the "general rule that federal courts are open to the public" and "protective orders, generally, are narrowly drawn for a purpose." Tr. Oral Arg. at 10 (Dkt. #2689).

At the conclusion of the hearing, the Court took the matter under advisement. The next day, on March 25, 2022, the Court issued its bench ruling granting the Motion to Enforce and issuing sanctions against Barrett and his law firm. The Court directed UMB to submit an itemization of attorney's fees and costs to the Court within seven days, after which Barrett would have three days to object to the reasonableness of the attorney's fees and costs asserted. UMB timely filed its *Invoice of Fees & Costs* (the "Invoice") (Dkt. #2655) on March 31, 2022. UMB attached an itemization of attorney's fees—totaling $3,139.40—to its Invoice as Exhibit A:

*RSC – Spencer Clift. Hourly Rate: $480.00*

| Date | TKPR | Description | Rate | Hours | Amount |
|---|---|---|---|---|---|
| 3.17.22 | RSC | Receipt and review of draft Motion to Enforce Protective Order; edits to Motion to Enforce Protective Order | $480.00 | 0.4 | $192.00 |
| 3.22.22 | RSC | Finalize Motion to Enforce Protective Order; draft Motion to Expedite Hearing on Motion to Enforce Protective Order; draft Order Granting Motion to Expedite Hearing on Motion to Enforce Protective Order; confirm approval to file same in Express Grain Terminals, LLC Chapter 11 Case | $480.00 | 0.9 | $432.00 |
| 3.22.22 | RSC | Email enclosing Motion to Enforce Protective Order, Motion to Expedite Hearing, proposed Order Granting Motion to Expedite Hearing and link/ transcript to parties in interest including Mr. Don Barrett | $480.00 | 0.1 | $48.00 |
| 3.23.22 | RSC | Email to Mr. Don Barrett enclosing Certificate of Service and pleadings / exhibits attached thereto to confirm service of all pleadings related to the Motion to Enforce Protective Order; confirm receipt of same via responsive email | $480.00 | 0.1 | $48.00 |
| 3.24.22 | RSC | Review of Response to Motion to Enforce Protective Order filed by Mr. Don Barrett | $480.00 | 0.2 | $96.00 |
| 3.24.22 | RSC | Attend the hearing on the Motion to Enforce Protective Order via telephonic hearing before Judge Maddox | $480.00 | 0.5 | $240.00 |
| | | **Total Spencer Clift** | | **2.2** | **$1,056.00** |

*PLR - Peter L. Riggs. Hourly Rate: $470.80*

| Date | TKPR | Description | Rate | Hours | Amount |
|---|---|---|---|---|---|
| 3.17.22 | PLR | Analysis of issues related to protective order based on radio interview by counsel in civil case. | $470.80 | 0.7 | $329.56 |
| 3.23.22 | PLR | Prepare for oral argument on Motion to Enforce Protective Order. | $470.80 | 1.3 | $612.04 |
| 3.24.22 | PLR | Represent client at hearing on Motion to Enforce Protective Order. | $470.80 | 0.5 | $235.40 |
| | | **Total Peter Riggs** | | **2.5** | **$1,177.00** |

| | | *KLH - Kersten L. Holzhueter. Hourly Rate: $453.20* | | | |
|---|---|---|---|---|---|
| 3.17.22 | KLH | Draft Motion to Enforce Protective Order; review and analyze case law and federal rules for same. | $453.20 | 2.0 | $906.40 |
| | | **Total Kersten Holzhueter** | | **2.00** | **$906.40** |
| | | | | | |
| | | Total | | **6.70** | **$3,139.40** |

In its Invoice, UMB alleges that it incurred additional costs and expenses relating to the Motion to Enforce, but UMB would not be seeking those at this time. Later, Barrett filed his *Response to UMB Bank, N.A.'s Invoice of Fees and Costs* (the "Invoice Response") (Dkt. #2683) on April 4, 2022. In his Invoice Response, Barrett does not contest the reasonableness of the fees incurred by UMB as described in their Invoice and Exhibit A and agrees to pay the full invoiced amount upon receipt of the Court's order.

### III. DISCUSSION

**A. Barrett and his Law Firm Violated the Court's Protective Order Warranting Imposition of Sanctions**

A court has "broad discretion" in all discovery matters. *In re Feldman*, 608 B.R. 426, 436 (Bankr. E.D. Penn. 2019) (citing *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841 (5th Cir. 2000)). When parties violate discovery orders, Federal Rule of Bankruptcy Procedure 7037, which incorporates Federal Rule of Civil Procedure 37, allows for a broad range of sanctions against counsel and parties. Fed. R. Civ. P. 37; Fed. R. Bankr. P. 7037. Specifically, Rule 37(b)(2) authorizes the court to impose a "concurrent sanction of reasonable expenses, including attorney's fees" caused by the violation of the discovery order. *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488 (5th Cir. 2012); Fed. R. Civ. P. 37(b)(2).

While a court has discretion to fashion remedies "suited to the misconduct," that discretion is limited. *Id.* (citing *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990)). Other courts have articulated that the sanctions imposed should be (1) "just" and (2) "relate to the particular claim to

which the discovery order was addressed." *Ali v. Dainese USA, Inc.*, 2021 WL 5999203, at *9 (S.D.N.Y. Dec. 17, 2021) (internal citations omitted). Further, a finding of bad faith or willful misconduct is required to support more severe remedies, whereas lesser sanctions do not require a finding of willfulness. *Id.* (citing *Chilcutt v. United States*, 4 F.3d 1313, 1323 n. 23 (5th Cir. 1993). Noncompliance with discovery orders is considered willful when the "court's orders have been clear, when the party has understood them, and when the party's noncompliance is not due to factors beyond the party's control. . . ." *Ali*, 2021 WL 5999203, at *11 (internal citations omitted). In addition to fashioning sanctions according to the level of misconduct, i.e., assessing a penalty, a court may impose discovery sanctions as a deterrent. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642-43 (1976).

The Fifth Circuit addressed the issue of court-imposed sanctions for violations of protective orders in *Cooper Tire & Rubber Company* ("*Cooper Tire"*), cited above, and the Court finds this case most instructive. In *Cooper Tire*, Smith & Fuller, P.A. and Hugh N. Smith (collectively, "Smith"), appealed the district court's imposition of sanctions for violation of the district court's protective order. *Cooper Tire & Rubber Co.*, 685 F.3d at 487. Smith represented the Trenado Family in a products liability suit against Cooper Tire & Rubber Company ("Cooper Tire"), the Appellee. *Id.* During discovery, the district court entered an amended protective order under Federal Rule of Civil Procedure 26(c) to protect Cooper Tire's confidential information throughout the discovery process. *Id.* According to the terms of the protective order, the Court limited access to the protected information to only authorized persons in the performance of their duties in connection with the trial preparation of the case. *Id.*

At some point during discovery, Smith inadvertently disseminated Cooper Tire's confidential information to other personal injury attorneys during a conference. *Id.* The

confidential information was mistakenly copied onto compact discs, which were then distributed at the conference. *Id.* Cooper Tire discovered the alleged violation when its counsel received documents with Trenado Bates numbers from plaintiffs' attorneys in an unrelated lawsuit. *Id.* Smith did not dispute the violation of the discovery order, and the district court found a clear violation and ordered remedial measures to correct the violation. *Id.* In addition, the district court found that despite Smith's inadvertent protective order violation, the violation warranted imposition of sanctions for two main reasons: (1) Cooper Tire "vigorously" moved for the strongly worded protective order and its enforcement; and (2) Smith understood the importance of compliance as Cooper Tire produced the documents relying on the protections provided in the protective order and, despite this, allowed dissemination of the protected information to other attorneys involved in litigation with Cooper Tire and other tire manufacturers. *Id.* at 487-88.

The Fifth Circuit affirmed the district court's imposition of sanctions. *Id.* at 489-90. The Fifth Circuit first analyzed the application of Rule 37(b)(2) sanctions to a violation of a Rule 26(c) protective order and found that the district court had the authority to impose sanctions for a violation even though Rule 37(b)(2) does not explicitly mention Rule 26(c). *Id.* The Fifth Circuit reasoned that the protective order was an "order to provide or permit discovery," as the phrase is used in Rule 37(b)(2), because the protective order governed confidential information produced in response to discovery, allowed parties to designate what information or material was confidential, addressed inadvertent production of confidential material, included procedures for objecting to material designated as confidential, limited access to confidential material, and included provisions governing the storage, use, and return of confidential material. *Id.* Finally, the Fifth Circuit determined that the district court's reasons for imposing sanctions (despite the unintentional disclosure) were "well-reasoned" because, according to the district court, any less penalty would

not serve as an adequate future deterrent. *Id.* at 490. The Fifth Circuit concluded simply: Smith conceded that they violated the court's protective order, and it was well within the district court's discretion to use sanctions as a tool to deter future abuse of discovery. *Id.*

To begin, based on the Fifth Circuit's holding in *Cooper Tire*, the Court finds that it has the authority to impose sanctions for violations of protective orders. While Rule 26(c) is not explicitly mentioned in the Protective Order, the Court contemplated the sensitive nature of the information being provided in an expedited fashion and ordered that the information, which is not generally known to the public, should be treated as confidential. The Court further finds that its Protective Order is an "order to provide or permit discovery" as contemplated under Rule 37(b)(2). The Protective Order clearly provides (1) documents produced and information contained in those documents are sensitive and confidential; (2) how and for what purpose the documents and information contained in the documents may be used; (3) the scope of persons bound by the Protective Order; (4) redaction measures should any documents be filed with the Court; (5) destruction of document(s) instructions at the conclusion of the § 557 procedures; and (6) inadvertent disclosure of privileged information.

The Court now turns to Barrett's misconduct and the reasons for imposition of sanctions. Surprisingly, the Court's imposition of sanctions in this Memorandum Opinion and Order is not due solely to Barrett's radio interview. As discussed in the Court's bench ruling, Barrett's statements in his radio interview on March 17, 2022, run dangerously close to violating this Court's Protective Order. Based on representations made to the Court, no discovery has taken place in the Civil Case. The only documents that could have been referenced by Barrett are either those filed as public record in this bankruptcy case or documents produced in the Interest Data Room for the purposes of the expedited discovery procedures under § 557. Barrett admitted that the documents

discussed in his radio interview are "mostly" available to the public. Mostly, however, does not cut it for this Court. Barrett's conclusory allegations against UMB, considering the context in which the statements were made, could have only come from the documents which UMB has now produced in the Interest Data Room.

While Barrett may consider his statements in such a public way a savvy litigation tactic, this Court is not impressed. Further, it is not lost on the Court that mediation to resolve the complex and intricate issues involved in this bankruptcy case was set to take place on the morning in which Barrett gave his radio interview. The more prudent point, however, is that the Court's Protective Order made clear that any information contained in the documents produced in the Interest Data Room should not be *communicated in any way*, except for the purposes of the § 557 procedures. Barrett's discussion of the documents generally, as well as his attached conclusions drawn from the contents of the documents is, at the very least, a communication of protected, confidential information. Despite this communication, however, the Court will not impose sanctions for Barrett's statements in the radio interview because Barrett did not reference specific documents or disclose specific information from those documents. The Court nevertheless formally admonishes Barrett as he undoubtedly has knowledge of the information contained in the documents produced in the Interest Data Room by UMB and communicated his conclusions based on those documents.

Barrett's knowledge of the information contained in the documents produced by UMB sets the stage for this Court's imposition of sanctions, albeit for misconduct that is only tangentially related to the radio interview. Barrett and his law firm's misconduct, much like the misconduct brought before the district court and the Fifth Circuit in *Cooper Tire*, is worthy of sanctions. The Motion to Enforce before this Court involves a similar situation to that in *Cooper Tire* where documents and information have been accessed by plaintiffs' attorneys seeking to use that

information in another forum. Just like the protective order at issue in *Cooper Tire*, this Court similarly included language in its Protective Order limiting the use of the documents and information contained in those documents.

While the underlying facts may not be exact, the reality before this Court is that Barrett and his law firm's misconduct is worse than the conduct at issue in *Cooper Tire*. Unlike Smith's inadvertent disclosure of information in *Cooper Tire*, Barrett and his law firm are knowingly and willfully violating the Protective Order by (1) having access to and possession of documents and information produced by UMB in the Interest Data Room and (2) attempting to use documents and information contained in those documents for the Civil Case. Barrett admitted in his pleading and at the hearing that he is aware of the Protective Order and its terms, and Barrett also admitted that he believes he and his law firm are complying with it.[8] The Court, however, finds these statements difficult to accept considering the clear language of the Protective Order concerning who may have access to the information and for what purposes the information may be used.

Although Barrett did not concede to violating the Protective Order like Smith in *Cooper Tire*, Barrett's further admissions at the hearing—that "my firm has attorneys who are looking at the documents and trying to understand the documents" in connection with the Civil Case—falls squarely in the gambit of misconduct in violation of the Protective Order. This admission, coupled with Barrett's admission that he and other lawyers in his law firm are aware of and have knowledge of the Protective Order and its terms (namely, that only agents, employees, and attorneys of the Participating Parties to the § 557 procedures may have access to the documents and information

---

[8] The Court points out that most of these defenses were asserted in response to UMB's accusation that Barrett's radio interview violated the terms of the Protective Order. As stated in the Court's bench ruling, after being questioned by the Court, Barrett had little to no justification for having possession of the protected documents and attempting to use the information contained in those documents.

contained therein), forces the Court to draw no other conclusion than to impose sanctions for their violation.

The Court is justified in finding a willful violation of the Protective Order because the terms of the Protective Order are clear (e.g., who may have access to the documents and for what purpose those documents may be used), Barrett admitted that he understood the terms in the Protective Order, and Barrett's noncompliance is soley the result of his failure to abide by those terms. Even if this Court did not find that Barrett and his law firm willfully violated the Protective Order, the result would be the same: sanctions would still be warranted because UMB specifically requested the entry of a Protective Order and produced its documents and information on an expedited basis relying on the protections provided in the Protective Order. The Court's purpose for issuing sanctions in this bankruptcy case is to serve as a deterrent for any attorney or law firm who wishes to violate its discovery orders in the future. The Court need not look much further than the *Cooper Tire* case to support that conclusion.

**B.     The Attorney's Fees Asserted by UMB are Reasonable**

Although Barrett does not dispute the reasonableness of the attorney's fees asserted by UMB, the Court will still briefly assess the reasonableness of those attorney's fees in its analysis. As noted in *Cooper Tire*, a party may be held responsible for the reasonable attorney's fees caused by the party's misconduct. *Cooper Tire & Rubber Co.*, 685 F.3d at 490 (citing *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002)). The Fifth Circuit uses the "lodestar" method to determine whether the attorney's fees are reasonable. *Id.* The lodestar method multiplies the number of hours reasonably expended by an appropriate hourly rate in the community for the work performed. *Id.*

As mentioned above, UMB timely filed its Invoice and itemization of attorney's fees. The attorney's fees itemization, shown above as an attorney's fees itemization chart, included work performed by three attorneys and two separate law firms—Spencer Clift ("Clift") of Baker Donelson and Peter Riggs ("Riggs") and Kersten Holzhueter ("Holzhueter") of Spencer Fane. From what the Court can ascertain from the itemization, Riggs, who charges a $470.80 hourly rate, was the first attorney to explore the potential legal issues related to Barrett's radio interview and the Protective Order. He spent roughly 0.7 hours performing that analysis. His only other involvement was preparation for the hearing, on March 23, 2022 (1.3 hours spent), and participation in the hearing (0.5 hours spent) on March 24, 2022. In total, Riggs billed 2.5 hours worth $1,177.00. Holzhueter, who charges a $453.20 hourly rate, had the lucky task of drafting the Motion to Enforce after having researched the relevant case law and procedural rules. She spent roughly 2.0 hours drafting the Motion to Enforce for a total amount billed of $906.40. Finally, Clift, who charges an hourly rate of $480.00, spent 2.2 hours of time reviewing a draft of the Motion to Enforce, finalizing the Motion to Enforce, drafting an expedited hearing motion on the Motion to Enforce, serving process on Barrett electronically, reviewing Barrett's Response to the Motion to Enforce, and attending the hearing on March 24, 2022. Clift billed a total of $1,056.00.

Altogether, the three attorneys spent 6.70 hours investigating the violation, drafting the appropriate motions, following the Court's procedural requirements, and attending the hearing. For that work, they billed a total of $3,139.40. The Court concludes that the hourly rate charged by each of the three attorneys, considering the complexities of this bankruptcy case, the number of attorneys and law firms involved, and the prevailing attorney rates in the community, is reasonable. After multiplying those rates by the number of hours expended to prosecute UMB's

Motion to Enforce (which the Court also finds is justified), the Court is satisfied that the $3,139.40 is reasonable.[9]

## IV. CONCLUSION

Based on the above, the Court finds that Barrett and his law firm's misconduct is a clear violation of the Protective Order, which warrants the imposition of sanctions in the amount of $3,139.40. While it is difficult to undo the potential harm to UMB, the Court does have the authority to deter future conduct. Therefore, it is hereby ORDERED that *UMB Bank, N.A.'s Motion to Enforce Protective Order and for an Order to Show Cause* (Dkt. #2579) is GRANTED. It is further ORDERED that the attorney's fees in the amount of $3,139.40 incurred by UMB to prosecute its Motion to Enforce are reasonable. It is further ORDERED that within seven days from the date of the entry of this Memorandum Opinion and Order, John W. Barrett and his law firm, Barrett Law Group, P.A., shall issue payment of $3,139.40 to UMB. UMB shall promptly notify the Court upon receipt of payment.

##END OF ORDER##

---

[9] Based on UMB's Invoice, the Court is aware that UMB could have requested additional attorney's fees and included the costs associated with prosecuting its Motion to Enforce. This further supports the Court's conclusion that the amount of attorney's fees requested in the Invoice and itemization are reasonable.