**SO ORDERED,**



*[signature]*

**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF MISSISSIPPI

**IN RE: EXPRESS GRAIN TERMINALS, LLC[1]**          **CASE NO. 21-11832-SDM**

**DEBTOR**                                          **CHAPTER 11**

## MEMORANDUM OPINION AND ORDER APPROVING JOINT APPLICATION TO COMPROMISE CONTROVERSY

This cause came before the Court on the *Joint Application to Compromise Controversy* (the "Settlement Application")(Dkt. #2718) filed by the Business Debtors, StoneX Commodity Solutions LLC ("StoneX"), UMB Bank, N.A. ("UMB"), Macquarie Commodities (USA) Inc. ("Macquarie"), Agrifund, LLC ("Agrifund"), Ag Resource Holdings, LLC, Ag Resource Management, BankPlus, Guaranty Bank and Trust Company ("Guaranty Bank"), Southern AgCredit, ACA ("Southern AgCredit"), Bank of Commerce, First South Farm Credit, ACA ("First South Farm Credit"), Planters Bank & Trust Company ("Planters Bank"), and Staple Cotton Discount Corporation ("Staple Cotton") (collectively, the "Movants"); the *Comment and Reservation of Rights Regarding Joint Motion for Approval of Settlement and Compromise* (the

---

[1] The above styled case is being jointly administered with *In re Express Biodiesel, LLC*, Case No. 21-11834-SDM and *In re Express Processing, LLC*, Case No. 21-11835-SDM. For ease of reference, the Court will refer to these Debtors collectively as the "Business Debtors".

"Reservation of Rights") (Dkt. #2755) filed by Travelers Casualty and Surety Company of America ("Travelers"); the *Disclaiming Farmers' Limited Objection to Joint Motion for Approval of Settlement and Compromise* (the "Objection") (Dkt. #2760) filed by approximately 99 farmers or farming entities (the "Disclaiming Farmers")[2]; *Farm Group's Response to Joint Motion for Approval of Settlement and Compromise* (the "Response") (Dkt. #2761) filed by Farm Group; and the various *Joinders* filed by Farm Group I (Dkt. #2762), Farm Groups II and III (Dkt. #2763), and the State of Mississippi Department of Agriculture and Commerce (the "State of Mississippi") (Dkt. #2765).

## I. JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief District Judge L.T. Senter and dated August 6, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

## II. FACTS AND PROCEDURAL HISTORY

The procedural history leading up to the filing of the Settlement Application is extensive. As such, the Court will limit its overview to the § 557 proceedings. On January 31, 2022, the Court entered the *Amended Section 557 Procedures – Phase 2 Scheduling Order* (the "Scheduling Order") (Dkt. #1800), establishing parameters for an expedited discovery process and final determination hearing (the "§ 557 Final Determination Hearing") necessary for the resolution of

---

[2] Certain farmers and farming entities elected to be the "Disclaiming Farmers", a term that is explained in more detail in this Memorandum Opinion and Order. Some of the Disclaiming Farmers are being represented by counsel in litigation initiated in the United States District Court for the Southern District of Mississippi ("Southern District") on November 8, 2021, in the case of *Island Farms, LLC v. UMB Bank, N.A.*, Case No. 3:21-cv-00721-HTW-LGI (the "District Court Action").

certain legal issues (the "Common Legal Issues") under 11 U.S.C. § 557.[3] The Scheduling Order

provided for discovery to begin on February 1, 2022, and continue through the month of February.

The § 557 Final Determination Hearing was set to begin on March 4, 2022, but on March 2, 2022,

following a status hearing with the parties, the Court entered its *Order Extending the Period for*

*Final Disposition of Grain or the Proceeds of Grain Under § 557(f), Rescheduling the Final*

*Determination Hearing on Common Legal Issues, and Outlining Procedures* (the "§ 557 Extension

Order") (Dkt. #2206). The § 557 Extension Order rescheduled the commencement of the § 557

Final Determination Hearing to March 31, 2022, continuing through April 7, 2022[4]. All other

discovery deadlines remained unaltered.

Later, on March 15, 2022, the parties informed the Court that they reached an agreement

to mediate all issues related to the disposition of grain and grain assets under § 557. Following this

announcement, the Court entered its *Order Referring 11 U.S.C. § 557 Procedures to Mediation,*

*Appointing Mediator, and Establishing Mediation Procedures.* (Dkt. #2543). The mediation was

set to begin on March 17, 2022, before former U.S. Bankruptcy Judge William H. Brown[5] as

---

[3] Unless indicated otherwise, all references shall be to Title 11 of the United States Code.

[4] The Court additionally ordered that, if the § 557 Final Determination Hearing did not conclude by April 7, 2022, the trial would resume on April 18, 2022 and continue daily until concluded.

[5] Former Judge Brown served as a United States Bankruptcy Judge for the Western District of Tennessee for 19 years before his retirement in 2006. As stated above, the Court will refer to former Judge Brown as the "Mediator" if reference is necessary. *See IDB Ventures, LLC v. Charlotte Russe Holdings, Inc.*, 2018 WL 4190841, at *1 (E.D. Tex. Aug. 24, 2018); *see also* Advisory Opinion No. 72, issued by the Committee on Codes of Conduct of the Judicial Conference of the United States, which provides, in pertinent part, that "[j]udges should insure that the title 'judge' is not used in the courtroom or in papers involved in litigation before them to designate a former judge, unless the designation is necessary to describe accurately a person's status at a time pertinent to the lawsuit." In any event, the Court cannot understate its appreciation for the Mediator in helping the parties achieve a settlement in this bankruptcy case. Considering the complexity involved in this bankruptcy case on numerous fronts, the Court recognizes the monumental task posed to all parties involved, including the Mediator.

mediator (the "Mediator"). Additionally, in consideration of the mediation request, the Court entered its *Order* (Dkt. #2545) resetting the § 557 Final Determination Hearing from March 31, 2022, to April 1, 2022.

On March 24, 2022, the Court held a hearing on several matters outside of (but related to) the § 557 proceedings.[6] Following the other substantive matters, the Court held a brief status conference regarding the ongoing settlement negotiations, during which several parties expressed to the Court the need for additional time to continue settlement discussions. To encourage all parties to continue working toward a settlement (and, in the case one was not reached, to give all parties the ability to prepare for the § 557 Final Determination Hearing), the Court entered its *Order Rescheduling § 557 Final Determination Hearing on Common Legal Issues and Outlining Pretrial Procedures* (Dkt. #2624). The Court rescheduled the § 557 Final Determination Hearing to April 18, 2022, at 9:30 a.m. CST.

On April 8, 2022, the parties informed the Court that a settlement had been reached in principle, and the Court held a status hearing on the same day for the parties to present the settlement terms to the Court. At the status hearing, and in addition to presenting settlement terms to the Court, the Movants made, and the Court granted, an *ore tenus* motion to stay the § 557 deadlines while the parties finalized the Settlement Application. The Court was also advised that the Movants would file the Settlement Application with the Court no later than April 11, 2022.

However, on April 11, 2022, the Court received correspondence from the Movants indicating that a "development" had arisen with respect to the proposed settlement and the

---

[6] These matters included the *Motion for Post-Sale Use of Cash Collateral for Wind Up Purposes* (Dkt. #2546); the *Motion to Enforce Protective Order and for an Order to Show Cause* (Dkt. #2579); and the *Motion Pursuant to 11 U.S.C. 105(a) and 363(b) for an Order Approving a Transition Services Agreement and Seeking Approval of Purchase Asset Surcharge Procedures* (Dkt. #2581).

Movants needed a status conference to receive direction from the Court. The Court held a status conference on April 12, 2022, at 4:00 p.m. CST at which the parties informed the Court that some of the Disclaiming Farmers were seeking to withdraw from the terms of the settlement. On April 12, 2022, the Movants filed the Settlement Application, and the Court set a hearing on the Settlement Application for April 25, 2022 at 9:30 a.m. CST. The Movants then filed their *Joint Motion to Continue & Reset the Final Determination Hearing, to Set the Initial Claims Hearing For the Non-Participating Farmers, & Extend the 557 Deadline* (Dkt. #2722), and the Court entered its *Order Granting Motion to Continue & Reset the Final Determination Hearing & Extend the 557 Deadline* (Dkt. #2725) on April 13, 2022. The § 557 Final Determination Hearing was continued to a date to be determined by the Court, and the § 557(f) deadline was to be extended by the Court after solidification of a new date for the § 557 Final Determination Hearing. Additionally, the *Order Granting Motion to Continue & Reset the Final Determination Hearing & Extend the 557 Deadline* set the Initial Claims Hearing[7] for May 3, 2022 at 10:00 a.m. CST.

*Movants' Arguments*

In support of the Settlement Application, the Movants submitted their *Supplemental Brief in Support of Joint Motion for Approval of Settlement and Compromise* (the "Supplemental Brief") (Dkt. #2758) outlining several "options" for farmers both in the event of a settlement approval or failure. The Movants outlined four options for famers in the event of this Court's approval of the Settlement Application: (1) farmers may consent to the settlement agreement (the "Settlement Agreement") and become "Consenting Farmers", a status that would allow them to receive payment in the future in exchange for mutual releases with settling parties, recover attorneys' fees

---

[7] The Court adopts this phrase as it is defined in the Settlement Application. The purpose of the Initial Claims Hearing is explained in more detail below.

paid to date via the farmer settlement fund, and save money by opting out of pursuing litigation

related to the grain assets under § 557; (2) farmers may elect to become "Disclaiming Farmers" by

withdrawing from the § 557 proceedings and disclaim any interest in the grain assets at issue in

the § 557 proceedings in exchange for the Disclaiming Farmers' receipt of attorneys' fees paid to

date via the farmer settlement fund as well as releases of all claims by the bankruptcy estate; (3)

farmers may elect to pursue their assertions of interest via the § 557 Final Determination Hearing,

essentially becoming "Non-Consenting Farmers", and will not receive a release from the

bankruptcy estate but may also pursue any civil litigation if desired; and (4) those farmers who

have an assertion of interest in the grain assets but have not elected to be a Consenting,

Disclaiming, or Non-Consenting Farmer ("Non-Participating Farmers") may appear at the Initial

Claims Hearing, where they will either (a) appear to make an election into the Consenting or Non-

Consenting Farmer elections or (b) fail to appear and be afforded only a general unsecured claim

in the non-objected to amount. According to the Settlement Agreement, the Disclaiming, Non-

Consenting, and Non-Participating Farmers have the option to change their election to a

Consenting Farmer, but the option expires at 5:00 p.m. CST—10 days after entry of an order

approving the settlement (the "Election Deadline").

   The Supplemental Brief also outlined the events that transpired on or about April 7, 2022

through April 11, 2022. As a part of the Settlement Agreement, certain "thresholds" must be met

by either Consenting Farmers or Disclaiming Farmers, and such thresholds were discussed by

farmers' counsel on or about April 7, 2022. These "thresholds", as outlined in paragraph 14.1 of

the Settlement Agreement,[8] were dependent upon farmers executing and signing a farmer election

---

[8] The Movants attached the Settlement Agreement to the Settlement Application as Exhibit
B. (Dkt. #2718).

form (the "Farmer Election Form"), through which a farmer elects to become a Consenting Farmer,

Disclaiming Farmer, or Non-Consenting Farmer. The Movants attached a blank copy of a Farmer

Election Form as an exhibit to the Settlement Agreement:

### FARMER ELECTION REGARDING THE
### SETTLEMENT AGREEMENT RELATED TO DISPUTED GRAIN ASSETS

The undersigned, a farmer creditor of Express Grain Terminals, LLC, Express Processing, LLC, and Express Biodiesel, LLC, (the "**Debtors**"), in the bushel amount set forth below, by executing this Election Form makes the following election with respect to the Settlement Agreement.

| Indicate your election by initialing in the box next to the statement you are electing. *Only initial one box.* | Initials |
|---|---|
| The undersigned does hereby consent to become a signatory as a Consenting Farmer to that certain Settlement Agreement Related to Disputed Grain Assets dated March 31, 2022 (the "**Settlement Agreement**"), by and among the Debtors, UMB Bank, N.A., StoneX Commodity Solutions LLC f/k/a FCStone Merchant Services, LLC, Macquarie Commodities (USA) Inc., the Production Lenders identified on Page 2 of this Election, and other farmers joining in the Settlement Agreement. | |
| The undersigned does hereby (1) withdraw any Assertion of Interest filed with the Court and (2) disclaim and waive any interest that the undersigned has or may claim to have to any and all grain delivered to the Debtors and the products and proceeds thereof which are the subject of the 557 Proceedings currently pending before the Bankruptcy Court (the "**Disputed Grain Asset Pool**") including, without limitation, all funds in any segregated accounts, accounts receivable, and remaining grain finished product inventory. The undersigned acknowledges that he/she/it has had an opportunity to receive funds from the Disputed Grain Asset Pool pursuant to this Settlement Agreement and/or to pursue remedies available pursuant to the Section 557 Proceedings in the Bankruptcy Court; however, the undersigned is knowingly and voluntarily disclaiming and waiving any right and interest to the Disputed Grain Asset Pool and any right to pursue remedies under Section 557 of the Bankruptcy Code. This Disclaimer is conditional upon Bankruptcy Court approval of the Settlement Agreement. If such agreement is not approved, this disclaimer is null and void. **This option contains a limited release from the Debtors' bankruptcy estates including claims related to "Chapter 5" causes of action and other "claw back" claims.** | |
| The undersigned intends to proceed forward with his/her/its rights in the Section 557 proceeding against the Disputed Grain Asset Pool and any other rights and remedies the undersigned may have under applicable law. **No releases shall be granted in connection with this option.** | |

The undersigned further covenants and agrees that before signing this Election, he/she/it has read, or had the opportunity to read, the Settlement Agreement in addition to the Additional Acknowledgements on Page 2 of this Election and has had the Settlement Agreement and the Additional Acknowledgments. . . .

*Settlement Agreement*, Ex. B (Dkt. #2718).[9]  At some point, farmers' counsel contacted Movants' counsel and advised that the initial threshold had been met and, on April 8, 2022, the Movants advised the Court of the terms of the settlement. But, as previously mentioned, on April 11, 2022, counsel for several farmers in the District Court Action contacted the Movants and represented that their clients intended to withdraw their Farmer Election Forms. This attempted withdrawal by several Disclaiming Farmers sets the stage for the issues that have been presented to this Court.

*Arguments of the Objecting and Responding Parties*

None of the parties to the Settlement Agreement assert that they substantively oppose the Settlement Agreement as not being in the best interests of the creditors and the bankruptcy estate. In fact, all parties represented to the Court that they do not oppose the resolution (via compromise or settlement) of disputes over the proceeds to grain and grain assets. The parties objecting or responding to the Settlement Application have done so for very specific reasons—all of which concern the terms of the Settlement Application and any settlement order[10] and how the terms of the settlement, as phrased in the Settlement Application and any settlement order, will impact the rights, claims, and defenses of certain parties and/or non-parties in other forums.

To begin, Travelers's interest in the outcome of the settlement stems from its issuance of certain grain warehouseman and grain dealer bonds in accordance with The Mississippi Grain

---

[9] The Farmer Election Form also contained a second page specifically relating to the Consenting Farmers and their releases, but the language contained on that page is not at issue currently before this Court.

[10] UMB submitted a proposed settlement order to the Court attached to the Settlement Application ("UMB's Proposed Settlement Order"). The Disclaiming farmers attached a red-line version of UMB's Proposed Settlement Order in their Objection and filed another proposed settlement order on the docket (the "Disclaiming Farmers' Proposed Settlement Order") (Dkt. #2768)

Dealers Law of 1978[11] (the "MGDL") and The Mississippi Grain Warehouse Law[12] (the "MGWL"). According to their Reservation of Rights, Travelers issued (a) Grain Warehouseman's Bond No. 107114715 in the penal sum of $1,000,000 (the "Warehouse Bond") and (b) Grain Dealers Bond No. 10711491 in the penal sum of $100,000 (the "Grain Dealers Bond") on behalf of Express Grain Terminals, with the nominal obligee for both being the Mississippi Department of Agriculture and Commerce. Travelers also maintains that the beneficiaries of the Grain Dealers Bond and the Warehouse Bond are third parties who transact with Express Grain based on its compliance with both the MGDL and the MGWL. In consideration for the issuance of these two bonds, Travelers states that Express Grain and other indemnitors executed an indemnity agreement in favor of Travelers. Based on these indemnity agreements and the different elections available to the farmers, which come with certain benefits and burdens, Travelers argues that the elections by the Consenting and Disclaiming Farmers impair Travelers's equitable subrogation rights to the Net Disputed Grain Asset Pool and release Express Grain as principal under both bonds. Further, Travelers argues that the Consenting and Disclaiming Farmer elections establish an additional defense to any claim by the Consenting and Disclaiming Farmers against the Bonds.[13]

The Disclaiming Farmers' Objection is tied to the District Court Action and is directly related to the apparent representation made to the Movants on April 11, 2022 regarding withdrawal of their Farmer Election Forms. Although the Disclaiming Farmers elected to be Disclaiming Farmers as a part of the Settlement Agreement, these farmers maintain that the Settlement Application and UMB's Proposed Settlement Order (both drafted by UMB) may impact claims,

---

[11] Codified as Miss. Code Ann. §§ 75-45-301, *et. seq.*

[12] Codified as Miss. Code Ann. §§75-44-1 through 75-44-71.

[13] As discussed more below, this "new defense" argument is also being leveled by the Disclaiming Farmers against UMB, albeit for different reasons.

cross claims, or counterclaims under tort law, contract law, or other statutes that do not relate to the determination of the interests in the grain proceeds. Specifically, the Disclaiming Farmers assert that certain language in the Settlement Application and UMB's Proposed Settlement Order runs afoul of the rights of the Disclaiming Farmers that were preserved as "excluded claims" in this Court's *Order Establishing Procedures for Determination of Rights, Ownership Interests, Liens, Security Interests and All Other Interests in and to Grain and Proceeds of Grain*. (Dkt. #1070) (the "§ 557 Procedures Order")[14].

Even though the Court excluded claims such as those asserted by the Disclaiming Farmers against UMB from the § 557 Procedures (and reserving all rights in that regard), the Disclaiming Farmers argue that the proposed language of the Settlement Application and UMB's Proposed Settlement Order "undercuts" those rights by allowing the releases contained in the Settlement Agreement to be used by the Warehouse Receipt Holders (the "WHR Group")[15] against the Disclaiming Farmers. Specifically, the Disclaiming Farmers assert that UMB may attempt to argue that UMB's Proposed Settlement Order prevents the Disclaiming Farmers from asserting such excluded claims against the WHR Group in any future litigation outside of this Court. Until such protections of the § 557 Procedures Order remain in place, the Disclaiming Parties maintain that the proposed Settlement Application, and by extension, the overall settlement, is not fair and

---

[14] The language specifically referenced is as follows: "k. Other claims preserved. These Interest Procedures will not apply to the determination of any claims, causes of action, cross claims, or counterclaims sounding in tort, contract, or statute that are not directly related to the determination of interests in the Pre-Petition Grain and the Proceeds pursuant to 11 U.S.C. § 557 (the "Excluded Claims"). The rights of all parties in interest regarding the Excluded Claims are expressly reserved." *§ 557 Procedures Order* (Dkt. #1070).

[15] The WHR Group includes UMB, StoneX, and Macquarie.

equitable with regard to non-parties[16] who, despite not being "Parties" to the Settlement Agreement, will be materially affected by it.

The Disclaiming Farmers argue that, without protective language being included in any settlement order entered by this Court, UMB (or another member of the WHR Group) may attempt to use this Court's approval of the Settlement Agreement and/or settlement order to limit claims, causes of action, or defenses in the District Court Action. Put simply, the Disclaiming Farmers argue that they do not, and have never, consented to a settlement that would create additional or "new defenses" for UMB in the District Court Action and, as such, no meeting of the minds has occurred which would bind any party to a settlement for later use of the Settlement Agreement or any settlement order as a defense against Disclaiming Farmers in the District Court Litigation. Finally, the Disclaiming Farmers make the argument that the Settlement Agreement is the establishment of a chapter 11 plan *sub rosa*, and, in effect, subverts the requirements of chapter 11 for confirmation of a reorganization plan. The Disclaiming Farmers cite *Pension Benefit Guar. Corp. v. Braniff Airways, Inc., (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) in support of this argument, but they do not elaborate on this argument in their Objection.

While the Farm Group did not "object" to the Settlement Application, the Farm Group did file its Response to address the issue as to whether the Disclaiming Farmers' election could create a "new defense" to UMB and other parties in the District Court Action. The Farm Group asserts that this outcome was never the intent of any agreement or party and that, when looking to the language of the § 557 Procedures Order, the Farmer Election Form, and the Settlement Agreement, the Disclaiming Farmers should have the same protections as all other parties upon approval by

---

[16] The Disclaiming Farmers, as well as other parties like the Farm Group and UMB, maintain that the Disclaiming Farmers are technically not parties to the settlement agreement. The Court disagrees and will address this issue in more detail below.

the Court. Based on the language contained in the § 557 Procedures Order and the Settlement Agreement, the Farm Group asserts that the Disclaiming Farmers have not released, waived, or impaired their claims in the District Court Action or any other actions against third parties. Ultimately, the Farm Group argues that the status quo of the District Court Action is, or at least should be, preserved by the Settlement Agreement.

*Additional Arguments*

Three parties filed reply and sur-reply briefs. UMB filed its *Reply to Disclaiming Farmers' Limited Objection to Joint Motion for Approval of Settlement and Compromise (Dkt. #2760) and Farm Group's Response to Joint Motion for Approval of Settlement and Compromise (Dkt. #2761)* (the "UMB Reply Brief") (Dkt. #2766) on the morning of April 25, 2022, and, upon oral motion by several parties, the Court granted additional time to all parties wishing to file a sur-reply brief to do so on or before April 27, 2022. Two sur-reply briefs were filed: Travelers filed its *Travelers Casualty and Surety Company of America's Post-Hearing Sur-Reply to the Reply to Disclaiming Farmers' Limited Objection to Joint Motion for Approval of Settlement and Compromise (Dkt. #2760) and Farm Group's Response to Joint Motion for Approval of Settlement and Compromise (Dkt. #2761)* (the "Travelers Sur-Reply") (Dkt. #2774); and the Disclaiming Farmers filed its *Disclaiming Farmers' Sur-Reply to Reply of UMB Bank* (the "Disclaiming Farmers Sur-Reply") (Dkt. #2775).

The UMB Reply Brief specifically references and addresses several arguments made by the Disclaiming Farmers and the Farm Group. UMB argues that the Disclaiming Farmers seek to avoid "legal consequences" of their execution of the Farmer Election Forms and the disclaimers contained therein while pushing for the non-disclaiming parties to waive or limit rights and defenses that should remain available to them in current or future litigation. In support of this

argument, UMB asserts that the Disclaiming Farmers are not parties to the Settlement Agreement and, as such, may not seek additional protections from the Settlement Agreement that are reserved solely for "Parties" such as the Consenting Farmers.

Next, UMB addresses the waivers signed by the Disclaiming Farmers, arguing that the Disclaiming Farmers cannot argue that they did not agree to a settlement that provides for "new defenses" because, according to UMB, the waivers signed by the Disclaiming Farmers were effective upon their execution and signing. Additionally, UMB states that the Settlement Agreement has not created "new defenses" for UMB or any other WHR Group member; however, the execution of the Farmer Election Forms and the waiver and disclaimer contained therein is an act that carries legal consequence that this Court should not address. Addressing any legal consequences of the execution of the Farmer Election Forms in another forum, UMB argues, would amount to the issuance of an advisory opinion by this Court. As such, any legal implication of the Farmer Election Form and its waivers and disclaimers upon future litigation should be decided by, and is within the purview of, the courts where other litigation is pending. Further, UMB argues that, since the outset of settlement negotiations, the WHR Group has been clear that it had no intention of waiving any defenses to claims that any Disclaiming Farmers have asserted or may assert in the future. UMB points to Section 11.8 of the Settlement Agreement and states that, when read in conjunction with the Farmer Election Form, no party can claim confusion, misunderstanding, mistake, or surprise that the WHR Group reserved all defenses in current or future litigation.

UMB also argues that allowing parties to seek the money contained in the Disputed Grain Asset Pool on the same or similar legal theories presented in this case in another forum goes against UMB's desire to settle the § 557 proceedings in this Court. UMB points out that this Court has

exclusive jurisdiction over the grain and grain proceeds that have been at issue since the inception

of this case under 28 U.S.C. § 1334(e)(1) and that, if the Disclaiming Farmers wanted to pursue

the specific funds contained in the Disputed Grain Asset Pool, they should have chosen to become

Non-Consenting Farmers and pursue litigation in this Court as opposed to litigation in the District

Court Action. Considering this fact, UMB asserts that the "limiting" or "clarifying" language

proposed by the Disclaiming Farmers and the Farm Group is a veiled attempt to subvert this

Court's exclusive jurisdiction over the grain and grain proceeds and, namely, the disputed grain

assets which are at issue.

UMB additionally asserts that the Disclaiming Farmers should be estopped from

withdrawing their Farmer Election Forms for two reasons: (1) the Disclaiming Farmers' Farmer

Election Forms and, ergo, the waivers and disclaimers, were effective upon execution and would

only be inoperable if the Court does not approve the Settlement Application; and (2) because of

equitable and/or judicial estoppel. UMB argues that, in reliance upon the Farmer Election Forms

and the representations made by the Movants and farmers' counsel that the initial thresholds had

been met, several parties, the WHR Group, and the Court agreed to stay certain deadlines with

respect to § 557 as well as continuing the § 557 Final Determination Hearing to a later date.

Last, UMB addresses the brief argument made by the Disclaiming Farmers that the

Settlement Agreement is an impermissible *sub rosa* chapter 11 plan. UMB argues that the

Settlement Agreement in this case is not an attempt to get around the requirements of chapter 11,

but rather it is an attempt to resolve claims and interests in the assets of the Business Debtors that

are before this Court by way of § 557. UMB asserts that the Settlement Agreement does not dispose

of all claims against the Business Debtors nor does it dictate any terms of any future plan of

reorganization; it does not require any secured or unsecured claimant to vote in any particular way;

and it does not provide for the release of claims by all parties against the Business Debtors, any of its creditors, or its officers or directors.

In its sur-reply, Travelers asserts that the objecting parties, namely the Disclaiming Farmers and the Farm Group, are attempting to prejudice certain rights, claims, and defenses held by Travelers and, that if the proposals of the Disclaiming Farmers and the Farm Group are included in an order approving the Settlement Application, such inclusions would grant a non-consensual third-party release. The Travelers Sur-Reply also addressed the two bonds issued by Travelers, namely that Travelers argues that the Consenting and Disclaiming Farmers' elections create a new defense to these bonds and that any release or compromise of the Consenting and Disclaiming Farmers' claims to the grain proceeds will prejudice Travelers's equitable subrogation rights. As Travelers is not a party to the Settlement Agreement or Settlement Application, and has no election rights regarding the Settlement Agreement, the scope and value of their equitable subrogation rights are not before this Court and should not be altered by the Settlement Agreement or any order approving the Settlement Application.

Travelers also argues that the objecting parties' request that this Court determine the effect and legal implications of the Farmer Election Forms in other forums is beyond this Court's authority. Such a determination, Travelers argues, would come in the form of a non-consensual third-party release or permanent injunction, relief that the Fifth Circuit has made clear bankruptcy courts lack the authority to grant. [17] Travelers goes on to point to specific language that has been requested by the Disclaiming Farmers and the Farm Group, arguing that the operative language "third parties" or "parties", as those phrases are generally used, demonstrates that the objecting

---

[17] In support of this argument, Travelers cites to *Bank of N.Y. Trust Co. v. Official Unsecured Creditors Comm. (In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) and *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995).

parties are seeking to obtain a release of rights, claims, and defenses of third parties such as Travelers. By using these general terms as opposed to the defined terms "Parties"[18] and "Disclaiming Farmers", the objecting parties are attempting to bind Travelers to the terms of the Settlement Agreement and its releases without Travelers ever having consented to the Settlement Agreement. Based upon Fifth Circuit precedent, Travelers concludes, the Settlement Agreement and any order approving the Settlement Application can only bind the actual parties to the Settlement Agreement: the Parties and the Disclaiming Farmers.

The Disclaiming Farmers Sur-Reply begins by addressing UMB's assertion that the Disclaiming Farmers' concerns regarding the scope of UMB's Proposed Settlement Order and the Settlement Agreement is a method to get around this Court and its jurisdiction to make a claim to such disputed grain assets in another forum. The Disclaiming Farmers do not dispute that this Court has jurisdiction over the disputed grain assets. To the contrary, the Disclaiming Farmers argue this Court has jurisdiction to determine the legal effects of disclaiming such interests that are beyond the scope of § 557, its procedures, or settlements that affect independent claims against third parties. The Disclaiming parties maintain that any recovery they seek in the District Court Action will not be sought from the actual disputed grain assets; rather, recovery sought in the District Court Action will come from UMB's fungible assets. The Disclaiming Farmers go on to argue that, even though the Disclaiming Farmers are not "Parties" to the Settlement Agreement (but nonetheless receive benefits from it), any burdens similarly incurred by the Disclaiming Farmers should not include or allow the use of the comprehensive releases and the Farmer Election Forms to be used against them in the District Court Action.

---

[18] "Parties" is defined in the Settlement Agreement as the Business Debtors, StoneX, Macquarie, the Production Lenders, and the Consenting Farmers. *See Settlement Agreement,* Ex. B, § 2.26 (Dkt. #2718).

Next, the Disclaiming Farmers aver that UMB's arguments before this Court, which includes an attachment of its motion to dismiss in the District Court Action as an exhibit to the UMB Reply Brief, further increase their concerns of the effect of the Settlement Agreement and UMB's Proposed Settlement Order in the District Court Action. To alleviate these concerns, the Disclaiming Farmers again state that the insertion of protective language[19] eliminates any improper attempt by UMB to use the Settlement Agreement and/or UMB's Proposed Settlement Order to limit claims or causes of action in the District Court Action. Finally, the Disclaiming Farmers address the estoppel argument made by UMB in the UMB Reply Brief: upon electing to be a Disclaiming Farmer, such farmers may not change their Farmer Elections unless it is to move into the Consenting Farmer group. The Disclaiming Farmers assert that this argument is misplaced because the Settlement Agreement contemplates the Farmer Elections being changed at any time before the "Effective Date."[20] Additionally, the Disclaiming Farmers argue that the Farmer Election Forms do not stand alone as independent waivers but must be interpreted within the context of the entire Settlement Agreement. When considering the "Effective Date" and the reliance of the Farmer Election Forms upon the Settlement Agreement, the Disclaiming Farmers state that, until such Effective Date occurs, the Settlement Agreement is inchoate and gives

---

[19] The Disclaiming Farmers attached to their sur-reply "Exhibit A", which includes the following proposed protective language: "(i) approval of the Settlement Agreement is solely for the purposes of resolving the 557 proceedings in this Court only; (ii) the Settlement Agreement and Farmer Elections do not create new defenses for UMB or any other WHR Group member against the Disclaiming Farmers; and (iii) the execution of a Farmer Election pertains only to the Disputed Grain Asset Pool and it shall not and cannot be construed to create any new or additional claims, defenses, or rights of any kind for any parties in any other proceedings, including, but not limited to, the District Court Action." *Disclaiming Farmers Sur-Reply* (Dkt. #2775).

[20] "Effective Date" is defined in the Settlement Agreement as "the later of (a) the date the Settlement Order becomes final and non-appealable, or (b) the date all the conditions precedent set forth in Section 14 of this Agreement have either been satisfied and/or waived in writing by the members of the WHR Group." *Settlement Agreement*, Ex. B, § 2.14 (Dkt. #2718).

optionality to the WHR Group of whether to continue forward with the settlement or not, depending upon what elections have been submitted by the "Election Deadline".

*Hearing on the Settlement Application*

As noted above, the Court held a hearing on April 25, 2022 at which the parties presented evidence and arguments for and against approval of the Settlement Application. In support of the Settlement Application, the Movants called two witnesses: Dennis Gerrard ("Gerrard"), the Chief Restructuring Officer ("CRO") of the Business Debtors and, and Heather Williams ("Williams"), a litigation and bankruptcy consultant of CR3 Partners. Gerrard's testimony was limited to discussing the debtor signatories' analyses and opinion of the Settlement Agreement–those being the three Business Debtors–and the costs that would be incurred, monetary and otherwise, should the Court not approve the Settlement Application. Gerrard explained that, if the settlement falls through, the continued wind up of the Business Debtors' operations would be chaotic because ownership of and the rights to the grain proceeds is unclear. Gerrard continued by stating that this lack of clarity would make it increasingly difficult for the Business Debtors to know how to disburse money, to whom such money should be disbursed, and in what portions it should be disbursed.

Gerrard also testified as to the estimated cost per day of attorneys' fees and expenses that would be incurred if litigation proceeds in the § 557 procedures: by multiplying the average hourly rate of all counsel and professionals in the case by the number of all counsel and professionals, the cost of litigation would be about $8,000.00 per hour. Based on the number of counsel and professionals involved, Gerrard testified that litigating to a result in the § 557 Final Determination Hearing would cost about $60,000.00 per day before expenses. Gerrard also stated that in addition

to the above, based on the roughly 120 claims objections filed in the case, it would cost an additional 240 hours to review those at a price tag of approximately $2.4 million.

Gerrard received questions about the Settlement Application and the Business Debtors' interest in its approval. He testified that not only do the Business Debtors support the Settlement Application, but also, they are interested in direction from the Court as to who or what entity to pay money to and in which amount and what releases are being given to and received by the Business Debtors. Further, Gerrard testified that, as CRO, he believes that the settlement is fair, equitable, and in the best interests of the Business Debtors and its creditors. On cross examination, Gerrard testified that, as of the execution of the Settlement Agreement, the working capital numbers have improved slightly, and that he has no objection to the Disclaiming Farmers reserving all rights, claims, and defenses in settling the case.

Williams was called to testify about her analysis of the Business Debtors' 90-day prepetition transfers, or preferential transfers, under § 549 as well as the Business Debtors' prepetition farmer payments that were cleared postpetition for famers who submitted a Farmer Election Form. The purpose of Williams's testimony was to demonstrate how the Business Debtors calculated the proposed release of approximately $27 million in claims. On cross examination, Williams admitted that she did not conduct a similar analysis of payments made to either UMB, StoneX, or Macquarie. Williams testified that she is aware that there were checks paid to UMB, StoneX, and Macquarie within 90 days prior to the filing of the petition, but, with respect to postpetition transfers, she is not aware of any.

The Disclaiming Farmers made two offers of proof, which the Court accepted, and called one witness: Derek Henderson ("Henderson"), attorney for the Farm Group. First, with respect to the offers of proof, counsel for the Disclaiming Farmers, Michael O'Neil ("O'Neil") read into the

record an excerpt from the Disclaiming Farmers objection: "Counsel for the Disclaiming Farmers

in the District Court Action sought to attend the mediation but were informed by the mediator that

the farmers' claims in that action were not within the scope of the negotiation and that such counsel

need not participate. Counsel for the District Court Action, relying on the representations of the

mediator as to the scope of the negotiations, left the mediation." *Objection* (Dkt. #2760). O'Neil

continued by stating that Christopher Winter, District Court Action counsel, would testify as to

this fact. O'Neil's second offer of proof concerned an alleged misstatement by UMB regarding the

District Court Action attorneys being "kept in the loop" by UMB. O'Neil stated that Christopher

Winter would testify that such an assertion by UMB of keeping the District Court Action counsel

informed throughout the mediation "may not be true".

Henderson's testimony shed more light on the events that took place on or about April 6,

2022, and April 12, 2022, which were addressed both by the Movants and the Disclaiming Farmers

in their pleadings. Henderson received questions about the "town hall" meeting that took place

with the farmers on April 6, 2022. That "town hall" served as the meeting during which Henderson

and other farmer counsel discussed the proposed settlement and explained its terms to the farmers

in attendance. Based on his understanding of the Farmer Election Forms, Henderson testified that

each farmer election is a different "bucket", in which a farmer could choose from depending on

his/her/its needs. With respect to the specific election of the "Disclaiming Farmer", Henderson

explained that he understood that election to be the "walk away" one, in which the Disclaiming

Farmers walk away from the § 557 procedures and, in return, receive a release from the Business

Debtors of Chapter 5 and breach of contract claims.

On cross examination, Henderson responded to questions about the April 6, 2022 "town

hall" meeting, his involvement in the review of the Settlement Agreement and notification of

meeting farmer thresholds, and his knowledge of certain terms contained in the Settlement Agreement. Henderson testified that, on April 6, 2022, both counsel for the farmers and counsel for the District Court Action were in attendance and that, prior to the submission of the Farmer Election Forms, counsel for the District Court Action had an opportunity to speak with the farmers. Henderson testified that he reviewed all terms of the Settlement Agreement and provided copies of the settlement to counsel for the District Court Action via a forwarded email; however, Henderson admitted that while he was not sure whether he forwarded the Settlement Agreement to everyone, he believed that he sent it to Christopher Winter and Don Barrett. When asked whether he was aware of Sections 11.6 ("District Court Action"), 11.8 ("No Release of Disclaiming Farmers by WHR Group"), and 11.9 ("No Release of Non-Consenting Farmers") of the Settlement Agreement, Henderson answered in the affirmative. Finally, Henderson testified that, once he received indication through submission of the Farmer Election Forms that the initial thresholds had been met on April 8, 2022, he sent an email that the threshold had been satisfied along with the numbers of farmers satisfying the threshold. Based upon this information, Henderson stated, it was represented to the Court that the Movants would be filing the Settlement Application, the request to continue the § 557 Final Determination Hearing, and the request to set the Initial Claims Hearing.

## III. DISCUSSION

Bankruptcy Rule 9019 authorizes the "trustee," which includes a debtor in possession in a chapter 11 case, to seek an order approving a compromise or a settlement. Fed. R. Bankr. P. 9019(a); 10 Collier on Bankruptcy ¶ 9019.01 (16th ed. 2022). Rule 9019 provides in relevant part that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor and indenture

trustees as provided in Rule 2002 and to any other entity as the court may direct." Fed. R. Bankr. P. 9019. An application to settle or compromise is brought before the court when the parties have reached an agreement upon which the settlement or compromise may be based. *In re Frye*, 216 B.R. 166, 170 (Bankr. E.D. Va. 1997).

Compromises in bankruptcy are a "normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997) (citing *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)). Courts are empowered to approve a compromise settlement under 9019(a) if the trustee or debtor in possession meets its burden to show the settlement is "fair and equitable and in the best interests of the estate". *In re Jackson Brewing Co.*, 624 F.2d at 602. Before the Court can address its approval of the settlement at issue in this bankruptcy case, the Court must address certain contractual formation and enforcement issues presented by the parties.

### A. The Disclaiming Farmers are Parties to an Enforceable Settlement Agreement under Mississippi law and cannot Withdraw Acceptance to the Settlement Agreement

Bankruptcy courts have the inherent power not only to recognize and encourage settlements, but also to enforce such agreements when reached by the parties. *In re Hyperion Foundation, Inc.*, 2009 WL 3633878 at *3 (Bankr. S.D. Miss. 2009) (citing *Bell v. Schexnayder*, 36 F.3d 447, 449 (5th Cir. 1994). To enforce a compromise, a federal court must determine whether such an agreement was reached under applicable state law. *Id*.

Mississippi recognizes settlement agreements as contracts, which are enforceable according to their terms absent any fraud, mistake, or overreaching. *McManus v. Howard*, 569

So.2d 1213, 1215 (Miss. 1990). Although enforceable contracts generally consist of an offer, acceptance, and consideration, Mississippi law requires six elements to be present for a contract to be valid: "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Estate of Davis v. O'Neill*, 42 So.3d 520, 527 (Miss. 2010) (citing *Rotenberry v. Hooker*, 864 So.2d 266, 270 (Miss. 2003)). Consideration has been defined under Mississippi law to be "(a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification, or destruction of a legal relation, or (d) a return promise, bargained for and given in exchange for the promise." *In re Howard*, 533 B.R. 532, 557 (Bankr. S.D. Miss. 2015) (citing *Estate of Davis v. O'Neill*, 42 So.3d at 527).

Parties to a settlement must have a meeting of the minds as to the material terms of the agreement, and no such "meeting of the minds" can occur until the terms of the offer are accepted. *In re Hyperion Foundation, Inc.*, 2009 WL 3633878 at *3; *see In re Estate of Davis*, 832 So.2d 534, 537 (Miss. Court App. 2001) ("This Court has noted there cannot be a meeting of the minds until the offeree accepts the provisions and terms set out by the offer."). The acceptance of a settlement agreement can, however, occur in a variety of different ways and "is based upon the objective manifestations of the parties and not upon their subjective, but unmanifested intent." *Id*. While a signature is the most blatant example of acceptance of an offer, acceptance may also be inferred from conduct of the parties. *Ammons v. Cordova Floors, Inc.*, 904 So.2d 185, 190 (Miss. Court App. 2005); *see also Edwards v. Wurster Oil Co., Inc.*, 688 So.2d 772, 775 (Miss. 1997) ("[A]cceptance of a contract as binding upon a party may be shown by his actions, and any definite and unequivocal course of conduct disclosing that the party has acceded or assented to it, is as binding on him as had he endorsed his assent in formal writing[.]" (internal citations omitted)).

Based on the parties' arguments before this Court, the initial issues to be resolved by the Court are (1) whether a settlement has been reached, i.e., meeting of the minds between the Disclaiming Farmers and other parties; (2) whether the Disclaiming Farmers are even a party to the Settlement Agreement; and (3) whether the Disclaiming Farmers may withdraw from the settlement by way of withdrawing the waivers contained in the Farmer Election Forms. As stated above, these questions concern the enforceability of the Settlement Agreement under relevant state law.

While the Disclaiming Farmers argue that there has not been a meeting of the minds with respect to a Settlement Agreement that creates new defenses for parties like UMB, this Court finds that a meeting of the minds did occur with respect to the settlement on or before April 8, 2022. The Court need not look much further than the Farm Group's positions taken at the hearing and its Response. As stated in the Response, the real dispute over the legal effect of the Settlement Agreement or any settlement order in other forums did not occur until *after* the Disclaiming Farmers discussed the settlement terms with counsel and executed their Farmer Election Forms. Two events happened after the farmers executed their Farmer Election Forms. First, counsel for farmers in the District Court Action raised an issue with the language in the Farmer Election Forms as it relates to the Disclaiming Farmers and, second, for whatever reason and possibly in response, UMB added additional language in the Settlement Application. The Court, however, is not approving the terms or language as framed in the Settlement Application. The Court is approving the settlement based on the terms and understanding of the parties via the Farmer Election Forms and the Settlement Agreement, which does not contain the disputed language.

It is clear to this Court that the Disclaiming Farmers *did* accept the terms of the Settlement Agreement as it was presented to them through their execution of the Farmer Election Forms now

codified in the language of the Settlement Agreement. As stated previously, a meeting of the minds cannot occur without acceptance of an offer by an offeree and, in Mississippi, acceptance may be inferred by the conduct of the parties. The mere fact that Disclaiming Farmers are not signatories to the Settlement Agreement itself does not defeat their status as parties to the Settlement Agreement and the fact that the parties reached a meeting of the minds at the time the farmers executed the Farmer Election Forms.

By executing the Farmer Election Forms, the Disclaiming Farmers accepted that they would be pursuing claims against UMB in proceedings outside of this bankruptcy case and, therefore, would withdraw their assertions of interest in the § 557 Procedures. In return for withdrawing from the § 557 Procedures, the Disclaiming Farmers would receive a release from all claims by the bankruptcy estate (Chapter 5 claims, such as preference actions, and to include breach of contracts claims) as well as attorneys' fees paid to date in connection with the § 557 proceedings. The execution of the Farmer Election Forms followed the "town hall" style meeting held on April 6, 2022, at which counsel for the Disclaiming Farmers and the Farm Group communicated settlement details to all farmers. These Farmer Election Forms were then sent to the drafting parties of the Settlement Agreement, and, on April 8, 2022, the Court held a status conference at which the general terms and scope of the settlement were presented to the Court. Therefore, with full knowledge of the language of the Farmer Election Forms and the Settlement Agreement and, in exchange for withdrawing assertions of interest in the § 557 Procedures, the Disclaiming Farmers executed the Farmer Election Forms to receive the benefit of their bargain.

While the execution of the Farmer Election Forms demonstrates a meeting of the minds and acceptance by the Disclaiming Farmers of the Settlement Agreement, the announcement of the terms of the Settlement Agreement following the full execution of the Farmer Election Forms

further supports acceptance by conduct. No party raised any objection at the status conference on

April 8, 2022, with respect to the rejection of the terms of the settlement as they were offered. Just

the opposite, it was not until April 11, 2022, that any Disclaiming Farmer indicated that there was

no "meeting of the minds" as to the terms of the Settlement Agreement. The series of events

preceding the Disclaiming Farmers' attempted revocation of the Settlement Agreement, and the

Court's reliance upon those events, makes one thing clear: there was an offer on the table for the

Disclaiming Farmers and, after having time to review the offer with counsel, the Disclaiming

Farmers accepted and informed the Court of that acceptance.

But even if the Court ignores the actions taken by the parties in announcing the settlement

in open court, the final nail in the coffin of the Disclaiming Farmers is ultimately the execution

and submission of the Farmer Election Forms. This conduct gave other parties to the agreement

notice of the Disclaiming Farmers' assent to the terms of the Settlement Agreement. To say that

the execution of the Farmer Election Forms, which have a direct impact on and connection to the

terms of the overall Settlement Agreement, is *not* a form of acceptance of the Settlement

Agreement makes little sense to this Court.

It is equally confusing to the Court that parties on both sides of the coin, namely UMB and

the Disclaiming Farmers, continue to maintain that the Disclaiming Farmers are *not* parties to the

Settlement Agreement. Regardless of the definition of "Parties" as contained in the Settlement

Agreement, the Disclaiming Farmers, along with the other parties to the settlement agreement (for

example, the Consenting Farmers), engaged in a bargained-for exchange with respect to the terms

associated with each class or category of farmer election. While it is true that each farmer election

class or category contains different terms of participation, all farmer elections (excluding the Non-

Participating Farmers) have, in different ways, incurred a benefit and a burden by way of their

elections. Under Mississippi law this is consideration, i.e., a return promise, bargained for and given in exchange for the promise.

For the Consenting Farmers, the benefit is sharing in settlement proceeds, being granted a release of all claims by the bankruptcy estate, and receiving attorneys' fees, while their burden is withdrawing from all future litigation (in this Court and elsewhere). For the Non-Consenting Farmers, their benefit is moving forward in this Court to receive a potentially larger share of the Disputed Grain Asset Pool, while their burden is not receiving releases from the bankruptcy estate, assuming the risk of receiving no grain proceeds at all, and limiting their legal claims brought at the § 557 Final Determination Hearing to assertions of constructive trust and reclamation.[21] Thus, it logically follows that the Disclaiming Farmers operate the same way: their benefit is receiving releases of all claims by the bankruptcy estate and receiving attorneys' fees, while their burden is receiving no distributions from the grain proceeds and being subject to litigation in the District Court Action. The Court's decision in finding that the Disclaiming Farmers are parties to the Settlement Agreement is further supported by the Settlement Agreement itself, which makes several references to the Disclaiming Farmers with respect to bankruptcy estate releases (Section 5), the non-release of Disclaiming Farmers by the WHR Group (Section 11.8), the conditions precedent to the effectiveness of the Settlement Agreement (Section 14), and the paragraph specifically excluding third party beneficiaries (Section 22).[22]

---

[21] While the Court has previously stated that it is not approving the terms or language as framed in the Settlement Application, this particular language is also included in UMB's Proposed Settlement Order and the Disclaiming Farmers' Proposed Settlement Order (Dkt. #2768). This is the only term contained outside of the Settlement Agreement that the Court adopts and approves as a part of the Settlement Agreement. Based on the Disclaiming Farmers' Proposed Settlement Order, it is clear that the parties have come to an agreement on this issue.

[22] Section 22 contains the following language: "For the avoidance of doubt, the Disclaiming Farmers shall receive a release from the Debtors, but shall (a) not receive **any other consideration** provided to the Consenting Farmers under this Agreement[.]" *Settlement*

As to whether the Disclaiming Farmers may withdraw their Farmer Election Form, and the Court presumes, withdraw from the settlement completely, the Court is unsure why the Disclaiming Farmers would want such a result.[23] Namely, why would the Disclaiming Farmers want to withdraw their elections simply because the parties are disputing UMB's subsequent characterization of the settlement in the Settlement Application that was only added later and likely in response to counsel for farmers in the District Court Action? The Farm Group and Disclaiming Farmers did not seem to take issue with the terms of the Farmer Election Forms at the time of execution and the language as proposed in the actual Settlement Agreement.[24] The Disclaiming Farmers are receiving exactly what they want: to proceed against UMB in the District Court Action. In addition, the Court believes based on its findings in this Memorandum Opinion and Order, the Disclaiming Farmers and the Farm Group's concerns necessitating the attempted withdrawals have been sufficiently addressed. Nothing presented to this Court leads it to conclude

---

*Agreement*, Ex. B (Dkt. #2718) (emphasis added). The phrase "any other consideration", as it is used in this sentence, demonstrates that the drafting parties acknowledge that the Disclaiming Farmers *are* receiving consideration as a part of the Settlement Agreement, but that they are not to receive any other consideration that is being provided to the Consenting Farmers unless the Disclaiming Farmers elect to become Consenting Farmers. The Disclaiming Farmers are parties to the Settlement Agreement because they are receiving consideration as a part of the Settlement Agreement.

[23] The Court also notes that the terms of the settlement provide that the farmers may not change their election unless they chose another classification and now wish to become part of the Consenting Farmer class. *See Settlement Agreement*, Ex. B, § 14.1 ("Once submitted, a Farmer Election cannot be retracted or modified unless a Disclaiming Farmer is electing to be a Consenting Farmer.") (Dkt. #2718).

[24] In fact, upon this Court's review of the arguments and issues presented, the Farm Group and Disclaiming Farmers do not seem take issue with UMB's added language to the Settlement Agreement or even the language in the Farmer Election Forms after the Farm Group and Disclaiming Farmers reviewed them. The Farm Group and Disclaiming Farmers take issue with the fact that, after their review of the Settlement Application, UMB seemingly added language to page 9 the Settlement Application reading, "Disclaiming Farmers are not getting releases from Non-Debtor parties and are not granting any releases of claims and can pursue third parties outside the bankruptcy court *subject to all valid defenses of the target parties*." *See Settlement Application* (Dkt. #2718) (emphasis added).

that there was not a binding, effective agreement under Mississippi law. Consequently, the Court will enforce the Settlement Agreement based on that finding.

Having established that there is an agreement between the parties, that the Disclaiming Farmers are parties to the Settlement Agreement, and that the Disclaiming Farmers may not withdraw from the Settlement Agreement, the Court will briefly address the scope of the settlement. The § 557 Procedures only concern the claims of parties to ownership interest in and priority to the prepetition grain and grain proceeds under § 557 of the Bankruptcy Code.[25] After reviewing all necessary arguments and documents presented to this Court, including the Settlement Agreement and the Farmer Election Form, no evidence indicates that the parties contemplated a resolution beyond that scope. Specifically, as to the Disclaiming Farmers, they are simply withdrawing secured claims to the money in the Disputed Grain Asset Pool (valued at approximately $59 million), which effectively represents the grain proceeds.[26] The Disclaiming Farmers merely retain a claim against the Business Debtors' bankruptcy estates and any assets apart from the Disputed Grain Asset Pool.

As far as the Court is concerned, under applicable bankruptcy law, this is the legal effect of the settlement as it relates to the Disclaiming Farmers and this bankruptcy case. Many of the arguments presented to this Court concern the potential legal effect of the Settlement Agreement or any settlement order issued by this Court in other forums (specifically, the District Court Action and the Travelers's bond/administrative proceeding before the Mississippi Department of

---

[25] The Court points the parties to the Court's previous § 557 Procedures Order that excludes certain claims from being part of the § 557 Procedures, which include "claims, causes of action, cross claims, or counterclaims sounding in tort, contract, or statute that are not directly related to the determination of interests in the Pre-Petition Grain and the Proceeds pursuant to 11 U.S.C. § 557." *§ 557 Procedure Order* (Dkt. #1070).

[26] The Court notes that by approving this settlement, it never determined whether the Disclaiming Farmers had an allowed secured claim.

Agriculture). Based on the settlement terms as presented by the parties, including the language contained in the Farmer Election Form and the Settlement Agreement, no release is being given by the Disclaiming Farmers of any claims they can make in the District Court Action, and no release is being given by UMB giving up any defense it may have to any claims asserted in the District Court Action. Any potential legal effect of this settlement on pending or future litigation in another forum, including any administrative proceedings, is not for this Court to determine as such litigation and administrative proceedings fall outside of this Court's limited jurisdiction.

The jurisdiction of the bankruptcy courts, like other federal courts, is limited by statute. *Zale Corp. v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 751 (5th Cir. 1995) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)). 28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). As this power is granted to the district courts, the district courts may, then, refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11" to the bankruptcy judges for the district. 28 U.S.C. § 157(a). Thus, in order to determine whether a bankruptcy court has subject matter jurisdiction over a proceeding, "it is necessary only to determine whether a matter is at least 'related to' the bankruptcy." *In re Zale Corp.*, 62 F.3d at 752. The Fifth Circuit in *Wood v. Wood (In re Wood)*, 825 F.2d 90, (5th Cir. 1987), in adopting the definition laid out by the Third Circuit, has defined "related" as "whether the outcome of that proceeding could conceivable have any effect on the estate being administered in bankruptcy." (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

Once it is determined that a bankruptcy court has, at a minimum, "related to" jurisdiction over a proceeding, it must be determined what "placement" that jurisdiction falls under pursuant

to 28 U.S.C. § 157. Pursuant to 28 U.S.C. § 157(b)(1), bankruptcy judges "may hear and determine all cases under title 11 and all core proceedings arising under title 11 [. . .] and may enter appropriate orders and judgments[.]" 28 U.S.C. § 157(b)(1). Alternatively, pursuant to 28 U.S.C. § 157(c)(1), a bankruptcy judge may hear a proceeding "that is not a core proceeding but that is otherwise related to a case under title 11." 28 U.S.C. § 157(c)(1). Core proceedings include, but are not limited to, the sixteen different types of matters enumerated in § 157(b)(2). *VSP Labs, Inc. v. Hillair Capital Invs. LP*, 619 B.R. 883, 896 (N.D. Tex. 2020) (citing *Stern v. Marshall*, 564 U.S. 462, 473 (2011)). If the proceeding is non-core, but otherwise "related to" a case under title 11, a bankruptcy judge may only "submit proposed findings of fact and conclusions of law to the district court," and any final order or judgment "shall be entered by the district court judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." *Stern*, 564 U.S. at 473; 28 U.S.C. § 157(c)(1).

The Court need not belabor this issue. While it is true that there is a link between the District Court Action and these § 557 Procedures by way of the Disclaiming Farmers and UMB—creditors of the Business Debtors—the District Court Action is not "related to" the bankruptcy as that term has been defined by the Fifth Circuit in *In re Wood*. The outcome of the District Court Action will not, in any way, affect the administration of the bankruptcy estate in this bankruptcy case because the dispute in that litigation has nothing to do with the assets of the bankruptcy estate, namely, the Disputed Grain Asset Pool and the determination of interests in the Disputed Grain Asset Pool. Farmers who have initiated litigation in the District Court Action are seeking relief from UMB, and such relief received, if any, shall come from UMB. Such relief is not property of the bankruptcy estate, which solely includes "all legal or equitable interests of the debtor in

property as of the commencement of the case," including "[p]roceeds, product, offspring, rents, or profits from property of the estate," and "[a]ny interest in property that the estate acquires after the commencement of the case." *See* § 541(a)(1)-(a)(7). For this Court to issue an order determining the effect of the Settlement Agreement or Farmer Election Forms on litigation that does not relate to the § 557 Procedures and this bankruptcy case is jurisdictionally improper.

**B. The Proposed Settlement is Fair and Equitable and in the Best Interests of the Bankruptcy Estate and Satisfies the 5th Circuit *Jackson Brewing* and *Foster Mortgage* factors.**

The Court will now turn to the approval of the settlement under Bankruptcy Rule of Procedure 9019. When analyzing whether to approve a settlement or compromise under Rule 9019, Courts in the Fifth Circuit follow the three-part test set out by the court in *Jackson Brewing*: "(1) the probability of success in the litigation, with due consideration for the uncertainty of fact and law, (2) the complexity and likely duration of the litigation and any attended expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise." *In Re Jackson Brewing Co.*, 624 F.2d at 609. Although the third factor operates as a "catch-all", the Fifth Circuit has specified that this catch-all contains two additional considerations. First, a court should consider the best interests of the creditors, "with proper deference to their reasonable views". Second, the court should consider "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion". *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995).

Evaluating a Rule 9019 settlement does not require a bankruptcy court to "conduct a mini-trial to determine the probable outcome of any claims waived in the settlement," but rather the court must "apprise [itself] to the relevant facts and law so that [it] can make an informed and intelligent decision." *In re Age Refining, Inc.*, 801 F.3d 530, 541 (citing *In re Cajun Elec. Power*

*Coop.*, 119 F.3d at 356).[27] The trustee, or debtor in possession, bears the burden of establishing that the balance of the *Jackson Brewing* and *Foster Mortgage* factors supports a finding that the compromise is fair, equitable, and in the best interests of the estate. *In re Heritage Real Estate Investment, Inc.*, 2020 WL 8551776 at *8 (Bankr. S.D. Miss. 2020) (citing *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008)). This burden is not a high one, and the debtor in possession "need only show that [its] decision falls within the range of reasonable litigation alternatives." *Id.* (internal citations omitted).

*Probability of Success in Litigation*

Every party to the Settlement Agreement over the course of this bankruptcy case and the § 557 Procedures has presented vigorous argument with respect to the ownership and/or priority of interests in the grain and grain proceeds at issue. Nevertheless, the Court and all parties understand that the resolution of these issues and claims are wholly dependent on the relationship between § 557 and state law, namely with respect to claims such as bailment, constructive trusts, reclamation, equitable subordination, negotiable and non-negotiable documents of title, and the effect of Articles 7 and 9 of the Mississippi Uniform Commercial Code. Admittedly, the resolution of these claims if litigation presses on is uncertain. Based on this uncertainty, the parties engaged in a risk/benefit analysis: how beneficial is it for the parties to the Settlement Agreement to pursue litigation of these issues? The Court does not, and will not, conduct a mini-trial to determine the

---

[27] *See In re Am. Reserve Corp.*, 841 F.2d 159, 163 (7th Cir. 1987) ("Since a bankruptcy judge will normally be familiar with the governing law and the factual issues surrounding a settlement, setting out his reasons for approving the settlement should not be unduly burdensome. A bankruptcy judge need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision, and set out the reasons for his decision. The judge can make either written or oral findings; form is not important, so long as the findings show the reviewing court that the judge properly exercised his discretion.").

outcome of these issues, nor will the Court conduct a mini, hypothetical trial on the outcome of

those claims which are being waived by certain parties as a result of the Settlement Agreement.

But when considering the facts before it and understanding that the law governing the imposition

of § 557 is incredibly scarce, the Court finds that this factor weighs in favor of the Settlement

Agreement.

*Complexity, Expense, and Likely Duration of Litigation*

      This bankruptcy case has only been in existence for seven months, but the complexity and

monetary expense so far is ever present in the parties' minds. This Court has repeatedly

acknowledged the difficulties facing all parties (including the Court) by the imposition of § 557

on October 25, 2021, and § 557's impact on all procedures governing the determination of interests

in and disposition of grain and grain proceeds held by the Business Debtors. Additionally, the

rearing of state law issues as connected to the "Common Legal Issues" contemplated by the § 557

Procedures Order brings about more complexity as the disposition of grain and grain proceeds

depend on how, exactly, these state law issues are applied during the Final Determination Hearing.

In fact, prior to the mediation beginning on March 17, 2022, all parties in this bankruptcy case

conducted extensive discovery during February of 2022, resulting in hundreds (if not thousands)

of potential exhibits and a list of well over a hundred potential witnesses that would be called to

testify.

      As of April 25, 2022, all parties agree that the complexity of moving forward in litigation,

as well as expense and duration, fully supports approval of the Settlement Application. As

mentioned previously, Gerrard, in testifying for the Movants in support of the Settlement

Application, explained that if the settlement falls through, winding up the Business Debtors'

operation would simply be "chaotic" as the ownership of the grain proceeds and assets is unclear.

Specifically, Gerrard explained that because ownership of the grain proceeds and assets is unclear, it would be unclear to Express Grain as to how money should be disbursed, to whom it should be disbursed, and in what portions. Thus, the § 557 Procedures would have to continue for all farmers—a result that would cause the parties and the Court to undergo a Final Determination Hearing lasting for weeks. Additionally, Gerrard explained that the estimated costs in attorneys' fees and expenses per day for litigating the § 557 Procedures and "Common Legal Issues" would likely be "roughly $8,000 per hour", and that, even if a trial were limited only to claims objections, it would cost a minimum of $2.4 million dollars in attorneys' fees and expenses to conclude them all. The Court finds that this factor weighs in favor of the Settlement Agreement.

*Other Relevant Factors Bearing on Wisdom of Settlement*

In analyzing this factor, the Court finds that settlement is in the best interests of the creditors with deference to their reasonable views and that the settlement is a product of arms-length bargaining rather than of fraud or collusion. A large majority of the Business Debtors' creditors fully support the Settlement Application and, in fact, those entities objecting to the Settlement Application have done so only with respect to the particular language contained in the Settlement Agreement and UMB's Proposed Settlement Order. Even if this Court were to take a tally as to the creditors opposing the settlement and found that a majority is in opposition, the desires of the creditors are not binding. *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d at 358 (citing *In re Foster*, 68 F.3d at 917). The test is not the "desires of the creditors" test; it is the "best interests of the creditors" test. *Id*. In reviewing the terms of the Settlement Agreement, considering the alternative to settlement, and considering the overwhelming approval by a majority of Express Grain's creditors of the settlement, resolving these issues without moving forward to extensive, risky, and expensive litigation in the realm of § 557 serves the best interests of all creditors.

Further, the Court has not been presented any evidence and there has been no assertion that the settlement is a result of fraud or collusion. The length of time between the start of settlement negotiations and the announcement of the settlement to the Court indicates that all parties went through a bargaining process at arms-length. In fact, the mere fact that all parties to the Settlement Agreement have been able to work together to produce any settlement at all lends credence to this factor, as this Court is certain that, had the negotiation process revealed or resulted in any fraud or collusion with respect to the settlement, several parties would have raised this issue at the Settlement Application hearing on April 25, 2022. This factor supports approval of the Settlement Application.

The Court will very briefly address the argument that the Settlement Agreement is a *sub rosa* chapter 11 plan. While Rule 9019 permits a trustee or debtor-in-possession to settle lawsuits pursuant to § 363(b), that section does not authorize the debtor-in-possession to enter a settlement if the result amounts to a *sub rosa* plan of reorganization. *In re Cajun Elec. Power Coop.*, 119 F.3d at 354. As the Fifth Circuit has stated, "The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of a plan *sub rosa* in connection with a sale of assets." *In re Braniff Airways, Inc.*, 700 F.2d at 940. Thus, when an objector to a transaction under § 363(b) "claims that it is being denied certain protections because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied." *In re Continental Air Lines, Inc.*, 80 F.2d 1223, 1228 (5th Cir. 1986) (citing *In re Braniff Airways, Inc.*, 700 F.2d at 940).

Here, although the Disclaiming Farmers have made the contention that the Settlement Agreement amounts to a *sub rosa* chapter 11 plan, the Disclaiming Farmers have not specified to

this Court exactly what protections under chapter 11 are being denied. In fact, the Disclaiming

Farmers presented neither evidence nor made any arguments at the hearing on April 25, 2022

identifying the chapter 11 protection that is being denied because of the Settlement Agreement

approval. Therefore, the Court cannot determine whether the Settlement Agreement is a *sub rosa*

chapter 11 plan based on the lack of evidence.

### IV. CONCLUSION

Based on the above, the Court finds that (1) the Settlement Agreement, by way of the

Farmer Election Forms, is enforceable under Mississippi law against the Disclaiming Farmers; (2)

the Disclaiming Farmers are parties to the Settlement Agreement; and (3) the Settlement

Application is fair, equitable, and in the best interests of the creditors and the estate. Therefore, it

is hereby **ORDERED** that:

1. The *Joint Application to Compromise Controversy* (Dkt. #2718) is **APPROVED;**

2. The terms set forth in Settlement Agreement, attached to the Settlement Application as

Exhibit B, and as stated in this Memorandum Opinion and Order, are hereby **APPROVED** under

Federal Rule of Bankruptcy Procedure 9019, *et. al*.;

3. On the Distribution Date (as defined in the Settlement Agreement): (i) any claim

objection that a Settling Party has against another Settling Party shall be deemed withdrawn; (ii)

any claim objection raised against or by a Disclaiming Farmer, will be deemed moot; and (iii) all

other claim objections, whether individually or the balance of a remaining omnibus claim

objection, shall be initially taken up at the Initial Claims Hearing (with respect to the Non-

Participating Farmers) and will be substantively taken up at the Final Determination hearing;

4. Except as specifically provided in Section 11.7 of the Settlement Agreement, nothing in the Settlement Agreement alters, cancels, extinguishes, impacts, supersedes, or supplants, the relief granted in the Sale Order[28] or the TSA Order;[29]

5. Except as specifically provided in Section 11.7 of the Settlement Agreement, nothing in the Settlement Agreement alters, releases, or waives, any claims, rights, responsibilities, or obligations of the (i) Debtors, (ii) UMB, (iii) each of the forgoing entities' respective affiliates and assigns, and (iv) each of the forgoing entities', affiliates' and assigns' agents, attorneys, directors, employees, law firms, managers, members, officers, shareholders, and staff working on their behalf including, without limitation, the CRO and CR3 Partners, LLC, that such parties may have under the Purchase Agreement, Sale Order, TSA, or TSA Order including, without limitation, any and all rights or claims with respect to insurance coverage related the Purchased Assets;

6. Once a bankruptcy estate cause of action or claim has been released by the Debtors, it cannot be revived and pursued by any other party derivatively or otherwise;

7. A Settling Party may maintain a secured claim against the bankruptcy estates to the extent the assets or proceeds securing such claim are not part of the Disputed Grain Asset Pool and that such secured claims can be separately classified for plan purposes to the extent allowed under applicable law;

8. Except as specifically modified herein or by the Settlement Agreement, the previous cash collateral orders issued by the Court shall stay in effect;

---

[28] *See Order Granting Motion to Sell Substantially All of the Assets Owned by Express Grain Terminals, LLC, Free and Clear of All Liens, Claims, and Interests, With Liens Attaching to Proceeds of Sale, Outside the Ordinary Course of Business* (Dkt. #2708)

[29] *See Order Approving Transition Services Agreement and Purchase Asset Surcharge Procedures* (Dkt. #2709)

9. The extension of the initial threshold deadline set forth in Settlement Agreement §14.1.12 was extended and has been subsequently satisfied;

10. Any party appealing from the Bankruptcy Court to the District Court or the Fifth Circuit will immediately seek a stay or abatement of those appeals, and within 14 days of the Distribution Date, withdraw the appeals;

11. The mailing and copying costs of noticing the Settlement Application shall be evenly split between the WHR Group;

12. Notice of the Motion was accurate, appropriate, reasonable and legally sufficient under the circumstances and in accordance with applicable Bankruptcy Code provisions and Bankruptcy Rules;

13. The provisions in this Memorandum Opinion and Order supplement the Settlement Agreement and to the extent there is an inconsistency between the terms and provisions of this Memorandum Opinion and Order and the Settlement Agreement, the terms and provisions of this Memorandum Opinion and Order shall control unless explicitly provided otherwise herein;

14. For purposes of the Final Determination hearing that may proceed with any Non-Consenting Farmers, the represented Non-Consenting Farmers' legal claims will be limited to assertions of Constructive Trust and Reclamation. At such Final Determination hearing, the Non-Consenting Farmers put on their cases in chief limited to their assertions of Reclamation and Constructive Trust first, and the Court will determine whether they have met their burden to establish either a Reclamation Claim or a Constructive Trust prior to the WHR Group being required to present their claims. Further details of any such Final Determination hearing will be set forth in a joint pre-trial order to be submitted at a future date set by the Court;[30]

---

[30] *See* Fn. 21.

15. The Settlement Agreement, as clarified herein, is fair and reasonable, falls within the range of possible litigation outcomes, is in the best interest of the estate because full settlement mitigates various risks associated with litigation in this matter, and that releases contemplated by the Settlement Agreement are consensual;

16. The Settling Parties are each authorized to implement and fully perform the Settlement Agreement and take any and all actions reasonably necessary or appropriate to consummate the Settlement;

17. Once a disclaiming election has been made via the Farmer Election Forms, it cannot be revoked, but only modified to a consenting election per the terms of the Settlement Agreement. The request or attempt to withdraw a previously submitted Farmer Election Form by a Consenting Farmer or Disclaiming Farmer is **DENIED**.

18. Consistent with this Court's prior § 557 Procedure Order, the Farmer Election Form(s), and the Settlement Agreement, the approval of the Settlement Agreement is for the purposes of resolving the § 557 Proceedings in this Court under 11 U.S.C. § 557.

19. Under Federal Rules of Bankruptcy Procedure 4001(a)(3) and 6004(h), the terms of this Order shall be immediately effective and enforceable upon its entry. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Memorandum Opinion and Order and the Settlement Agreement.

##END OF ORDER##